UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

                Plaintiff,

-against-

JOSEPH M. LAURA, ANTHONY R. SICHENZIO, and WALTER GIL DE RUBIO,

                Defendants.

MEMORANDUM & ORDER
18-CV-5075 (NGG) (VMS)

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiff Securities and Exchange Commission (the "SEC") instituted this action against Defendants, alleging primary and derivative violations of Sections 10, 15, and 17 of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. (*See generally* Compl. (Dkt. 1).) The SEC alleges that Defendants made false representations to induce third parties to invest in Pristec America, Inc. ("PAI"),[1] a partial subsidiary of Austrian corporation Pristec AG ("PAG"), and misappropriated invested funds for their own benefit. (*Id.*)

Initially, Defendants Laura and Sichenzio moved to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6)-(7), arguing that: (1) the SEC's failure to join necessary parties mandated dismissal, (2) many of the allegations in the Complaint related to conduct that occurred outside of the governing limitations period, and (3) the Complaint failed to satisfy the heightened pleading requirements for fraud. *See SEC v. Laura*, No. 18-cv-5075 (NGG) (VMS), 2020 WL 1434114, at *1

---

[1] As noted in the Complaint, there are two U.S.-based entities with this name, one incorporated in New Jersey ("PAI-NJ") and the other incorporated in Nevada ("PAI-NV"). (Compl. ¶ 8.) The court uses "PAI" to refer to both entities.

1

(E.D.N.Y. Mar. 24, 2020).[2] The court denied that motion in its entirety. *See id.* Mr. Laura and Mr. Sichenzio then submitted their Answer, in which they asserted 11 affirmative defenses. (*See* Answer (Dkt. 83) at 14-19.) Now before the court is the SEC's motion, under Federal Rule of Civil Procedure 12(f), to strike seven of the 11 defenses, specifically the First Defense (statute of limitations), Second Defense (laches), Third Defense (unclean hands), Fifth Defense (waiver, and accord and satisfaction), Sixth Defense (settlement), Seventh Defense (collateral effect of arbitration), and Eleventh Defense (claims relating to a joint venture ("JV") partner). (*See* SEC's Mem. in Supp. of Mot. to Strike (Dkt. 96-1) ("Mem."); Defs.' Mem. in Opp. to Mot. to Strike (Dkt. 97) ("Opp."); SEC's Reply (Dkt. 99).) For the following reasons, the SEC's motion to strike is GRANTED in its entirety, and Defendants' first, second, third, fifth, sixth, seventh, and eleventh affirmative defenses are STRUCK.

I. BACKGROUND

The court assumes familiarity with the facts of the case, as outlined in its Memorandum & Order denying Defendants' motion to dismiss. *See Laura*, 2020 WL 1434114 at *1-3. To summarize: PAG was established to develop and commercialize certain "cold cracking" technology used in connection with the refining of crude oil. *Id.* In 2011, Defendants' company Innovative Crude Technologies ("ICT") and PAG became equal partners in PAI, an entity established to market PAG's technology in the United States, Canada, Mexico, and Colombia. *Id.* Between 2013 and 2017, Defendants raised around $7 million in investor funds for PAI. *Id.* The SEC alleges that Defendants made fraudulent misrepresentations while soliciting investors in PAI, misappropriated at least $3.7 million of investors' money to cover both their own

---

[2] The third defendant, Mr. Gil de Rubio, has not joined Mr. Laura and Mr. Sichenzio in their motions or answering papers.

personal expenses and debts and the expenses and debts of other, unrelated business ventures, and made efforts to conceal the fraud along the way. *Id.* Defendants insist that PAG, in league with PAI's investors, "provided the SEC with false information in order to saddle Defendants with litigation and to steal their shares in [PAI]" to "convert valuable, proprietary and patented technology, for their own means." (Opp. at 1.) In their telling, the SEC is in on the steal, and either knew or should have known that PAG and the PAI investors, whom the SEC describes as victims and relies on as witnesses, were in fact "thieves who had their own secret agendas." (*Id.* at 20, 2-3.)

## II. LEGAL STANDARD

An affirmative defense is an "assertion of facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim, even if all the allegations in the complaint are true." *Affirmative Defense*, *Black's Law Dictionary* (11th ed. 2019). "In order to prevail on a motion to strike [an affirmative defense], a plaintiff must show that: (1) there is no question of fact which might allow the defense to succeed; (2) there is no question of law which might allow the defense to succeed; and (3) the plaintiff would be prejudiced by inclusion of the defense." *SEC v. McCaskey*, 56 F. Supp. 2d 323, 326 (S.D.N.Y. 1999)[3]; *see also GEOMC Co., Ltd. v. Calmare Theraputics Inc.*, 918 F.3d 92, 95-99 (2d Cir. 2019) (discussing the origin and evolution of the *McCaskey* factors).

