UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

JOSEPH M. LAURA, ANTHONY R.
SICHENZIO, and WALTER GIL DE RUBIO,

Defendants.

**MEMORANDUM AND ORDER**
18-cv-5075 (HG) (VMS)

**HECTOR GONZALEZ**, United States District Judge:

## Table of Contents

INTRODUCTION ........................................................................................................................... 2
FACTUAL BACKGROUND ......................................................................................................... 3
   I.   Parties ................................................................................................................................ 3
   II.   Timeline ............................................................................................................................ 4
   III.   The Investor Agreements .................................................................................................. 7
   IV.   Money Raised by Laura and Sichenzio ........................................................................... 9
   V.   PAG's Bankruptcy ......................................................................................................... 10
PROCEDURAL HISTORY ......................................................................................................... 10
EXPERT TESTIMONY DISCUSSION ...................................................................................... 11
   I.   Lesa Adair ...................................................................................................................... 12
   II.   Michael LaBrie .............................................................................................................. 14
   III.   Farid Sigari-Majd .......................................................................................................... 16
SUMMARY JUDGMENT LEGAL STANDARD ...................................................................... 17
SUMMARY JUDGMENT DISCUSSION .................................................................................. 18
   I.   Laura—Misstatement Liability ...................................................................................... 19
      A.   The Investor Agreements Are Securities ................................................................... 21
      B.   Laura Made Material Misstatements .......................................................................... 22
         1.   Ownership of the Cold Cracking Technology .................................................... 22
         2.   Revenue Share Agreements ................................................................................ 24
         3.   Anticipated Production Date ............................................................................... 26
         4.   "Working Capital" .............................................................................................. 28
      C.   Scienter ..................................................................................................................... 29
   II.   Laura—Liability as an Unregistered Broker .................................................................. 31
   III.   Laura & Sichenzio—Scheme Liability .......................................................................... 33
   IV.   Sichenzio—Aiding and Abetting Laura's Misrepresentations .......................................... 35
   V.   Statute of Limitations ..................................................................................................... 38
CONCLUSION ............................................................................................................................. 40

**INTRODUCTION**

Plaintiff Securities and Exchange Commission (the "SEC") filed this action against Joseph M. Laura and Anthony Sichenzio (collectively "Defendants,") on September 7, 2018.[1] The Complaint alleges that Laura violated Sections 17(a)(1), (2), and (3) of the Securities Act of 1933 ("Securities Act"), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder, and Section 15(a)(1) of the Exchange Act. The Complaint alleges that Sichenzio violated Sections 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder, and aided and abetted Laura's violations of Section 17(a)(2) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder. *See* ECF No. 1 ("Compl.).

Before the Court is the SEC's motion for summary judgment against both Defendants, ECF No. 145, as well as Defendants Laura and Sichenzio's joint motion for partial summary judgment and to strike the SEC's expert reports. ECF No. 156. The Court consolidates those motions for the purposes of this order. For the reasons set forth below, the Court grants in part and denies in part the SEC's motion for summary judgment and denies Defendants' motions for partial summary judgment and to strike expert testimony.

---

[1] A third Defendant, Walter Gil de Rubio, has settled with the SEC and is not a party to this motion. *See* ECF No. 168 (SEC's motion for judgment based on settlement as to Defendant Walter Gil de Rubio); ECF No. 169 (granting SEC's motion for judgment).

**FACTUAL BACKGROUND**

I.      **Parties**

        A.      *Laura and Sichenzio*

Both Laura and Sichenzio were New Jersey residents.  ECF No. 152 ¶¶ 1, 8 (Defs. 56.1).

Laura was a lawyer with no training in science or physics and had no background in the oil

business before the formation of Pristec America, Inc. ("PAI").  *Id*. ¶¶ 2–5.  Sichenzio was

employed by a registered broker-dealer, including for part of the time when the events in the

Complaint were taking place.  *Id*. ¶¶ 8–10.  Laura had previously borrowed money from

Sichenzio, and, by 2010, owed him approximately $1 million.  *Id.* ¶¶ 150–55.

        B.      *Pristec AG*

Pristec AG ("PAG"), an Austrian stock corporation involved in emerging technologies in

the oil industry, including "cold cracking technology," was formed in 2006.  Defs. 56.1 ¶ 78.

PAG, like all Austrian stock corporations, has its corporate governance divided among three

bodies:  the Management Board, which runs the day-to-day operations and is authorized to

represent and bind the corporation legally, *id*. ¶¶ 14–15; the Supervisory Board, which "appoints,

removes and supervises" the Management Board, *id*. ¶18; and the Shareholders' General

Meeting, which elects the Supervisory Board and decides whether to make a distribution of the

corporation's net profits or to retain them, *id*. ¶¶ 16, 23.  Laura and Sichenzio became members

of PAG's Supervisory Board on September 19, 2013, soon after which Laura was appointed its

Chairman.  *Id*. ¶¶ 38–39.

3

C.      ICT

Innovative Crude Technologies, Inc. ("ICT") is a New Jersey corporation established by Laura in 2010[2] and owned by Laura and Sichenzio in equal share from at least January 2014 through at least April 7, 2020.  Defs. 56.1 ¶ 48.  Laura was the Chairman and President of ICT. *Id*. ¶ 73.  ICT acquired a 50% interest in PAG in 2010, *id*. ¶ 51, which was diluted to 33% in 2011, *id*. ¶ 52, and 23.33% by 2016, *id*. ¶ 53.

D.      The PAI Companies

Laura, acting as President and Chairman of ICT, established two corporations, each named Pristec America, Inc. (collectively, the "PAI Companies")—one in New Jersey ("PAI-NJ") in 2011, Defs. 56.1 ¶¶ 55, 57, and one in Nevada ("PAI-NV") in 2013, *id*. ¶ 56.  The PAI Companies were each owned 50/50 by PAG and ICT.  *Id*. ¶¶ 55, 56.  Laura was the PAI Companies' Chairman and/or President, *id*. ¶ 73, and Sichenzio held various roles including Vice Chairman, Vice President, Secretary, and Director, *id*. ¶ 75.  ICT, PAI-NJ, and PAI-NV only had one other employee besides Laura and Sichenzio, an individual who performed "driver services" and "computer/office support."  *Id*. ¶ 60.  None of the companies ever had separate office space, and all three used Laura's home address as their business address.  *Id*. ¶ 65.

**II.      Timeline**

Laura was first introduced to PAG sometime around December 2008, Defs. 56.1 ¶ 77, when he was presented a business plan by an individual associated with PAG regarding "cold cracking technology," something Laura "didn't really know much" about, *id*. ¶ 79.  The

---

[2]      ICT was originally named Pristec America, Inc., but the name was changed in October 2010.  *Id*. ¶ 44.

individual claimed that with "cold cracking technology," PAG could convert heavy oil into light oil.[3]  *Id*. ¶ 78.  Laura understood that PAG had been trying to market this technology since the company was formed in 2006.  *Id*. ¶ 80.  Sometime around May 2010, Defendants agreed that Sichenzio would forgive Laura's debt in exchange for Laura splitting his interest in, and income received from, ICT.[4]  *Id*. ¶¶ 150–51.

PAG had only entered into one contract before 2010—a "pilot test" with an Indian company.  *Id*. ¶ 86.  Laura knew that the Indian contract was explicit that there would be no commercial aspect to the arrangement until the technology was proven.  *Id*. ¶¶ 87–88.  PAG never entered into a commercial contract with the Indian company.  *Id*. ¶ 92.  PAG (but not ICT or the PAI Companies) did have a contract with an Egyptian company for a "pilot project" from 2010 to 2011, but PAG was never able to monetize that project.  ECF No. 159 at 5 n.2 (Laura Decl.).

On June 30, 2010, ICT and PAG entered into a written "Financing Contract,"[5] which Laura signed, whereby ICT agreed to loan PAG $1.4 million in the form of a convertible bond.  *Id*. ¶ 144.  By December 15, 2010, if PAG had not paid back the principal, plus 20% interest,

---

[3]     Light crude oil is considered more valuable than heavy crude oil because it produces a higher percentage of gasoline and diesel fuel when refined.  *See Oil and petroleum products explained,* U.S. ENERGY INFORMATION ADMINISTRATION, https://perma.cc/886S-JTUR (last accessed June 28, 2023).  *See also* Defs. 56.1 ¶ 81.

[4]     ICT, at the time, was still called Pristec America, Inc.  Defs. 56.1 ¶ 44.

[5]     The 2010 Financing Contract included, *inter alia*, the following provision: "ICT and PRISTEC intend a long term partnership and cooperation in marketing and operating PRISTEC heavy oil technologies in the North America region."  ECF No. 150-17 ("2010 Financing Contract") at 1: § 1.