In light of the Supreme Court's decisions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Second Circuit has clarified that for the first *McCaskey* factor, the facts pleaded in an affirmative defense must be "plausible," but "applying the plausibility standard to any pleading is a context-specific task." *GEOMC*, 918 F.3d at 98.

---

[3] When quoting cases, and unless otherwise noted, all citations and quotation marks are omitted and all alterations are adopted.

*Twombly* and *Iqbal* had no effect on the second factor, where "[t]here is no dispute that an affirmative defense is improper and should be stricken if it is a legally insufficient basis for precluding a plaintiff from prevailing on its claims." *Id.* As to the third factor, "[a] factually sufficient and legally valid defense should always be allowed if timely filed even if it will prejudice the plaintiff by expanding the scope of the litigation." *Id.* However, "prejudice may be considered and, in some cases, may be determinative, where a defense is presented beyond the normal time limits of the Rules, especially at a late stage in the litigation, and challenged by a motion to dismiss."[4] *Id.* at 99. The decision to strike an affirmative defense is within the court's discretion. *Id.*

### III. DISCUSSION

#### A. First Affirmative Defense: Statute of Limitations

Defendants assert, as their first affirmative defense, that "[t]he SEC's claims against Laura are barred in whole or in part by the applicable statute of limitations."[5] (Answer at 14.) As the court explained in its Memorandum & Order denying Defendants' motion to dismiss, this case is governed by the five-year statute of limitations provided by 28 U.S.C. § 2462, and "the SEC cannot obtain relief for any conduct occurring prior to June 2, 2013." *Laura*, 2020 WL 1434114 at *5. As the court has already held, the SEC has alleged extensive misconduct during the limitations

---

[4] Despite the language in *McCaskey* to suggest that a moving plaintiff must show both a fatal factual or legal defect "and" prejudice, the court understands the Second Circuit's language in *GEOMC* that prejudice "may be considered," as well as that case's focus on the timeliness of a "factually sufficient and legally valid defense," to mean that a factually implausible or legally impossible affirmative defense is necessarily prejudicial to a plaintiff and should be struck, regardless of when it was asserted. *See also Car-Freshner Corp. v. Just Funky LLC,* No. 19-cv-289, 2019 WL 6270991, at *2 (N.D.N.Y. Nov. 25, 2019).

[5] Although the first affirmative defense names only Mr. Laura, the court understands the arguments to apply with equal force to all Defendants.

period, and it seeks disgorgement, civil monetary penalties, and injunctive relief only for post-June 2, 2013 conduct. (*See* Mem. at 6; *Laura*, 2020 WL 1434114 at *5.)

Defendants argue that not every allegation on the face of the SEC's Complaint occurred on a date within the limitations period. (*See* Opp. at 9.) They also argue that no evidence from outside of the limitations period should be permitted, even if it goes to conduct that occurred within it. (*See id.* at 9-10.) The court has already addressed those arguments, and its answer has not changed. Defendants can only face liability for conduct after June 2, 2013. The extent to which background evidence should be excluded as untimely will be considered in evidentiary motions, if the SEC submits such evidence and Defendants make an appropriate objection. *See Laura*, 2020 WL 1434114 at *5. Accordingly, because there is no question of law or fact with respect to the statute of limitations that would defeat the SEC's claims, Defendants' first affirmative defense should be struck.

### B. Second Affirmative Defense: Laches

As their second defense, Defendants claim that "[t]he SEC's claims against Answering Defendants are barred in whole or in part by the doctrine of laches." (Answer at 14.) Laches is an equitable defense, applied where "the plaintiff delayed unreasonably and inexcusably in commencing the action and [] the defendant suffered prejudice as a result." *McCaskey*, 56 F. Supp. 2d at 327; *see also FTC v. Consumer Health Benefits Assoc.*, 10-cv-3551 (ILG) (RLM), 2011 WL 13295634 at *5-6 (E.D.N.Y. Oct. 5, 2011). This defense must be struck because "laches is not available against the federal government when it undertakes to enforce a public right or protect the public interest." *United States v. Angell*, 292 F.3d 333, 338 (2d Cir. 2002).