ICT had the option to convert the loan into 35,000 shares of PAG. *Id*. Laura was aware that PAG needed the money to pay off debts, and that if it did not, it could go bankrupt. *Id*. ¶¶ 139–40.[6] Sichenzio put up a "substantial" portion of the money sent to PAG, *id*. ¶ 160, and the rest "mostly" came from Sichenzio's friends and family, *id*. ¶ 161. Laura testified that the expectation was that " [PAG] knew that they were not going to pay us back and that we would get the shares." *Id*. ¶ 146.[7]

Laura was also aware, at least by August 2010, that there were patent applications filed with the U.S. Patent Office on May 14, 2010, for the "cold cracking technology," but (i) the patents were in the names of the four identified applicants and inventors,[8] not PAG, and (ii) that those patents had not yet been granted. *Id*. ¶ 97. Laura was also aware of an agreement, dated March 2010, for PAG to acquire the cold cracking patents—if and when the patents were granted—in exchange for a 30% ownership stake in PAG. *Id*. ¶¶ 129–32. The same agreement also stated that "the transfer of patent ownership and rights will become effective only upon issuance of shares in [PAG] equaling a 30 percent interest in [PAG], only upon approval by the

---

[6] A sample 2010 Financing Contract between Defendants and investors provided by the SEC states: "ICT is aware of the critical financial situation that PRISTEC is currently in and intends to support PRISTEC in order to secure the joint mid and long term business perspectives in the region . . . . In July and August 2010 PRISTEC is in need of EUR 500.000 in order to pay open accounts and to avoid insolvency proceedings and PRISTEC plans to raise these funds with existing small shareholders." 2010 Financing Contract at 1: § 1, 2: § 1.

[7] ICT did exercise its option and converted the loan into 35,000 shares of PAG after PAG did not pay back the loan by December 2010. Defs. 56.1 ¶ 147. This gave ICT a 50% stake in PAG. *Id*. ¶ 51.

[8] The inventors include: Rudiger Nuerk; Miguel Delgado Castillo; Fedor Chernikov; and Anibal Veneciano Rivera (the "Inventors"). Defs. 56.1 ¶ 128

shareholders of [PAG] at a general meeting.  In the event the shareholders of [PAG] do not approve the issuance of the shares to the Inventors at the general meeting, then all patents and patent rights revert back to the inventors."  *Id*. ¶ 132.  PAG did not exercise its option to acquire the patents until sometime between 2013 and 2015.[9]  *Id*. ¶¶ 135–37.  Neither of the PAI Companies had a written agreement providing it with a license to the cold cracking technology until, at the earliest, October 2013, when the PAI Companies were granted an exclusive license for the cold cracking technology in the United States, Mexico, Canada, and Venezuela and a nonexclusive license anywhere else.  *Id*. ¶ 137

## III.        The Investor Agreements

Sometime in the fall of 2010, a few months after the signing of the 2010 Finance Agreement, Laura and Sichenzio began soliciting funds for ICT and PAI[10] from various individuals through investor agreements—specifically "revenue share agreements, stock purchase agreements, convertible loan agreements, and several loan agreements and promissory notes."  Defs. 56.1 ¶ 291.  This continued until at least January 2017.  *Id*.

All of the revenue share, convertible loan and share purchase agreements were drafted and signed by Laura, *id*. ¶¶ 294, 295; Sichenzio, as an officer of the PAI Companies, signed some of the agreements, *id*. ¶ 296.  Various investor agreements, including certain revenue share and convertible loan agreements, contained a clause that stated that one of the PAI Companies

---

[9]        The exact date is disputed by the parties.  *Compare* Pl. 56.1 ¶¶ 135–37, *with* Defs. 56.1 ¶¶ 135–37.

[10]        Defendants did not solicit funds for investments in PAG.

either "developed and owns" or "owns exclusive global rights to" "certain 'TECHNOLOGY'[11]

for heavy oil upgrading and refining including intellectual property rights, knowledge and

facilities for cold cracking and reforming, visbreaking and desulphurization." *Id*. ¶¶ 306, 307,

321, 322.

 The revenue share agreements also typically stated that one of the PAI Companies "is in

need of financing in the amount of [amounts varied by investor] for funding of the international

roll-out of its patented technology," or "WHEREAS, PRISTEC is in need of financing for

working capital for funding of the international roll-out of its patented technology." *Id*. ¶ 309.

Some of the revenue share agreements contained an anticipated production date that ranged from

six to eleven months after the date of the contract. *Id*. ¶ 310; *see also* ECF No. 151 at 16.  Some

investor agreements noted that the funds given by investors would help with the "installation of

its patented 'hydrogen' cold cracking units" at a pilot program in Egypt.[12]  *Id*. ¶ 224.  Other

agreements further stated that revenue payments would be paid monthly within ten days after the

conclusion of a production month.  Defs. 56.1 ¶ 310.  At least some of the agreements contained

a schedule of payments indicating that production would escalate from either 10,000 or 20,000

barrels per day ("bpd") in the first month to 200,000 bpd by the twelfth month.  *Id*. ¶ 314.

---

[11] Laura testified that the term "TECHNOLOGY" in these agreements refers to the cold cracking technology.  Defs. 56.1 ¶ 308.

[12] This pilot program was between an Egyptian company and PAG.  Defs. 56.1 ¶ 227. Defendants hoped that the project would prove that the technology was commercially viable. *See id*. ¶ 163 (Laura stated that "initially we were going to launch in Egypt and . . . grow the business from there . . . . [I]t was always once we were proven commercially someplace, everything would fall into place.").  Neither ICT nor the PAI Companies had a contract with the Egyptian government or the company in Egypt piloting the technology.  *Id*. ¶ 227.

Defendants also solicited funds by way of convertible loan agreements and share purchase agreements. *Id*. ¶¶ 317, 330. Some of the convertible loan agreements provided for a one-year loan with interest rates between 10% and 18%, payable at the end of the year, as well as an option for the investor to convert the loan into equity in whichever of the PAI Companies they were investing in. *Id*. ¶ 318. The share purchase agreements offered investors shares in different entities (*e.g.*, one of the two PAI Companies, or ICT). *Id*. ¶ 330. At least one share purchase agreement offered investors shares in a soon-to-be-formed entity. *Id*. ¶ 331. All the convertible loan agreements and share purchase agreements were signed by Laura, and some were also signed by Sichenzio. *Id*. ¶ 325. None of the investor agreements contained cautionary language. *Id*. ¶ 333.[13]

## IV.      Money Raised by Laura and Sichenzio

Much of the money Laura and Sichenzio raised from investors was deposited into bank accounts for PAI ("PAI Accounts"), or ICT ("ICT Accounts"), or an account at Laura & Matarrese, the law firm where Laura was a partner at the time (collectively, the "Accounts"). Defs. 56.1 ¶¶ 364–66, 410. Except for one PAI Account, where Sichenzio was also a signatory, there were no authorized signatories on the Accounts except for Laura, who was also the only debit card holder on the PAI and ICT Accounts. *Id*. ¶¶ 384, 385. Some checks from investors were made payable directly to Sichenzio. *Id*. ¶ 368.

Laura and Sichenzio both transferred millions of dollars in funds from the Accounts to their own individual personal accounts. For example, $65,000 from a $100,000 investment,

---

[13]      In addition, a four-page statement of "Risk Factors" was reviewed and approved by Laura in August of 2013, but never shared with investors. Defs. 56.1 ¶¶ 338–39

initially deposited into a PAI Account, was transferred to Laura's and Sichenzio's personal accounts less than a week after the money was deposited.  Defs. 56.1 ¶¶ 394–97.  Money transferred to Sichenzio was "put to personal use."  *Id.* ¶ 370.  Laura used some of the funds for, among other things:  purchases at a furniture store, *id.* ¶ 406; a sporting goods store, *id.* ¶ 411; Neiman Marcus, *id.*; and Costco, *id.* ¶ 419; as well as making a car payment, *id.* ¶ 411; and paying for landscaping, *id.*  According to Sichenzio, Laura used funds raised through investors to support himself.  ECF No. 150-6 (Sichenzio Dep.) at 211:10-20.

## V.        PAG's Bankruptcy

PAG was dissolved in 2021 and the company's assets, including the patents for the "cold cracking technology," were sold by the bankruptcy administrator.  Defs. 56.1 ¶¶ 429, 430.  PAG's shareholders and creditors were "wiped out" by the bankruptcy.  *Id.* ¶¶ 432–33.