### C. Third Affirmative Defense: Unclean Hands

Defendants next argue that the SEC's claims are barred in whole or in part by the doctrine of unclean hands, an equitable defense that requires plaintiffs to "have acted fairly and without fraud or deceit as to the controversy in issue." *Precision Instrument Mfg. Co. v. Automotive Maint. Mach. Co.,* 324 U.S. 806, 814–15 (1945). Specifically, Defendants assert that the SEC is working in concert with allegedly injured investors who are, in reality, attempting to fraudulently divest Defendants of their property interests in ICT, PAI, and PAG. (Answer at 14-17.)

As with the doctrine of laches, a defense under the doctrine of unclean hands is not generally available against a government agency that brings an action pursuant to its statutory mandate, which is presumably in the public interest. *See SEC v. KPMG LLP*, 03-cv-671 (DLC), 2003 WL 21976733 at *3 (S.D.N.Y. Aug. 20, 2003); *see also SEC v. Rosenfeld*, 97-cv-1467 (RPP), 1997 WL 400131 at *2 (S.D.N.Y. July 16, 1997). However, a defendant may assert unclean hands against the Government "where the agency's misconduct was egregious and the resulting prejudice to the defendant rose to a constitutional level." *Id.* That bar is high, and Defendants have not asserted factual or legal claims to clear it.

Here, at minimum, Defendants would need to show that the allegedly injured investors are engaged in a fraudulent scheme against them, and that the SEC has participated in the fraud. Apart from Defendants' implausible and unsupported allegations, there is no reason to believe that the SEC is engaged in egregious misconduct that has deprived Defendants of any constitutional right. For instance, the mere fact that SEC attorneys "raised hypothetical questions" during a witness interview does not lead to Defendants' conclusion that, "[t]he SEC has engaged in abrasive investigatory tactics in an effort to get witnesses to agree that wrongdoing occurred, using all sorts of hypotheticals

and facts which bore no relation to the truth." (Opp. at 12.) Similarly, Defendants assert that the SEC helped investors in their disputes with Defendants "by timing the filing of the Complaint in this action to do maximum potential damage to Defendants in their ongoing arbitration and in the state court litigation." (Opp. at 13.) The only evidence for this allegation appears to be that the SEC had contact with those private parties and that some proceedings happened roughly contemporaneously. (*See id.* at 17-18.) The list of Defendants' allegations is long. They claim the SEC worked with PAG's forensic accountant to mount a case against Defendants (Opp. at 14), that they helped prepare an expert report in related arbitration that "was an epic fail" (Opp. at 19), and that they "signed off" on transactions to alienate Defendants' intellectual property (Opp. at 13). The evidence for all of these theories is merely that the SEC was in contact with private parties—not parties in this case—who were engaged in private disputes with Defendants.

Despite Defendants' theories, there is nothing unusual about the SEC interviewing allegedly harmed investors, nor that public and private litigation and dispute resolution concerning the same parties and conduct would happen around the same time. Even if Defendants are correct that the witnesses whom the SEC interviewed are lying and engaged in fraud—and the court does not so conclude at this time—the fact that the SEC was in contact with them does not implicate the SEC in their fraud. Of course, to the extent that Defendants wish to attack the credibility of the SEC's evidence or witnesses, they can do so at trial.

Because Defendants have not advanced any plausible factual or legal argument to show that the SEC engaged in egregious misconduct that deprived them of a constitutional right, their unclean hands defense must be struck.

### D. Fifth and Sixth Affirmative Defenses: Waiver, Accord and Satisfaction, and Settlement

In their fifth and sixth defenses, Defendants claim that the doctrines of waiver, accord and satisfaction, and settlement serve as a bar to portions of the SEC's claims. (Answer at 18.) All three doctrines concern the preclusive effect, in subsequent litigation, of agreements between parties. Here, the SEC is not a party to any waivers, accords, or settlements, so none of those doctrines could operate against it, and the defenses are therefore legally insufficient. The agreements on which Defendants base their arguments were entered into by investors who are third parties to this action, not by the SEC. Nonetheless, Defendants claim that the Supreme Court's recent decision in *Liu v. SEC*, 140 S. Ct. 1936 (2020), stands for the broad proposition that insofar as the SEC seeks a disgorgement remedy, it does so on behalf of wronged investors, and its remedy is limited to that which the investors could pursue on their own. (*See* Defs.' Letter of Aug. 26, 2020 (Dkt. 103).) The court does not share that interpretation.