## PROCEDURAL HISTORY

The SEC initiated this action on September 7, 2018.  ECF No. 1.  Defendants filed their Answer in April 2020 after the Court denied their motion to dismiss.  ECF No. 77.  On December 3, 2021, the parties filed a joint letter certifying discovery had been completed.  ECF No. 135.

Both Plaintiff and Defendants sought summary judgment, and Defendants also sought to strike expert testimony.  ECF Nos. 136–38.  The parties filed their fully briefed motions, including their Rule 56.1 statements, on May 27, 2022.[14]

---

[14]        *See* ECF Nos. 145, 146, 148–50 (Plaintiff's motion for summary judgment and declarations in support); ECF No. 147 (Pl. 56.1); ECF Nos. 151, 153–55 (Defs. opposition to Pl's motion for summary judgment); ECF No. 152 (Defs. 56.1); ECF Nos. 156–59 (Defs. motion for partial summary judgment and to strike expert testimony, and declarations in support); ECF

## EXPERT TESTIMONY DISCUSSION

The Court will first address Defendants' motion to strike expert testimony before ruling on the summary judgment motions.

Federal Rule of Evidence 702 governs the admission of expert testimony.  Fed. R. Evid. 702.  Rule 702 allows the testimony of "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education" where:  "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  *Id*.  "A party seeking to admit expert testimony under Rule 702 must establish admissibility by a preponderance of the evidence under a liberal standard for admissibility."  *Sokolovic v. CVS Health*, No. 17-cv-6609, 2023 WL 2742148, at *5 (E.D.N.Y. Mar. 31, 2023).[15]

"When parties seek to introduce expert testimony in accordance with Rule 702 of the Federal Rules of Evidence, the trial judge has the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *United States v. Willis*, 14 F.4th 170, 185 (2d Cir. 2021); *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579

---

Nos. 160–62 (Pl's opposition to Defs' motion for summary judgment and to strike expert testimony, and declarations in support); ECF No. 163 (Defs' reply in support of their motion for partial summary judgment and to strike expert testimony); ECF No. 164 (Pl's reply in support of its motion for summary judgment).

[15]     Unless noted, case law quotations in this Order accept all alterations and omit all internal quotation marks, citations, and footnotes.

(1993).  "The district court must analyze whether the proffered expert testimony is relevant and whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered."  *Willis*, 14 F.4th at 185.  To do this, a district court examines:  "(1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case."  *Sokolovic*, 2023 WL 2742148, at *5.  "[O]nly serious flaws in reasoning or methodology will warrant exclusion."  *Id*.

Expert testimony must also be relevant.  "Whether expert testimony is relevant is governed by the same test as any other evidence—Rule 401."  *Better Holdco, Inc. v. Beeline Loans, Inc.*, No. 20-cv-8686, 2023 WL 2711417, at *19 (S.D.N.Y. Mar. 30, 2023).  "Under that rule, [e]vidence is relevant if:  (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  *Id*.

## I.     Lesa Adair

The SEC retained Lesa Adair as an "oil and gas expert."  ECF No. 151 at 4.  For their part, Defendants also recognize Adair as "an engineer with oil and gas experience."  ECF No. 157 at 4.  The Court agrees that Adair's decades of experience in the oil and gas industry qualify her as an expert in the field.  *See* ECF No. 150-12 at 60–68 (Adair Report).  Adair opines on:  the difficulties of establishing new technologies in the oil and gas industry; the testing that "industry standards and practice" typically require of a new technology; the data typically required "to demonstrate reliable, repeatable, and stable output from the technology" in order to prove the technology can achieve "wide-scale commercialization"; Defendants' lack of "industry experience"; and the risks, including geopolitical risks, typically involved in international oil

processing and refining.  *Id*. at 2–4.  Given that a key issue in this case turns on whether Defendants made material misrepresentations to investors regarding the commercial viability of the cold cracking technology, the Court finds that Adair's proffered testimony is both relevant and helpful to the trier of fact.  *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002).

Defendants contend that Adair was not given sufficient information on which to base her opinion.  ECF No. 157 at 4 ("The SEC gave Adair just a few documents (14 to be precise) of the nearly half a million pages of documents exchanged in discovery.").  First, Defendants are simply incorrect regarding the volume of documents reviewed by Adair—her report makes clear that she reviewed 148 documents, not 14.  ECF No. 150-12 at 74–76.  Next, Defendants contend that Adair is rendering engineering opinions she is not retained to give.  ECF No. 157 at 4, 18. The Court does not find that Adair provides any engineering opinions—nowhere in her report does she assess the technological viability of the "cold cracking" technology from the perspective of an engineer.  Rather, Adair's report explains what type of information is typically given to demonstrate that a technology is commercially viable from the perspective of a customer (*i.e.*, a company that would buy the technology) in the oil and gas industry.[16]  Adair does say that the lack of sufficient information regarding the technology would have been a red flag for a potential customer.  ECF No. 150-12 at 21, 32, 45.  The Court does not understand that to be an opinion regarding the viability of the technology—rather, it is simply an opinion that a

---

[16]     In fact, Adair makes clear that she does not have enough information to determine the viability of the technology.  ECF No. 150-12 at 5.

customer in the oil and gas industry would be unlikely to purchase the technology based on the data Defendants provided.

Defendants further contend that Adair is not qualified to render engineering or marketing opinions.  ECF No. 157 at 19–20.  However, the Court does not find that Adair makes any "marketing" opinions.  Rather, she provides an assessment, based on decades of industry experience, of what type of information a customer in the oil and gas industry would likely need to see to purchase the cold cracking technology at the center of this case.

Accordingly, Defendants' motion to exclude the testimony of Adair is denied.[17]

## II.      Michael LaBrie

The SEC retained Michael LaBrie as an expert on patent law.  Pl. 56.1 ¶ 98 n.6. Defendants do not dispute that LaBrie is qualified to offer an expert opinion on general patent law or the U.S. Patent and Trade Office ("USPTO"), and the Court finds that LaBrie—a practicing patent attorney for almost 30 years—is qualified to render an opinion in this area.  *See* ECF No. 150-11 at 2–3 (LaBrie Report).  LaBrie opines about the patent application process, and the patent application histories of PAG and ICT (including what patents have been rejected, granted, or abandoned).  *Id.* at 3–4.  Given that a key issue in this case turns on whether Defendants made material misrepresentations to investors about the existence of "patented

---

[17]      To the extent Defendants raise other issues with Adair's testimony, the Court finds that those issues are either irrelevant to the admissibility of Adair's testimony (*e.g.* that other individuals witnessed the technology and found it sufficiently impressive to invest money), ECF No. 157 at 5–8, or that those issues go to the weight of her testimony, but not its admissibility (*e.g.*, that company inventor and founder Miguel Delgado Castillo disagrees with portions of her report), *id*. at 5.

technology," the Court finds that LaBrie's testimony regarding the existence of said patents is both relevant and helpful to the trier of fact. *Amorgianos*, 303 F.3d at 265.

Defendants contend that LaBrie is not qualified to offer expert opinions on Austrian patent law. ECF No. 157 at 21. However, from a review of his report, the Court does not find that LaBrie is offering an expert opinion on Austrian patent law. While he does identify that some patents "were first granted in Austria," he provides no opinion on Austrian law. ECF No. 150-11 at 3. The ability to identify publicly filed patents, even patents first granted outside the United States, is something well within the expertise of any patent law expert. Defendants further contend that LaBrie was not given sufficient information to evaluate the patents or their viability. ECF No. 157 at 19. Defendants, however, do not identify what information LaBrie was missing. In any event, the Court does not find that LaBrie evaluates the patents themselves—he does not, for example, review them in the way the USPTO would, nor does he assess the viability of the underlying technology. At most, LaBrie opines that *if* any pending or future ICT patents rely on the same technology as the ICT or PAG patents that were previously rejected by the USPTO, then it is unlikely they would be approved. ECF No. 150-11 at 3 ("The rejections of the ICT patent applications also call into question the validity of the [PAG] patents and the efficacy of the underlying technology *to the extent that the PAG patents rely upon the same underlying technology as the ICT patents*.") (emphasis added). The Court finds that LaBrie's opinion that the USPTO is likely to make a similar decision if confronted with a similar application is something well within his expertise as a patent law expert.

Defendants further contend that LaBrie is not qualified to render engineering or marketing opinions. ECF No. 157 at 18–21. However, Defendants do not identify what

engineering or marketing opinions LaBrie is making, and the Court cannot identify any.  Rather

LaBrie's report is concerned with patent law and procedure, how patents are examined by patent

offices, and the history of PAG's and ICT's patent applications.  ECF No. 150-11 at 2–4.