In *Liu*, the Court held that disgorgement is a type of "equitable relief" that the SEC may seek under 15 U.S.C. § 78u(d)(5), even though the Court held in *Kokesh v. SEC*, 137 S. Ct. 1635 (2017), that disgorgement constitutes a penalty for statute of limitations purposes, and penalties are not enforced in equity. *See Liu*, 140 S. Ct. at 1940-1941. As an equitable remedy, disgorgement is subject to equitable limitations. Thus, the Court held, the SEC may not seek disgorgement in excess of the net profits gained from the wrongdoing. *Id.* at 1946. Further, disgorgement cannot be applied jointly-and-severally where joint-and-several liability was not available at common law, and courts must deduct legitimate expenses from a disgorgement award. *See id.* at 1949-1950. However, most relevant to the case at bar, the Court stated that "[i]t is an open question whether, and to what extent" the practice of depositing disgorgement funds with the Treasury when it is infeasible to remit them to investors "is consistent with

8

the limitations of Section 78u(d)(5)." *Id.* at 1948. With that, the Court allowed that an order remitting wrongful profits to the public rather than to an injured party might still be "for the benefit of investors as required by Section 78u(d)(5)," which decouples a disgorgement award from the particular injury felt by individual investors. *Id.* The court reads that section of the *Liu* decision as precluding Defendants' expansive reading of the case, namely, that the SEC's power to seek disgorgement is exactly coterminous with an individual injured investor's claim. If that were so, the open question that the Court identified would be settled against the SEC.

*Liu* requires that a disgorgement award not exceed Defendants' ill-gotten gains, but it does not require that a disgorgement award reflect every individually wronged investor's private agreements. If it did, a court would need to conduct a mini-trial as to each investor before it could order disgorgement. There is no reason to believe that *Liu*, which confirmed the breadth of the SEC's power to seek equitable awards, also stealthily erected such a substantial barrier to SEC recovery. In any event, even if Defendants could limit a future disgorgement award based on the agreements of individual investors, they could easily assert that challenge under their fourth affirmative defense, which states that "[t]he SEC's claims for disgorgement are barred insofar as the SEC lacks the authority under existing law to seek such relief."

Accordingly, Defendants' fifth and sixth affirmative defenses should be struck.

### E. Seventh Affirmative Defense: Arbitration

For their seventh defense, Defendants argue that an arbitral award entered on June 10, 2019 by the International Center for Dispute Resolution ("ICDR") bars certain of the SEC's claims. (Answer at 18.) In that proceeding, Mr. Laura and Mr. Sichenzo

were claimants, purporting to act both individually and derivatively on behalf of PAI and ICT; and PAG was respondent. (*See* Final Arbitral Award (Dkt. 80-3).) This argument suffers from the same legal defect as Defendants' fifth and sixth defense: the arbitral award cannot collaterally estop the SEC, which was not a party to the proceeding. Indeed, as the Arbitrator stated, "nothing in this Award should be construed as my giving an opinion, one way or the other, on the allegations and accusations made in the SEC Investigation . . . ." (*Id.* at ECF p. 25.) As he recognized: "the issues within the SEC Investigation . . . are outside my jurisdiction, and I am not prepared to rule, in a contract matter, as to whether any of the Parties are culpable of the complex, financial schemes covered by [that] investigation[]. Nor do I have access to all of the evidence possessed by the regulatory authorities that would give me the competence to rule on these issues." (*Id.* at ECF pp. 36-37.)

By the plain terms of the arbitral award, to which the SEC was not a party and therefore did not have the opportunity to fully litigate, it has no effect on the instant case. Therefore, Defendants' seventh affirmative defense must be struck.

### F. Eleventh Affirmative Defense: Claims relating to a JV partner

Finally, with their eleventh affirmative defense, Defendants argue that any claims involving Defendants' joint venture ("JV") partner in PAI, cannot be included in the SEC's claims. They assert that "[t]he SEC's claims concerning the 'JV Partner' are barred, in whole or in part, because only a passive investor in a Delaware limited liability company who expected profits to flow primarily from the efforts of the promoter or third party would have the ability to make such a securities law claim." (Answer at 19.) Again, this defense fails as legally insufficient because the private rights of a JV Partner are separate from the statutory mandate of the SEC, which has the power to bring actions on

behalf of the public to enforce the federal securities laws. *See* 15 U.S.C. § 78u. Therefore, it is irrelevant to the SEC's action that an individual who is not a party to the action can (or cannot) bring the same claims.

## IV. CONCLUSION

For the foregoing reasons, the SEC's Motion to Strike (Dkt. 96) is GRANTED in its entirety, and Defendants' first, second, third, fifth, sixth, seventh, and eleventh affirmative defenses are STRUCK.

SO ORDERED.

Dated:    Brooklyn, New York
           December 30, 2020

                                                /s/ Nicholas G. Garaufis
                                                NICHOLAS G. GARAUFIS
                                                United States District Judge