Accordingly, Defendants' motion to exclude the testimony of LaBrie is denied. [18]

### III.    Farid Sigari-Majd

The SEC retained Farid Sigari-Majd as an expert on Austrian law.  Pl. 56.1 ¶ 12 n.4.

Defendants do not contend that Sigari-Majd is unqualified to offer an expert opinion on Austrian

law, and the Court finds that Sigari-Majd—an Austrian attorney with 20 years of experience

advising on Austrian corporate law issues, ECF No. 150-8 at 4 (Sigari-Majd Report)—is

qualified in this area.  Sigari-Majd opines that:  PAG may only be legally bound by its

Management Board or individuals legally authorized by power of attorney to bind PAG, and that

PAG could not be liable for agreements entered into by ICT, *id*. at 5–6; that neither Defendant

was ever a member of PAG's Management Board or authorized by power of attorney, *id*.; that

PAG could only distribute profits to shareholders, and thus could not have legally distributed

profits to PAI-NJ or PAI-NV, *id*.; that PAG failed to comply with its Austrian legal obligation to

file financial statements in a timely manner, *id*.; and that PAG failed to re-appoint members of

the Management and Supervisory Boards in a timely manner, making it unable to make legally

enforceable decisions given the absence of a proper composition and quorum as of March 2018,

---

[18]     To the extent Defendants raise other issues with LaBrie's testimony, the Court finds that
those issues are either irrelevant to the admissibility of LaBrie's testimony (*e.g.*, the possible
outcomes of ongoing legal disputes between Defendants and nonparties), ECF No. 157 at 11–12,
or that those issues go to the weight of his testimony but not its admissibility (*e.g.*, that company
inventor and founder Castillo disagrees with portions of his report), *id*. at 13.

*id*. at 5–6.  Given that a key issue in this case turns on whether Defendants made material misrepresentations to investors about the relationship between themselves and PAG, the Court finds that Sigari-Majd's testimony on what PAG was legally allowed or required to do under Austrian law is both relevant and helpful to the trier of fact.  *Amorgianos*, 303 F.3d at 265.

Defendants argue that "Sigari-Majd was given cherry-picked documents."  ECF No. 157 at 14–15.  Sigari-Majd notes that he considered 144 documents related to this case.  ECF No. 150-8 at 37–40.  Defendants do not explain what vital documents he missed, or how the 144 documents were "cherry picked."  Defendants then contend that they legitimately believed "they were PAG supervisory board members" and Nuerk—one of the inventors of the technology— "was authorized to act on behalf of PAG and could commit PAG to paying the U.S. investors." ECF No. 157 at 15.  First, Sigari-Majd does not opine on Defendants' state of mind, only what he believes is appropriate under Austrian law, and thus this criticism is irrelevant.  Second, even assuming that any of Defendants' objections are valid, their criticism goes only to the weight of Sigari-Majd's opinion, not its admissibility.  *See Sokolovic*, 2023 WL 2742148, at *9 (noting that attacks on the factual basis of an expert's opinions go to the weight of the testimony, not its admissibility).

Accordingly, Defendants' motion to exclude the testimony of Sigari-Majd is denied.

## SUMMARY JUDGMENT LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  The moving party has the burden of demonstrating that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "Where the moving party demonstrates the absence of a genuine issue of material fact, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact."  *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).

In deciding a summary judgment motion, any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the nonmoving party.  *LaFond v. Gen. Physics Servs. Corp.*, 50 F.3d 165, 171 (2d Cir. 1995).  In reviewing the evidence and inferences that may reasonably be drawn, the Court "may not make credibility determinations or weigh the evidence . . . .  Credibility determinations . . .  [are a] jury function[ ], not [that] of a judge."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  Nevertheless, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."  *Anderson*, 477 U.S. at 252.

## SUMMARY JUDGMENT DISCUSSION

The SEC brings claims against Laura under both "misstatement" and "scheme" theories of liability.  The SEC also alleges that Laura acted as an unregistered broker.  It brings claims against Sichenzio under both "aiding and abetting" and "scheme" theories of liability.

Specifically, claim one alleges that Laura violated Sections 17(a)(1), (2), and (3) of the Securities Act in, Compl. ¶¶ 104–07; claim two alleges that Laura violated Section 10(b) of the

Exchange Act and Rule 10b-5(a), (c) thereunder, *id*. ¶¶ 107–09; and claim seven alleges that

Laura violated Section 15(a)(1) of the Exchange Act, *id*. ¶¶ 122–24.  Claim three of the

Complaint alleges that Sichenzio violated Sections 17(a)(1) and (3), *id*. ¶¶ 110–12; claim four

alleges that he violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, *id*. ¶¶

113–15; claim five alleges that he aided and abetted Laura's material misrepresentations in

violation of Section 17(a)(2), *id*. ¶¶ 116–18; and claim six alleges that he aided and abetted

Laura's misrepresentations in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b)

thereunder, *id*. ¶¶ 119–21.

## I.        Laura—Misstatement Liability

Claims one and two of the complaint include allegations that Laura is liable under a

"misstatement liability" theory in violation of Section 17(a)(2) of the Securities Act and Rule

10b-5(b) of Section 10(b) of the Exchange Act, respectively.

In order to show that a defendant is subject to misstatement liability under Section 10(b)

and Rule 10b-5, the SEC must show "that [a] defendant:  (1) made a material misrepresentation

or a material omission as to which he had a duty to speak . . . ; (2) with scienter; (3) in

connection with the purchase or sale of securities."  *SEC v. Xia*, No. 21-cv-5350, 2022 WL

17539124, at *18 (E.D.N.Y. Dec. 8, 2022); *see also SEC v. Spark Trading Grp., LLC*, No. 18-cv-

1498, 2018 WL 6727349, at *2 (E.D.N.Y. Dec. 21, 2018); *see also SEC v. CKB168 Holdings,

Ltd.*, 210 F. Supp. 3d 421, 441 (E.D.N.Y. 2016).

For the first element, a material omission or misstatement is one which "would have been

viewed by the reasonable investor as having significantly altered the total mix of information

available."  *Wang v. Cloopen Grp. Holding Ltd.*, No. 21-cv-10610, 2023 WL 2534599, at *8

(S.D.N.Y. Mar. 16, 2023).  "Only if an omission or misstatement is so obviously important or unimportant to a reasonable investor that reasonable minds cannot differ on the question of materiality is the issue appropriately resolved as a matter of law by summary judgment."  *SEC v. Jankovic*, No. 15-cv-1248, 2017 WL 1067788, at *10 (S.D.N.Y. Mar. 21, 2017).

For Plaintiff's claims under Section 10(b) of the Exchange Act, the second element, scienter, is defined as "intent to deceive, manipulate or defraud or knowing or intentional misconduct."  *SEC v. Rosenberger*, No. 22-cv-4736, 2023 WL 1928093, at *5 (S.D.N.Y. Feb. 10, 2023); *see also SEC v. Obus*, 693 F.3d 276, 286 (2d Cir. 2012).  "The requisite scienter may be established through a showing of reckless disregard for the truth, that is, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care."  *Rosenberger*, 2023 WL 1928093, at *5.  "Proof of scienter need not be direct, but may be a matter of inference from circumstantial evidence."  *Id*.  A court may infer recklessness at the summary judgment stage if it finds that a defendant exhibited an "egregious refusal to see the obvious, or to investigate the doubtful."  *SEC v. Yorkville Advisors, LLC*, 305 F. Supp. 3d 486, 511 (S.D.N.Y. 2018).

Regarding the third element, a "security" is defined by the Securities Act Section 2(a)(1) and Exchange Act Section 3(a)(10) to include an "investment contract."  An investment contract is "an investment of money in a common enterprise, with a reasonable expectation of profits to be derived from the efforts of others."  *Spark*, 2018 WL 6727349, at *2 (quoting *SEC v. W.J. Howey*, 328 U.S. 293, 299 (1946)).  The "in connection with" requirement of the third element is satisfied if the fraud and the sale of the securities coincide.  *Xia*, 2022 WL 17539124, at *26; *see SEC v. Zandford*, 535 U.S. 813, 822 (2002).

Plaintiff's claims under Section 17(a)(2) of the Securities Act are essentially the same as those under Section 10(b) of the Exchange Act, except that a "showing of negligence is sufficient" to satisfy the second element.  *SEC v. Ginder*, 752 F.3d 569, 574 (2d Cir. 2014); *see also CKB168*, 210 F. Supp. 3d at 441; *Aaron v. SEC*, 446 U.S. 680, 695–696 (1980).

### A.     The Investor Agreements Are Securities

As a threshold matter, the Court finds that the investor agreements solicited by Laura and Sichenzio for PAI and ICT are "securities."  Nowhere in Defendants' opposition do they argue that the investor agreements are not securities.  *See* ECF No. 151 at 8 (Defendants' opposition). The share purchase agreements offered "stock" in exchange for an investment; the revenue share agreements offered "profit-sharing" in exchange for an investment; and the convertible loan agreements contained an "option" for investors to convert their loan into stock in exchange for an investment.  These various agreements, therefore, all qualify as securities under Securities Act Section 2(a)(1) and Exchange Act Section 3(a)(10).

The Court further notes that all three types of investment agreements also meet the Supreme Court's *Howey* test for determining what is a security:  Laura and Sichenzio solicited an "investment of money" in a "common enterprise" (the cold cracking technology) that created an "expectation of profit" (the increased value that would come from converting heavy oil into light oil), based "on the efforts of others" (the inventors and others working to operationalize the technology).  *Howey*, 328 U.S. at 299; *see also Xia*, 2022 WL 17539124, at *19; *CKB168*, 210 F. Supp. 3d at 450.

B.    *Laura Made Material Misstatements*

1.    Ownership of the Cold Cracking Technology

The Court finds that the SEC has demonstrated the absence of a genuine issue of material

fact that Laura made material misrepresentations in the investor agreements regarding the PAI

Companies' ownership of the cold cracking technology.  Neither of the PAI Companies ever

"developed and own[ed]" or "own[ed] exclusive rights to" the cold cracking technology, as was

claimed in the agreements.  Defs. 56.1 ¶¶ 129, 306, 307, 321, 322.  Yet, Defendants admit that

Laura repeatedly made such misrepresentations in the investor agreements—asking investors to

put up "working capital" for the "international roll-out of its patented technology" that the

companies did not, in fact, own.  *Id*. ¶ 309, ECF No. 150-11 at 3–4.  In reality, when Laura first

began soliciting investors, as Defendants concede—and the SEC's patent expert has illustrated

by detailing exactly when the patent applications were first granted—the patents for the

technology did not yet exist.[19]  Defs. 56.1. ¶ 97; ECF No. 150-11 at 3.

Defendants argue that these representations were not false for two reasons:  First, because

"ICT was in fact owned and controlled in the early years by the inventors and PAG," who owned

the patents.  ECF No. 151 at 23–24; Defs. 56.1 ¶ 48.  However, there is a difference between (i) a

company owning a patent and (ii) a company being partially owned by individuals who also own

a patent.  As the sample agreements provided by the SEC show, at least some of the investor

---

[19]    Defendants began soliciting funds from investors in 2010.  Defs. 56.1 ¶ 149.  One patent
application was granted in Austria on April 15, 2012, and the other was granted in the United
States on January 15, 2013.  *Id*. ¶ 99.

agreements explicitly stated the former, *id*. ¶¶ 306, 307, 321, 322, when, in fact, it was the latter, ECF No. 150-11 at 3.  This was a material misstatement.

Defendants argue that this was not a misrepresentation pursuant to the "doctrine of implied patent license rights."  ECF No. 151 at 24–25.  Courts have recognized implied patents in circumstances where an owner of a patent implicitly consents to a license.  *See Bobcar Media, LLC v. Aardvark Event Logistics, Inc.*, 354 F. Supp. 3d 375, 383 (S.D.N.Y. 2018); *My First Shades v. Baby Blanket Suncare*, 914 F. Supp. 2d 339, 349 (E.D.N.Y. 2012).  "This rule includes exclusive license[s]."  *My First Shades*, 914 F. Supp. at 350.  "[F]or the party to establish that it was an implied exclusive licensee of the patents it must have received the patentee's express or implied promise that others shall be excluded from practicing the invention within that territory as well."  *Id*.

First, even if the Court concluded that an implied license existed, the SEC has demonstrated that investor agreements still falsely claimed that the PAI Companies *owned* the patents themselves.  ECF No. 150-11 at 3–5.  Second, even when viewing the evidence in the light most favorable to the nonmoving party, the Court does not find any evidence suggesting that the PAI Companies owned an "exclusive global license."  Defs. 56.1 ¶¶ 306, 307, 321, 322. As the SEC has correctly pointed out, before 2013, and possibly as late as 2015, PAG did not own the patents—having only been given an option to buy them from the Inventors in the future after they had been approved.  *Id*. ¶¶ 129–37.  PAG could not have implicitly promised an exclusive global license for something it did not own.  It was not until October 2013 that Laura and the Inventors signed a contract granting an exclusive license in select countries, and a non-exclusive license globally, to PAI-NV.  *Id*. ¶¶ 265–69.  Accordingly, there is no issue of material

fact about whether the PAI Companies owned an implied exclusive global license to the cold cracking technology—they did not.

The fact that the PAI Companies did not own the technology or an exclusive global license to the technology "significantly alter[s] the total mix of available information." *Spark*, 2018 WL 6727349, at *2.  Investors were told they were investing in a company that owned something of value—patented technology that could turn heavy oil into much more valuable light oil—and the PAI Companies needed their money as "working capital" to "roll out" the technology.  Defs. 56.1 ¶ 309.  However, as the SEC has shown, the truth was that they were investing in companies that, at most, owned a non-exclusive license to a technology that had never had a commercial roll out.  ECF No. 150-12 at 2–4.  The Court finds these misrepresentations and omissions are "so obviously important to an investor" that they are material misrepresentations as a matter of law.  *Jankovic*, 2017 WL 1067788, at *10; *see, e.g.*, *SEC v. Glob. Telecom Servs., LLC*, 325 F. Supp. 2d 94 (D. Conn. 2004) (holding that defendants' representation that they owned patent rights was a material misrepresentation and granting summary judgment in favor of the SEC); *SEC v. Research Automation Corp.*, 585 F.2d 31, 34–36 (2d Cir. 1978) (holding that false representation regarding patent rights was material).

### 2.    Revenue Share Agreements

The Court further finds that the SEC has demonstrated that there is no genuine issue of material fact that Laura made material misrepresentations regarding the source of revenue related to the revenue share agreements.  In more than 100 revenue share agreements, Laura promised to pay investors "a return on their investment based on certain specified fractional pennies per barrel of oil processed using the cold cracking technology."  Defs. 56.1 ¶ 299.  It is undisputed

24

that the PAI Companies never entered into any commercial contracts to process oil that would have generated revenue, nor is there any evidence they were in the process of doing so. *Id*. ¶¶ 290, 326 (noting that any revenue from the PAI Companies came from licensing, not commercial contracts). Rather, investors who entered into a revenue share agreement were investing money in the PAI Companies in order to receive revenue that a different company, PAG, would make through commercial contracts with third parties. *Id*. ¶ 299. As the SEC has shown, that critical fact was not disclosed in the revenue share agreements. *See, e.g.*, ECF 150-26 (sample revenue share agreement).

First, even if PAG had intended to share a portion of its oil processing revenue, the fact that the revenue share agreements promised an investment in the PAI Companies in exchange for revenue from a totally separate, foreign company is in itself a material omission. Without that information investors would not be aware of the full extent of the risks they were incurring. For example, as the SEC's expert in Austrian commercial law has illustrated, an Austrian company, such as PAG, is not legally allowed to share such revenue with non-shareholders. ECF No. 150-8 at 5–6. Second, there is no evidence that PAG was ever obligated to share any of this future revenue with the PAI Companies. PAG's Shareholders' General Meeting is the only body authorized to make revenue sharing decisions under Austrian corporate law, Defs. 56.1 ¶¶ 16, 23; ECF No. 150-8 at 5–6, and there is no evidence it ever agreed to do so. For example, there is no contract among PAG and ICT or the PAI Companies involving revenue sharing—the loan agreement among those companies required PAG to either repay the loan or give ICT and the PAI Companies an equity stake. Defs. 56.1 ¶ 144. That is not the same as agreeing to share revenue. Thus, every revenue share agreement was promising something that Laura had no right

to promise.  As with the patent ownership misstatements, the Court finds these misrepresentations and omissions are "so obviously important to an investor" that they are material misrepresentations as a matter of law.  *Jankovic*, 2017 WL 1067788, at *10; *see, e.g.*, *SEC v. StratoComm Corp.*, 2 F. Supp. 3d 240, 248 (N.D.N.Y. 2014) (granting summary judgment where defendants made false and misleading statements regarding the source and existence of revenue), *aff'd*, *SEC v. StratoComm Corp.*, 652 F. App'x 35 (2d Cir. 2016); *SEC v. Enters. Sols., Inc.*, 142 F. Supp. 2d 561, 577 (S.D.N.Y. 2001) (holding that statements regarding sources of company's revenue were materially misleading when company had no revenue).

### 3.    Anticipated Production Date

The Court next finds that there is no genuine issue of material fact that Laura made material misrepresentations regarding the anticipated production dates in the investor agreements.  The SEC has shown, and Defendants admit, that "some Investor Contracts . . . referred to an 'estimated production date' or an 'anticipated production date' that ranged from approximately six to ten or eleven months after the date of the Investor Contract."  ECF No. 151 at 16.  The anticipated date of when the cold cracking technology would be operational is a material piece of information since there can be no serious question that an investor would need to know when to expect to see a return on the investment.  *See Spark*, 2018 WL 6727349, at *2.

While the record shows that at least some investors were aware that they were investing in "a start-up in a volatile and inherently risky industry," ECF No. 151 at 17; ECF Nos. 153–55, the Court finds no evidence in the record that those investors were aware that the cold cracking technology had *never* been proven to be commercially viable, Defs. 56.1 ¶ 274.  There had been only one pilot project in India in 2008, which failed to lead to a commercial contract.  Defs. 56.1

26

¶¶ 86–92.  Over the next ten years, there were several more pilot contracts, including the one in

Egypt, none of which ever led to proof of commercial viability.  *Id*. ¶¶ 251–57, 258–59, 274;

ECF No 150-12 at 3–4.  And yet, Laura continued proposing "anticipated production date[s]" of

less than a year in the investor contracts.  Defs. 56.1 ¶¶ 310, 314; ECF No. 151 at 16.

Thus, the omission of the fact that the technology had never been proven commercially

viable at the time of investment is material, in that it altered the "mix of available information"

that an investor would need to evaluate just how unrealistically optimistic those anticipated

production dates were.  *Spark*, 2018 WL 6727349, at *2.  Defendants contend that these

estimates were reasonable based on the information available to them at the time.  ECF No. 151

at 17.  However, the Court finds that it is a material misrepresentation to promise investors an

anticipated production date, particularly one so optimistic, on a technology that (unbeknownst to

investors) had *never* been shown to be commercially viable.

The Court further finds that Defendants' misrepresentations and omissions are "so

obviously important to an investor" that the anticipated production dates in the investor contracts

were a material misrepresentation as a matter of law.  *Jankovic*, 2017 WL 1067788, at *10; *see,

e.g.*, *CKB168*, 210 F. Supp. 3d at 441 (granting summary judgment in favor of SEC where

defendants told investors that the company would soon go public even though there was no

evidence to suggest that it would); *SEC v. Constatin*, 939 F. Supp. 2d 288, 295, 306 (S.D.N.Y.

2013) (granting summary judgment in favor of SEC where defendants' "rosy projections,

advising clients that they would be able to liquidate their investments many months before they

actually ended up being able to do so . . . and promising very high returns" were found to be

materially misleading statements); *Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221,

27

239 (S.D.N.Y. 2006) ("optimistic statements may be actionable upon a showing that the defendants did not . . . reasonably believe the positive opinions they touted").

4.    <u>"Working Capital"</u>

The Court, however, finds that there remains a genuine issue of material fact as to whether or not Laura made misrepresentations regarding what constituted "working capital." The SEC argues that Laura's representations that "the investors' monies would be used 'as working capital for the international rollout of [the PAI Companies'] patented technology'" was "undisputedly false because Laura and Sichenzio misappropriated 50% of the approximately $12 million Defendants . . . raised from investors." ECF No. 146 at 26–27. Defendants do not dispute that an undisclosed intent to misappropriate funds would establish scheme liability. Rather, they argue that there are genuine issues of material fact as to whether: (i) they disclosed their intent to use the funds for themselves, and (ii) whether their personal use of the funds counts as misappropriation. ECF No. 151 at 18–19.

None of the investor agreements explicitly state that money would flow to Defendants' personal accounts. However, they all do contain language stating that money would go to "working capital." Defendants respond that the "working capital" that investors put up included salaries and expenses, and that any money that flowed to Laura was, in effect, either a loan, or his salary. *Id*. Defendants cite to *SEC. v. Empire Dev. Grp. LLC*, where the court defined "general working capital" as "including salaries." 2008 WL 2276629, at *2 (S.D.N.Y. May 30, 2008); ECF No. 151 at 18–19. Defendants further argue that Sichenzio, who put up the vast majority of the initial capital, was simply being appropriately repaid debts that he was owed by the PAI Companies. *Id*. ¶ 368. Finally, Defendants argue that investors were aware that their

28

money could be used this way, a claim they back up with declarations from a handful of investors.  ECF Nos. 153–55.  While the SEC insists that an investor would want explicitly to know that his or her funds were not being used for personal use by the PAI Companies leadership, they cite no authority for this proposition.  Given that the PAI Companies were clearly startups, the Court believes it is a genuine issue of material fact whether or not an investor would assume that some of their funds would go to support the CEO of that startup.

Accordingly, construing the evidence in the light most favorable to the nonmoving party, the Court is not willing to conclude at this stage that Laura made a material misrepresentation by not stating explicitly that "working capital" could include money paid to himself or Sichenzio.

### C.    Scienter

While the Court finds that the undisputed facts of this case establish that Laura's misstatements and omissions regarding the ownership of the cold cracking technology, the possibility of revenue sharing, and the anticipated production dates were material, when construing the evidence in the light most favorable to the nonmoving party, it finds that there are still genuine issues of material fact as to whether Laura had the requisite scienter when he made those statements.

When it comes to the cold cracking technology, Laura was aware that the PAI Companies did not own the patents he told investors they owned, and that they did not own an exclusive license to the technology.  *Id*. ¶¶ 135–37, 265–69.  Laura even admits that he was aware of this but did not disclose it because the investors "would not want to have an agreement with PAG, as in the event there was a problem, they would have to go to Europe to sue."  ECF No. 150-3 at 127 (Laura deposition).  However, even conceding those facts, Laura argues that his statements

29

regarding the ownership of the technology were not wrong because ICT and the PAI Companies had "implied license rights."  ECF No. 151 at 23–24.  The SEC contends that this argument is "factually unsupported and legally meritless."  ECF No. 164 at 6.  While that may be true, it does not diminish that there is a genuine issue of fact as to whether Laura believed it was true and, if so, whether he was reckless in holding that belief.

Laura further argues that the revenue share agreements were "grounded in good faith belief," ECF No. 151 at 7, in part because Defendants then legitimately believed "they were PAG supervisory board members," that revenue was to be shared due to the "overlapping ownership" between ICT and PAG, Defs. 56.1 ¶¶ 14, 45, 143, and that Nuerk—one of the Inventors— "was authorized to act on behalf of PAG and could commit PAG to paying the U.S. investors."  ECF No. 157 at 15.  The Court has already found Laura's statement that revenue would be shared between PAG and either ICT or the PAI Companies was a material misstatement.  There was never any agreement to share revenue with PAG.  However, as PAG never actually generated any revenue, Defs. 56.1 ¶ 274, it remains a genuine issue of fact whether Laura believed that once PAG began generating revenue some of that revenue would flow to PAI and ICT's investors.

Finally, when it comes to the anticipated production dates in the revenue share agreements, it is undisputed that, even though Laura never saw any of ICT or the PAI Companies ever receive any revenue from processing oil, he continued promising investors anticipated production dates of less than a year.  Defs. 56.1 ¶¶ 274, 310–14.  The SEC argues that such dates were "baseless projections" that were "undisputedly intentionally or recklessly false."  ECF No. 164 at 13.  While the Court finds that this is a close call, construing the evidence in the light most

favorable to the nonmoving party, the Court is not willing to conclude at this stage that Laura's misstatement regarding the anticipated production dates rose to the level of recklessness.

Because there are genuine disputes of material fact as to whether Laura's misstatements were made with scienter, the Court cannot enter summary judgment on the SEC's claims against Laura under Section 10(b) or Rule 10b-5(b).

However, the Court finds that Laura's statements were indisputably negligent. *See Jankovic*, 2017 WL 1067788, at *14 ("[C]ourts in this Circuit have not strayed far from a black-letter, 'reasonable person' standard in defining 'negligence' under Section[s] 17(a)(2) and (3). . . . Under these provisions, the definition of negligence is the failure to use reasonable care, which is the degree of care that a reasonably careful person would use under like circumstances."). It was negligent for Laura to state that the PAI Companies "owned" cold cracking technology that they never owned. It was negligent for Laura to promise investors that PAG would share revenue when there was never any legal obligation to do so based on the promises of one of the Inventors, or his misunderstanding of Austrian corporate law. It was negligent for Laura to promise anticipated production dates of less than a year, particularly after he repeatedly saw those deadlines pass without producing any refined oil. Because the undisputed facts of this case also establish the other elements of Section 17(a)(2), the Court grants summary judgment in favor of the SEC against Laura on these claims.

## II.     Laura—Liability as an Unregistered Broker

Claim 7 alleges that Laura failed to register properly as a broker in violation of Section 15(a)(1) of the Exchange Act.

"Section 15(a)(1) of the Exchange Act makes it unlawful for a broker 'to make use of . . . interstate commerce to effect any transactions in, or to induce or attempt to induce the purchases or sale of, any security unless such broker is registered [with the SEC].'"  *CKB168*, 210 F. Supp. 3d at 452.  Courts use a six factor test when evaluating whether or not an individual is acting as a broker:  "1) is an employee of the issuer; 2) received commissions as opposed to a salary; 3) is selling, or previously sold, the securities of other issuers; 4) is involved in negotiations between the issuer and the investor; 5) makes valuations as to the merits of the investment or gives advice; and 6) is an active rather than passive finder of investors."  *Id*.  The SEC does not need to establish that every factor applies to the Defendant for the Court to find that he acted as a broker, but that some combination of the factors establishes that fact.  *See id*.

Laura argues, using authority outside the Second Circuit, that the second factor should be viewed as the most important.  *SEC v. Kramer*, 778 F. Supp. 2d 1320, 1334 (M.D. Fla. 2011).  He claims that "there is no evidence, let alone an allegation, that Laura received a commission on any of the sales at issue herein."  ECF No. 151 at 29.  First, courts in the Second Circuit have not held that the second factor is more important than any of the others.  *See CKB168*, 210 F. Supp. 3d at 453 (noting that no factor is dispositive and the SEC only needs to prove some combination of factors to establish that defendant acted as a broker).  Second, while there was no formal commission structure, Laura "relied upon funds raised through investors to support himself," Sichenzio Dep. at 211:10-20, and channeled some of the money from the investment contracts directly into his own accounts.  Although there was no formal commission structure, the fact that Laura was living off the funds created an incentive structure where "the size of [his] purported entitlement directly correlate[d] to the size and success of each investment," similar to a

commission.  *Jobanputra v. Kim*, No. 21-cv-7071, 2022 WL 4538201, at *9 (S.D.N.Y. Sept. 28,

2022) (noting that such a fee structure is a "hallmark of broker-dealer activity").

Viewing the factors as a whole, the Court finds that the SEC has proven that there is no

genuine issue of material fact as to whether Laura was a broker:  (i) Laura was President and

Chairman of the PAI Companies, which entered into the investor agreements, satisfying the first

factor; (ii) he was involved in the negotiations between the issuer and the investor when he

drafted the agreements, satisfying the fourth factor; (iii) he made valuations as to the merits of

the investments, in that he told investors he believed them to be a good investment, satisfying the

fifth factor; and (iv) he was an active, rather than passive finder of investors, satisfying the sixth

factor.[20]  While the Court believes there is some debate as to the second factor—whether Laura

received a commission—the weight of the other factors overwhelmingly supports the conclusion

that defendant was a broker as a matter of law.  *See, e.g.*, *CKB168*, 210 F. Supp. 3d at 452.

Accordingly the Court grants summary judgment in favor of the SEC on claim seven.

### III.        Laura & Sichenzio—Scheme Liability

Claims one, two, three, and four of the complaint also allege that both Defendants may be

held liable under a theory of "scheme liability."

The "Exchange Act [Section] 10(b), Rule 10b-5(a) and (c), and Securities Act [Sections]

17(a)(1) and (3) create what courts have called scheme liability."  *SEC v. Sason*, 433 F. Supp. 3d

496, 508 (S.D.N.Y. 2020).  Scheme liability requires showing that "[d]efendants . . . participated

in an illegitimate, sham or inherently deceptive transaction where [their] conduct or role ha[d]

---

[20]        The Court notes that, because there is no allegation that Laura ever previously sold
securities of other issuers, the third factor has not been satisfied.

the purpose and effect of creating a false appearance." *Id*.  To state a scheme liability claim

under Section 10(b) or Section 17(a)(1), the SEC must allege "that defendants:  (1) committed a

deceptive or manipulative act; (2) in furtherance of the alleged scheme to defraud; (3) with

scienter." *Id.* at 508–09.

　　　To state a scheme liability claim under Section 17(a)(3) the SEC must allege essentially

the same elements as under Section 10(b), Rule 10b-5(a) and (c), and Securities Act § 17(a)(1),

except that only a showing of negligence is required to satisfy the requisite mental state.  Scheme

liability under Section 17(a)(3) is broader than misstatement liability under Section 17(a)(2),

allowing the Court to look beyond specific statements made by Defendants, but is also harder to

prove:  scheme liability, under all sections, requires that the SEC demonstrate that Defendants'

behavior went "beyond misstatements and omissions"; in other words, that they did "something

*extra* that makes a violation a scheme." *SEC v. Stubos*, No. 22-cv-4674, 2022 WL 6776741, at

*15 (S.D.N.Y. Oct. 11, 2022) (emphasis added); *see also SEC v. Rio Tinto plc*, 41 F.4th 47, 49–

54 (2d Cir. 2022).

　　　The SEC contends that the "something extra" that Defendants engaged in that makes the

violations a scheme was "[r]epresenting to investors that funds obtained in an offering are to be

used for one purpose and diverting them for another purpose."  ECF No. 146 at 32.  In other

words, keeping the investor money for themselves, when the investors expected it to go towards

commercializing the cold cracking technology.  It is well established that an undisclosed intent to

misappropriate funds is sufficient to establish scheme liability on a motion for summary

judgment. *Commodity Futures Trading Comm'n v. McDonnell*, 332 F. Supp. 3d 641, 720

(E.D.N.Y. 2018); *SEC v. Zandford*, 535 U.S. 813, 819–20 (2002).

As noted above, the Court has already found that there are genuine issues of material fact as to whether Laura deceptively misappropriated investor funds sufficient to establish misrepresentation liability.  *See supra* at 28–29.  For those same reasons, the Court cannot find Defendants deceptively misappropriated investor funds sufficient to establish scheme liability. As the SEC has not shown that Defendants engaged in "something extra" beyond material misrepresentations, the Court cannot grant summary judgment on the SEC's scheme liability claims against Defendants under Exchange Act Section 10(b) and Rule 10b-5 thereunder, or Securities Act Sections 17(a)(1) and (3).

## IV.        Sichenzio—Aiding and Abetting Laura's Misrepresentations

The SEC also contends that Sichenzio is liable for aiding and abetting Laura's material misrepresentations under the Securities Act Section 17(a)(2) (claim five) and Exchange Act 10(b) and Rule 10b-5(b) thereunder (claim six).

To hold a defendant liable as an aider and abettor in a civil enforcement action, the SEC must plead and ultimately prove:  "(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge of this violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the primary violation."  *SEC v. Ripple Labs, Inc.*, No. 20-cv-10832, 2022 WL 762966, at *6 (S.D.N.Y. Mar. 11, 2022).  The elements are interrelated.  *Id.* ("Courts cannot consider the three requirements in isolation from one another because satisfaction of the knowledge requirement will depend on the theory of primary liability, and there may be a nexus between the degree of knowledge and the requirement that the alleged aider and abettor render substantial assistance."). "To establish knowledge, the SEC must show a defendant's general awareness of his overall role

in the primary violator's illegal scheme." *Paulsen*, 2020 WL 6263180, at *14. "The defendant need not know all of the details of the crime . . . if the evidence shows that he joined the venture, shared in it, and that his efforts contributed towards its success." *Id.* "Notably, the SEC need not demonstrate that the [defendants] were aware that [the violation] *was* illegal." *Ripple Labs*, 2022 WL 762966, at *7 (emphasis in original). Still, to establish that a defendant had "knowledge" of the violation requires a showing of something more than negligence, "[r]ather, the SEC must show that the Individual Defendants knew, or recklessly disregarded, the facts that made [the violation] illegal." *Id*. "To establish substantial assistance, the SEC must offer evidence that a defendant associated himself with the illegal venture, that he participated in it as something he wished to bring about, and that he sought by his action to make it succeed." *Paulsen*, 2020 WL 6263180, at *15. This requires the Defendant to "consciously assist the commission of the specific crime in some active way." *Id*.

First, because the Court has found there is a genuine issue of material fact as to whether Laura recklessly or intentionally made material misstatements in violation of Section 10(b), the Court cannot find Sichenzio liable for aiding and abetting Laura under that section. However, the Court has found that Laura negligently made material misstatements in violation of Section 17(a)(2), and therefore the Court can analyze whether Sichenzio aided and abetted Laura's material misstatements under that section.[21]

---

[21]    In addition, because the Court found that there were genuine issues of material fact as to whether Laura made material misrepresentations regarding what constituted "working capital" in violation of Section 17(a)(2), it cannot find Sichenzio liable for aiding and abetting any of Laura's alleged misstatements regarding "working capital."

As an initial matter, the Court finds that Sichenzio substantially assisted Laura's material misstatements:  As an officer of the PAI Companies, Sichenzio solicited investments in the PAI Companies, and even signed some of the investor agreements.  Defs. 56.1 ¶ 296.  Sichenzio brought in 12–13 investors, *id*. ¶ 171, and was often their only source of information (or misinformation).  *Id*.  ¶ 172.  Through these actions, Sichenzio "consciously assisted" the primary violation—Laura's material misstatements—in an "active way."  *Paulson*, 2020 WL 6263180, at *15; *see, e.g.*, *StratoComm*, 2 F. Supp. 3d at 262 (granting summary judgement in favor of SEC after finding defendant substantially assisted material misstatements when he referred investors to materials that he knew contained material misstatements), *aff'd*, 652 F. App'x 35 (2d Cir. 2016); *SEC v. Syron*, 934 F. Supp. 2d 609, 637 (S.D.N.Y. 2013) (signing investor documents that defendants knew to be misleading indicates substantial assistance).

As it relates to Sichenzio's knowledge of Laura's material misstatements, the SEC argues that "[a]t a minimum, Sichenzio admits he knew that it was Pristec AG, not the PAI Companies, that would be seeking to enter into revenue-generating contracts."  ECF No. 146 at 31 n.19.  The Court agrees.  Sichenzio indisputably had "knowledge" that Laura was making misrepresentations to investors as to the revenue share agreements.  Sichenzio has admitted he knew that potential revenue from processing oil was coming from PAG, not the PAI Companies, Defs. 56.1 ¶¶163–66 ("Sichenzio understood that, at this time, if a contract was entered into, it would be between Pristec AG and the oil companies.").  Yet, Sichenzio signed some of the revenue share agreements that omitted the source of this future revenue.  *Id*. ¶ 296.

However, the Court finds that there are genuine issues of material fact as to whether Sichenzio knew, or recklessly disregarded, Laura's other material misstatements.  There is no

evidence that Sichenzio was aware that Laura's statements regarding the cold cracking technology were false.  As it relates to the anticipated production date of processed oil included in some of the investor contracts, Sichenzio has admitted he was aware of the challenges faced by PAG's early attempts to make the technology commercially viable, *id*. ¶¶ 163–66, and was aware of the geopolitical risks, *id*. ¶ 178.  However, Sichenzio also admitted that Laura had "more information" on whether money was "going to come back based on investment contracts based on barrels of oil produced," *id*. ¶ 168, and, at least initially, "was not aware of the amount of capital that would be required to commercial[ize] the technology," *id*. ¶ 183.  While it is a close call, the Court cannot say based on this that Sichenzio knew, or recklessly disregarded, that Laura's statements regarding the "anticipated production date" were false.

The Court finds that the undisputed facts of this case establish that Sichenzio aided and abetted Laura's material misstatements relating to the revenue share agreements under Section 17(a)(2), however, there remain genuine issues of material fact as to whether Sichenzio had sufficient knowledge to be liable for aiding and abetting Laura's other material misstatements.  Accordingly, the Court grants summary judgment in favor of the SEC against Sichenzio on this claim as it relates to aiding and abetting Laura's misstatements regarding revenue sharing only and denies summary judgement as to all other aiding and abetting claims.

## V.        Statute of Limitations

Defendants also move for partial summary judgment contending that the SEC's claims prior to June 2, 2013, are timed barred.  ECF No. 157 at 31–32.  For the reasons explained below, the Court holds that a ten-year statute of limitations applies to the SEC's ability to seek disgorgement related to its scienter-based claims and, therefore, denies Defendants' motion for

partial summary judgment.  However, the SEC does not dispute that a five-year statute of limitations applies to its disgorgement remedy related to its non-scienter claims, which are the only claims on which the Court is granting summary judgment in favor of the SEC.

On January 1, 2021, Congress passed the National Defense Authorization Act ("NDAA"), H.R. 6395, § 6501(a)(3) (to be codified at 15 U.S.C. § 78u(d)(8)(A)(ii)), which extended the statute of limitations to ten years for disgorgement remedies for securities violations that require the Commission to prove scienter.  *Stubos*, 2022 WL 6776741, at *8.  Before Congress amended the statute of limitations, this Court had ruled that "Defendants can only face liability for conduct after June 2, 2013."  *SEC v. Laura*, No. 18-cv-5075, 2020 WL 8772252, *3 (E.D.N.Y. Dec. 30, 2020).  Defendants argue that "the Court's ruling on the statute of limitations remains the law of the case."  ECF No. 156 at 32.

Given that there was an "intervening change of controlling law," the Court believes it is appropriate for it to reconsider its earlier ruling on the statute of limitations.  *Vornado Realty Tr. v. Marubeni Sustainable Energy, Inc.*, 987 F. Supp. 2d 267, 276 (E.D.N.Y. 2013).  Congress explicitly stated that the provisions of the NDAA "shall apply with respect to any action or proceeding that is *pending on*, or commenced on or after, the date of enactment of this Act."  *See* NDAA, Section 6501(b) (emphasis added).  The Second Circuit has recently confirmed that "[t]he NDAA's disgorgement amendments explicitly apply to cases pending at the time of enactment."  *SEC v. Ahmed*, No. 21-1686, 2023 WL 4219923 (2d Cir. June 28, 2023); *see also Stubos*, 2022 WL 6776741, at *12 ("the words 'pending on' clearly envision . . . that the statute of limitations contained in the NDAA has some retroactive effect and, in turn, revives some previously time-barred claims").

39

Many of the forms of relief available to the SEC are still timed barred, however.  While the SEC may now pursue a disgorgement remedy at trial pursuant to the sections with a scienter element[22] relating to investor payments made within the ten-year period before the SEC filed this action, civil penalties for all of the SEC's claims are still subject to the original five-year statute of limitations, regardless of whether the claims require a finding of scienter.  *Xia*, 2022 WL 17539124, at *13 (civil penalties subject to original five-year statute of limitations); *see SEC v. Fowler*, 6 F.4th 255, 260 (2d Cir. 2021) (civil penalties subject to original five-year statute of limitations), *cert. denied*, 211 L. Ed. 2d 367, 142 S. Ct. 590 (2021).  The SEC may, however, seek disgorgement and injunctive relief based on these claims at trial, given the change in law. *See SEC v. Gallison*, 588 F. Supp. 3d 509, 521 (S.D.N.Y. 2022) ("pursuant to the NDAA, Congress has explicitly decided that a ten-year statute of limitations applies for the SEC's injunctive relief"); 15 U.S.C. § 78u(d)(8)(A), (B).

## CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiff's motion for summary judgment on claim one as to Laura's material misstatements in the investor contracts under Section 17(a)(2) of the Securities Act, except as it pertains to statements regarding "working capital"; on claim seven, as to whether Laura acted as an unlicensed broker under Section 15(a) of the Exchange Act; and on claim five, as to whether Sichenzio aided and abetted Laura's material misstatements under Section 17(a)(2) of the Securities Act, but only as to the revenue share agreements.

---

[22]     Section 17(a)(1) of the Securities Act and Section 10(b) of the Exchange Act.

The Court DENIES Plaintiff's motion for summary judgment on claim two as to whether Laura made material misstatements with scienter under Section 10(b) of the Exchange Act; DENIES Plaintiff's motion for summary judgment on claim six, as to whether Sichenzio aided and abetted Laura's material misstatements under Section 10(b) of the Exchange Act; and DENIES Plaintiff's motion for summary judgement on claims one, two, three, and four, as to whether both Defendants engaged in a fraudulent misappropriation scheme.

The Court further DENIES Defendants' request to strike expert testimony, and to bar the SEC from raising claims that arose prior to June 2, 2013—the SEC may pursue a disgorgement remedy and injunctive relief under Section 17(a)(1) and Section 10(b) relating to investor payments made within the ten-year period before the SEC filed this action.

SO ORDERED.

*/s/ Hector Gonzalez*
HECTOR GONZALEZ
United States District Judge

Dated: Brooklyn, New York
          June 28, 2023