**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

**SECURITIES AND EXCHANGE COMMISSION,**

                           **Plaintiff,**

     - against -

**JOSEPH M. LAURA,**
**ANTHONY R. SICHENZIO,**
**and WALTER GIL DE RUBIO,**

                        **Defendants.**

**18 Civ. 5075 (HG) (VMS)**

**ECF CASE**

**MEMORANUDUM OF LAW IN SUPPORT OF THE SECURITIES AND EXCHANGE**
**COMMISSION'S MOTION FOR MONETARY REMEDIES**
**AGAINST DEFENDANTS JOSPESH M. LAURA AND ANTHONY R. SICHENZIO**

SECURITIES AND EXCHANGE
COMMISSION
Victor Suthammanont
Hayden Brockett
Margaret D. Spillane
New York Regional Office
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-5674 (Suthammanont)

Attorneys for Plaintiff

November 17, 2023

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

PRELIMINARY STATEMENT ......................................................................................... 1

RELEVANT PROCEDURAL HISTORY .......................................................................... 2

STATEMENT OF RELEVANT FACTS ............................................................................ 3

    I.     THE COMPLAINT'S ALLEGATIONS .................................................. 3

    II.    THE BANK RECORD ANALYSIS AND ADDITIONAL EVIDENCE ............... 5

    III.   THE SEC'S PREJUDGMENT INTEREST CALCULATIONS ........................... 9

ARGUMENT ...................................................................................................................... 9

    I.     LAURA AND SICHENZIO SHOULD BE ORDERED TO PAY
        DISGORGEMENT AND PREJUDGMENT INTEREST ....................................... 9

        A.    Laura Should Be Ordered to Disgorge $4,262,060 and Pay
            $2,113,244 in Prejudgment Interest ..................................................... 10

        B.    Sichenzio Should Be Ordered to Disgorge $1,794,976 and Pay
            $905,960 in Prejudgment Interest ....................................................... 12

    II.    LAURA AND SICHENZIO SHOULD BE ORDERED TO PAY
        CIVIL PENALTIES OF $4,262,060 AND $1,794,976,
        RESPECTIVELY ................................................................................................. 14

CONCLUSION ................................................................................................................... 17

# TABLE OF AUTHORITIES

**<u>Cases</u>**

*FTC v. Bronson Partners, LLC*, 654 F.3d 359 (2d Cir. 2011)................................................ 11, 12

*SEC v. Ahmed*, 72 F.4th 379 (2d Cir. 2023) ................................................................. 9

*SEC v. Amerindo Inv. Advisors Inc.*, No. 05 Civ. 5231 (RJS), 2014 WL 2112032
  (S.D.N.Y. May 6, 2014) .......................................................................... 17

*SEC v. Bronson*, 246 F. Supp. 3d 956 (S.D.N.Y. 2017) ............................................. 14

*SEC v. Fowler*, 6 F.4th 255 (2d Cir. 2021) ...................................................... 9, 10, 11

*SEC v. Govil*, No. 22-1658, 2023 WL 7137291 (2d Cir. Oct. 31, 2023).................................... 10

*SEC v. Inorganic Recycling Corp.*, No. 99 Civ. 10159 (GEL), 2002 WL 1968341
  (S.D.N.Y. Aug. 23, 2002) ....................................................................... 17

*SEC v. Liu*, 140 S. Ct. 1936 (2020)........................................................... 9, 10, 14

*SEC v. Lybrand*, 281 F. Supp. 2d 726 (S.D.N.Y. 2003) ............................................. 15

*SEC v. Razmilovic*, 788 F.3d 14 (2d Cir. 2013)................................................... 10, 14

*SEC v. Teo*, 746 F.3d 90 (3d Cir. 2014)........................................................... 9

**<u>Statutes</u>**

15 U.S.C. § 77t(d) ............................................................................. 14

15 U.S.C. §78u(d) ........................................................................... 9, 14

Plaintiff Securities and Exchange Commission ("SEC") respectfully submits this memorandum of law in support of its motion for monetary remedies against Defendants Joseph Laura ("Laura") and Anthony Sichenzio ("Sichenzio" and, with Laura, "Defendants"), together with the declarations of Neil Hendelman and Victor Suthammanont. For the reasons set forth below, the Court should grant the SEC's motion in the form of the proposed judgment attached as Exhibits F and G to the November 17, 2023 Declaration of Victor Suthammanont.

## PRELIMINARY STATEMENT

In bifurcated consent judgments the Court entered on August 22, 2023 (DE 175), following the Court's grant of partial summary judgment to the SEC (DE 170 (June 28, 2023 Mem. and Order) ("June 2023 Order")), Defendants agreed that the Court would deem true the allegations in the SEC's Complaint for purposes of determining monetary remedies. As the Complaint alleges and additional evidence shows, from at least 2010 to January 2017, the Defendants raised $12.4 million from more than 150 investors in a scheme that defrauded investors through repeated misrepresentations and omissions as well as the misappropriation of investor funds. In oral statements and written agreements, the Defendants knowingly or recklessly misstated a variety of material facts concerning the investments—including the status of the underlying technology, prospects of commercialization and investor payments, and the use of investor funds. Together, Laura and Sichenzio misappropriated $7.4 million of investors' funds, either in direct transfers to themselves or by incurring personal expenses using investors' money. The harm to investors—many of whom were inexperienced and of modest wealth—was enormous. They never received any of the promised returns, and aside from a lucky few, they never obtained a return of their investment. The investor losses total almost $12 million.

The SEC's analysis of bank records and other documents reveals that Laura took over $2.7 million of investors' cash through withdrawals and cash transfers to accounts he controlled, as well as spent approximately the same amount from investors' funds on personal expenses. Offsetting for personal liabilities Laura incurred to fund the venture in 2017 and 2018, Laura's ill-gotten gains that should be disgorged amount to $4,262,060. Sichenzio received nearly $1.9 million of investors' funds, and after an offset for a personal liability he incurred, should be ordered to disgorge $1,794,976 in ill-gotten gains. In addition to prejudgment interest on those amounts ($2,113,244 against Laura and $905,960 against Sichenzio), each Defendant should be ordered to pay a penalty—$4,262,060 as to Laura and $1,794,976 as to Sichenzio—in light of their egregious deception and misappropriation, high degree of scienter, and devastating monetary loss they caused to investors.

Accordingly, for the reasons described below, the Court should grant the SEC's motion ordering the disgorgement, prejudgment interest, and penalty amounts above as set forth in the SEC's proposed judgments.

## RELEVANT PROCEDURAL HISTORY

The SEC filed its Complaint on September 7, 2018. DE 1. The Complaint alleges violations of Sections 17(a)(1), (2), and (3) of the Securities Act of 1933 ("Securities Act"), Sections 10(b) and 15(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 thereunder against Laura. As to Sichenzio, the Complaint alleges he violated Securities Act Sections 17(a)(1) and (3), Exchange Act Section 10(b), and Rule 10b-5(a) and (c), and that he aided and abetted Laura's violations of Securities Act Section 17(a)(2), Exchange Act Section 10(b), and Rule 10b-5(b). Following discovery, the parties each moved for partial summary judgment.

On June 28, 2023, the Court granted summary judgment in favor of the SEC on certain of its claims and denied Defendants' motion. DE 170. In the June 2023 Order, the Court granted the SEC's motion against Laura as to liability for at least negligently making material misrepresentations under Securities Act Section 17(a)(2) and for acting as an unregistered broker under Exchange Act Section 15(a), and against Sichenzio for aiding and abetting Laura's Section 17(a)(2) violations. DE 170 at 40. Subsequently, Laura and Sichenzio consented to judgments imposing injunctive relief as to all claims, and providing for disgorgement, prejudgment interest, and penalties to be determined by the Court on the SEC's motion, and the Court entered those judgments on August 22, 2023. DE 175. Among other things, Laura's and Sichenzio's consent judgments provide that, in such a remedies motion, (a) they cannot argue that they did not violate the securities laws as alleged in the Complaint and found by the Court in the June 2023 Order; (b) they cannot challenge the validity of the consents or judgments; (c) the allegations of the Complaint shall be accepted as and deemed true by the Court; and (d) the Court may determine the issues raised in the motion on the basis of affidavits, declarations, excerpts of sworn testimony, and documentary evidence without regard for the standards for summary judgment contained in Fed. R. Civ. P. 56(c). DE 175 at 4, 14.

## STATEMENT OF RELEVANT FACTS

## I.    THE COMPLAINT'S ALLEGATIONS

The Complaint alleges that Laura and Sichenzio along with a former defendant who has since settled, Walter Gil de Rubio (*see* DE 169 (Jan. 24, 2023 Final Judgment)), schemed to deceive investors and misappropriate millions of dollars through the fraudulent offer and sale of securities of Pristec America, Inc. ("PAI"), a U.S. company incorporated by Laura in New Jersey and Nevada, and Pristec AG ("PAG"), an Austrian company that purportedly had rights to an application of a crude-oil processing technology called "cold-cracking." Compl. ¶¶ 1, 16, 18

(DE 1). Laura and Sichenzio held shares of PAI and PAG through Innovative Crude Technologies, Inc. ("ICT" and, together with PAI, the "PAI Companies")). Compl. ¶¶ 17-18, 22.

Defendants sold securities in the form of revenue-sharing, stock-purchase, and convertible-loan agreements, which Laura—a lawyer, *see* Compl. ¶ 13—drafted and signed, and Sichenzio signed. Compl. ¶ 2. These investment contracts and Defendants' oral solicitations of investors contained numerous fraudulent misrepresentations and omissions of material facts, including about Defendants' use of investors' funds, ownership of the oil-processing technology, PAI's financial condition, and Defendants' purported investments in PAI. *Id.* The revenue-sharing contracts also contained baseless and unreasonably optimistic projections concerning oil production and the timing and amount of investment returns investors could expect to realize. *Id*.

For example, the agreements falsely claimed that PAI owned and had exclusive worldwide rights to profit from the cold-cracking technology. In fact, PAI had no license to use the technology for the first several years, and once issued, that license granted exclusive rights in only certain countries, with non-exclusive rights elsewhere. Compl. ¶ 23. The Court ruled that this was a material misrepresentation based on undisputed facts, as were misrepresentations concerning the source of revenue related to the revenue-sharing agreements. DE 170 at 24.

Similarly, the claims regarding the projected amount and timing of revenue investors would receive were baseless. The majority of the revenue-sharing contracts promised investors a set payoff per oil barrel processed and contained schedules showing production dramatically increasing, for as much as a 2000% return. Compl. ¶¶ 23, 60. In some cases, the contracts promised that revenues would begin to flow in less than a year, even though no contract for commercial oil production existed at any time. Compl. ¶¶ 23, 60, 63. Defendants had no reasonable basis for these highly unlikely projections, and failed to disclose to investors

significant risks to achieving these projections that Defendants were well aware of. Compl. ¶¶ 77-81. The Court found these to be material misrepresentations based on undisputed facts. DE 170 at 26.

From at least 2010 through 2017, Defendants' scheme raised more than $12 million from more than 150 investors. Compl. ¶ 5. When the Complaint was filed, Defendants were still soliciting investments and using them for their personal benefit. Compl. ¶ 100. During the period alleged in the Complaint, Defendants failed to produce any revenues for their investors from commercializing the oil-processing technology. Compl. ¶ 5. Many of the investors were inexperienced and/or of modest wealth and income. Compl. ¶ 42.

The Complaint alleged that Laura misappropriated and misdirected over $4 million of $8.5 million in investor funds raised from 2010 to approximately May 2013, *see* Compl. ¶ 32, and over half of the $3.7 million in investor funds Defendants raised between June 2013 and January 2017. Compl. ¶ 3. Substantial portions of this amount were directed to Sichenzio for his personal use. *Id.*

## II.     THE BANK RECORD ANALYSIS AND ADDITIONAL EVIDENCE

The SEC summary analysis of the PAI Companies' bank accounts shows that investors suffered a pecuniary loss of almost $12 million. Investors transferred a total of $8,037,060 into bank accounts held by PAI ("PAI Accounts"), but only received $257,475 out of those accounts. Hendelman Decl. ¶ 13 and Ex. F. In addition, there were $1,319,500 of investor deposits into accounts held by ICT ("ICT Accounts"), but only $199,500 of that amount went back to investors. Hendelman Decl. ¶ 12 and Ex. E. There were also $2,930,232 in investor deposits into an account owned by Laura's now-defunct law firm, but only $4,100 of that amount was paid back to investors. Hendelman Decl. ¶ 9 and Ex. C. Finally, Laura and Sichenzio received a total of $85,000 of investor funds directly into their personal accounts. Hendelman Decl. ¶¶ 7 and 8,

Exs. A and B. Summing these totals, investors invested $12,371,792, but received only $461,075 back—a loss of $11,910,717. These losses were due to Defendants' fraud—including the misappropriation of investor funds by Laura and Sichenzio.

The SEC's summary analysis also shows the amounts Laura and Sichenzio respectively obtained in ill-gotten gains from their fraud. With respect to Laura, he deposited $10,000 of investor funds directly into his personal bank account, which were subsequently used for personal expenses. Hendelman Decl. ¶ 7 and 7(a), Ex. A. Laura's former law firm received $436,436 more in investor funds than it transferred onward to the PAI Accounts. Hendelman Decl. ¶¶ 10-11, Ex. D. Laura further received $1,199,655 in net transfers from the PAI Accounts, and $354,504 in net transfers from the ICT Accounts. Hendelman Decl. ¶¶ 16-17, Exs. I and J. In addition to these direct payments to bank accounts that Laura controlled, he also withdrew $512,942 in cash from the PAI Accounts and $214,131 from the ICT Accounts. Hendelman Decl. ¶ 18 and Ex. K. Moreover, Laura spent $1,572,729 from the PAI Accounts and $1,169,763 from the ICT Accounts on categories of items that appear to be personal or without evidence of a business justification.[1] *See* Hendelman Decl. ¶ 19 and Ex. L. This includes approximately $90,685 on retail purchases including at Neiman Marcus, Sleepys, and PC Richard, a net of $20,791 on education expenses, and $293,907 spent on sports-related expenses. Hendelman Decl. ¶¶ 21 and 21(a), Ex. L. As alleged in the Complaint, the improper payments also included payments to settle an unrelated lawsuit, personal rent, and gym membership.[2] Compl. ¶ 51(a)-(*l*).

---

[1] As reflected in Hendelman Decl. Ex. L, these sums are net of refunds or repayments.

[2] Given the additional documents and analysis undertaken after the filing of the Complaint, for the sake of consistency, precision, and equity, the SEC submits that the Court should rely on the analysis and figures set forth in the Hendelman Declaration as the most reasonable means of calculating disgorgement.

Thus, in total, Laura received $5,462,060 in benefits from investors to which he was not entitled, as shown in the table below:

| Category | Amount | Hendelman Decl. |
|---|---|---|
| Investor funds sent directly to Laura | $10,000 | ¶ 7, Ex. A |
| Funds sent to Laura's law-firm accounts | $436,436 | ¶ 11, Exs. C and D |
| Transfers from PAI Accounts to Laura | $1,199,655 | ¶ 16, Ex. I |
| Transfers from ICT Accounts to Laura | $354,504 | ¶ 17, Ex. J |
| Cash and equivalent withdrawals from PAI Accounts | $504,842 | ¶18, Ex. K |
| Cash and equivalent withdrawals from ICT Accounts | $214,131 | |
| Personal expenses from PAI Accounts | $1,572,729 | Ex. L |
| Personal expenses from ICT Accounts | $1,169,763 | |
| **Total Misappropriation** | $5,462,060 | |

For his part, Sichenzio deposited a total of $75,000 of investor funds directly into his bank accounts, which he subsequently used for personal expenses. Hendelman Decl. ¶ 8 and Ex. B. Sichenzio also received $1,300,900 more from the PAI Accounts and $494,076 more from the ICT Accounts than he sent to those accounts, including payments made on Sichenzio's behalf to his wife and Atlas Limo. Hendelman Decl. ¶¶ 14-15, Exs. G and H. Sichenzio testified in a prior arbitration that he lives with his wife, who does not work. Suthammanont Decl. Ex. C at 3-4 (Tr. 9:20-10:3). In the same arbitration, Sichenzio testified that Atlas Limo is a corporation established by his personal limo drivers, who drove him to and from his job as a registered broker-dealer representative and for personal matters. Suthammanont Decl. Ex. C at 5-13 (Tr. 51:24-59:6). Thus, in total, Sichenzio received $1,869,976 in benefits from investors to which he was not entitled, as shown in the table below:[3]

---

[3] Between 2010 and 2012, Sichenzio deposited $1,190,500 into Laura's law firm account, and received $45,000 from that account, for a net amount of $1,145,500. Hendelman Ex. C at 3. The SEC did not factor those amounts into its claims for disgorgement from Sichenzio for the reasons discussed below in Argument Section I.B.

| Category | Amount | Hendelman Decl. |
|---|---|---|
| Investor funds sent directly to Sichenzio | $75,000 | ¶ 8, Ex. B |
| Transfers from PAI Accounts to Sichenzio | $1,300,900 | ¶ 14, Ex. G |
| Transfers from ICT Accounts to Sichenzio | $494,076 | ¶ 15, Ex. H |
| **Total Misappropriation** | $1,914,976 | |

During the litigation, Defendants provided the SEC with evidence that they had obtained certain loans that they personally guaranteed in whole or in part, and the proceeds of which Defendants used to fund the ongoing operations of the PAI Companies, including litigations attempting to secure the PAI Companies' right to the cold-cracking technology. Suthammanont Decl. ¶¶ 4-8. Laura and Sichenzio jointly and severally guaranteed a $150,000 loan. Suthammanont Decl. ¶ 6 and Ex. A. Although both are liable for the full amounts of that loan, to avoid double-counting, the SEC calculated a 50% allocation to each ($75,000) to determine their contribution to the PAI Companies. Laura guaranteed an additional $1,125,000 in loans.[4] Suthammanont Decl. ¶ 7 and Ex. B at 3-4 (¶ 3.4 of the Option Agreement noting prior loans of $1,125,000). Netting the loan amounts the Defendants have substantiated—$1,200,000 for Laura (the sum of $75,000, representing 50% of his and Sichenzio's joint loan, and his own $1,125,000 worth of loans) and $75,000 for Sichenzio—against the sums they misappropriated, Laura's net ill-gotten gains total $4,262,060, and Sichenzio's ill-gotten gains total $1,794,976.[5]

---

[4] Although certain of these loans included an additional guarantor, the other guarantor is not a party to the case and there is no evidence that they have paid the amounts due. Because Laura is fully liable for the amounts unless they are paid by the other guarantor, the SEC credited Laura with the full amount of the loans as a repayment to the PAI Companies.

[5] Although Defendants provided a schedule of loans totaling approximately $2 million that they purportedly took to fund the PAI Companies' business in 2017 and 2018, they only provided documents sufficient to substantiate the amounts above. Suthammanont Decl. ¶¶ 4-8.

## III.  THE SEC'S PREJUDGMENT INTEREST CALCULATIONS

The SEC calculated pre-judgment interest based on the Internal Revenue Service ("IRS") tax underpayment rate from June 1, 2013, the date to which Defendants consented to begin the running of prejudgment interest for purposes of this motion (DE 175 at 4, 14), and August 22, 2023, the date on which Defendants consented to injunctive relief and determination of remedies in this case. DE 175. Based on that calculation, interest on Laura's and Sichenzio's ill-gotten gains totals $2,113,244 and $905,960, respectively. Suthammanont Decl. Exs. D and E.

## ARGUMENT

## I.  LAURA AND SICHENZIO SHOULD BE ORDERED TO PAY DISGORGEMENT AND PREJUDGMENT INTEREST

Congress authorized disgorgement of defendants' ill-gotten gains in SEC enforcement actions. 15 U.S.C. §78u(d)(3), (5) & (7); *see also SEC v. Liu*, 140 S. Ct. 1936, 1940 (2020) (disgorgement "that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under § 78u(d)(5)"). The purpose of disgorgement is to prevent the unjust enrichment of securities-laws violators. *See SEC v. Ahmed*, 72 F.4th 379, 396 (2d Cir. 2023). There is a ten-year statute of limitations for the SEC to claim disgorgement for certain violations, including fraud actions. *See* 15 U.S.C. § 78u(d)(8)(A)(ii). The earliest dates for which the SEC seeks disgorgement are in 2010, well within the ten-year statute of limitations based on the SEC's filing of the Complaint in September 2018.

The Second Circuit allows courts to order disgorgement of the "reasonable approximation of profits causally connected to the violation." *SEC v. Fowler*, 6 F.4th 255, 267 (2d Cir. 2021). Courts may also order prejudgment interest on the disgorged amounts. *See id.* (ordering prejudgment interest on recalculated disgorgement amount); *see also SEC v. Teo*, 746 F.3d 90, 109 (3d Cir. 2014) (the court has discretion to decide both the interest rate and period of

time on which to calculate interest). Under *Liu*, courts "must deduct legitimate expenses" from amounts ordered disgorged. *Liu*, 140 S. Ct. at 1950. But, once the SEC establishes a reasonable approximation of the ill-gotten gains, the burden shifts to the wrongdoers to establish any claimed "legitimate" business expenses that should be deducted from the disgorgement amount, and "any risk of uncertainty" should be resolved against the "wrongdoer whose illegal conduct created that uncertainty." *Fowler*, 6 F.4th at 267 (*citing SEC v. Razmilovic*, 788 F.3d 14, 31 (2d Cir. 2013)).

In addition, the Second Circuit recently held that a district court at the remedial phase of an SEC enforcement action abused its discretion when it ordered disgorgement without finding that the victims suffered pecuniary harm. *SEC v. Govil*, No. 22-1658, 2023 WL 7137291, *5 (2d Cir. Oct. 31, 2023). As set forth in Statement of Relevant Facts ("Facts") Section II above, investors suffered pecuniary losses totaling $11,910,717, net of investment returns the Defendants paid to certain investors, and never received the investment returns that they were promised. In other words, investors here suffered significant pecuniary harm. The Court should order the Defendants to pay the full amount of their ill-gotten gains with prejudgment interest, as described below.

### A. Laura Should Be Ordered to Disgorge $4,262,060 and Pay $2,113,244 in Prejudgment Interest

As set forth in Facts Section II, Laura obtained $5,462,060 in gross gains as the result of his fraud and misappropriation in the form of direct transfers of investor funds to his bank accounts, cash withdrawals, and the payment of personal expenses from the PAI and ICT Accounts. *See also* Compl. ¶ 51(b) (alleging misuse of funds to pay an unrelated lawsuit, insurance and medical expenses, personal loans, and personal auto expenses). Laura contends that some or all of the $2,742,492 spent in the PAI and ICT Accounts for his personal auto and

health insurance, gym memberships, traffic tickets, and retail outlets, and to other recipients for which there is no documented or apparent business purpose were "legitimate" business expenses. *See*, *e.g.*, May 6, 2022 Declaration of Joseph M. Laura (DE 154) ¶¶ 67 (discussing business-development efforts), 72-73 (discussing backup documentation), 98 (discussing cash withdrawals), 100 (discussing gym membership). But the Second Circuit has repeatedly held that it is a defendant's burden to establish the legitimacy of those expenses, *e.g.*, *Fowler*, 6 F.4th at 267, and Laura's primary—if not only—evidence in support of his claimed deductions is his say-so.[6] But his assertions are inherently implausible and entirely uncorroborated, and any confusion is of Laura's own creation. Accordingly, $5,462,060 is a reasonable approximation of Laura's ill-gotten gain prior to any deductions for "legitimate" business expenses or other offsets.

Under the facts here, the personal liability Laura incurred in 2018 for $1,200,000 in loans to continue the operations of the PAI Companies' business constitutes the returns of funds to the business, which should offset Laura's overall disgorgement amount. *See FTC v. Bronson Partners, LLC*, 654 F.3d 359, 368-69 (2d Cir. 2011) (amounts returned by the wrongdoer may offset disgorgement). Because the SEC's disgorgement calculation is based upon the *net* amount of transfers between Laura's and his law firm's bank accounts and the PAI Companies' accounts, *see* Hendelman Decl. ¶¶ 7, 10-11, 16-19, no deduction for other payments reflected in the bank

---

[6] For example, the Laura Declaration (DE 154) relies in part on "expense summaries" (DE 154-6 to -41), generated for a litigation years after the fact, that do not actually set forth the business purpose of expenses listed within. By way of one example, nothing in Laura's Declaration or supporting exhibits explain why a series of purchases at Home Depot, the Water Club, BJs, Best Buy, and Walmart (DE 154-7 at 3) are related to the legitimate business of the PAI Companies. Despite withdrawing over $700,000 in cash over the period the SEC analyzed, Laura did not provide a shred of contemporaneous documentation to demonstrate what it was spent on, support a business use for any of it, or even bother to describe for what purposes he "had to make extensive use of cash[.]" *See* DE 154 ¶ 98.

records is necessary or appropriate. Accordingly, the total reasonable approximation of Laura's ill-gotten gains is $4,262,060.

Prejudgment interest of $2,113,244 on this amount is reasonable and appropriate. As set forth above in Facts Section III, that amount represents the IRS tax underpayment rate on the disgorgement amount from June 1, 2013, the date to which Laura consented to begin the running of prejudgment interest for purposes of this motion (DE 175 at 4), and August 22, 2023, the date on which Laura consented to injunctive relief and determination of remedies in this case. DE 175.

**B.** **Sichenzio Should Be Ordered to Disgorge $1,794,976 and Pay $905,960 in Prejudgment Interest**

As to Sichenzio, as discussed in Facts Section II, he received $1,869,976 in gross ill-gotten gains in the form of net transfers to his bank accounts from the PAI and ICT Accounts and in payments made to benefit him. This includes the amounts paid to Sichenzio's wife and to Atlas Limo, a company that chauffeured him around for purposes other than the PAI Companies' business, as Sichenzio testified. Suthammanont Decl. Ex. C at 3-4 (Tr. 9:20-10:3); 5-13 (Tr. 51:24-59:6). As with Laura, there is no apparent or documented business purpose for these amounts, and the payments therefore benefitted Sichenzio personally. Accordingly, the Court should find that the $1,869,976 is a reasonable approximation of Sichenzio's ill-gotten gains prior to any deductions for "legitimate" business expenses.

As with Laura, under the facts here, Sichenzio's incurred personal liability for $75,000 in a loan taken in 2018 to fund the PAI Companies' operations constitute the returns of funds to the business for purposes of offsetting his ill-gotten gains. *See Bronson Partners*, 654 F.3d at 368-69. Thus, the reasonable total disgorgement amount for Sichenzio is $1,794,976.

Although Sichenzio deposited a total of $1,190,500 into Laura's law-firm account and received $45,000 from that account, for a net amount of $1,145,500 between 2010 and 2012, that amount should not offset his total disgorgement obligation. Hendelman Ex. C; *see also* Defs. 56.1 Statement (DE 152) ¶ 157. At least some of those funds were to be used to purchase shares of Pristec AG. Defs. 56.1 Statement (DE 152) ¶¶ 145-147 (citing Sichenzio Decl. (DE 153) ¶¶ 3-11); ¶ 160. Sichenzio and Laura alternately claimed that the initial payments were investments, Compl. ¶¶ 84, 96, or loans, Compl. ¶ 96, Defs. 56.1 Statement (DE 152) ¶ 156-157. Either way, they should not offset Sichenzio's disgorgement amount.

If Sichenzio's payments to the law-firm account were for "investments," *see* Compl. ¶¶ 19, 96, whether in the PAI Companies or Pristec AG, they are essentially capital contributions that provide Sichenzio with an equity interest in return. Because he received such an interest in return, those amounts should not offset his disgorgement.

If, on the other hand, the payments to the law firm account were loans, the "repayments" were improper because investors were not told Sichenzio's loans would be repaid with their funds, *see* Compl. ¶¶ 55-56, 96, and his resulting net proceeds were direct results of those omissions. *See Liu*, 140 S. Ct. at 1946. Not crediting Sichenzio with an offset for the originally loaned amounts does not violate *Liu*'s holding that the court can only award "net profits." 140 S. Ct. at 1946. If the amounts Sichenzio advanced were in fact loans, the PAI Companies may still be liable to him for the amounts of those loans to the extent that the PAI Companies improperly repaid Sichenzio and he disgorges the funds for the benefit of investors. Crafting equitable disgorgement in this fashion (*i.e.*, Sichenzio disgorges the improper payments to him for return to harmed investors, but the PAI Companies may continue to be liable to him for the amounts he originally loaned) comports with the Supreme Court's recognition of the fact that equitable

remedies "often imposed a constructive trust on wrongful gains for wronged victims." *Liu*, 140 S. Ct. at 1944.

Finally, requiring Sichenzio to pay prejudgment interest of $905,960 on his net fraudulent proceeds of $1,794,976 is reasonable and appropriate under the same methodology set forth above for calculating Laura's prejudgment interest. *See* Facts Section III.

## II. LAURA AND SICHENZIO SHOULD BE ORDERED TO PAY CIVIL PENALTIES OF $4,262,060 AND $1,794,976, RESPECTIVELY

The Securities Act and Exchange Act each provide for three tiers of penalties to be "determined by the court in light of the facts and circumstances." 15 U.S.C. §§ 77t(d)(2) & 78u(d)(3). The "amount of any civil penalty rests squarely in the discretion of the Court." *Razmilovic*, 738 F.3d at 38; *see also SEC v. Bronson*, 246 F. Supp. 3d 956, 977 (S.D.N.Y. 2017). Third-tier violations are those that "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. §§ 77t(d)(2)(A)-(C) & 78u(d)(3)(B)(i)-(iii). For each violation occurring between March 4, 2009, and March 5, 2013, the maximum third-tier penalty for a natural person is $150,000. 17 C.F.R § 201.1001, Table I (inflation adjustments for maximum penalties). For each violation between March 6, 2013, and November 2, 2015, the maximum third-tier penalty is $160,000, and for each violation between November 3, 2015, and the present, the maximum third-tier penalty is $204,385. *See id.*; https://www.sec.gov/enforce/civil-penalties-inflation-adjustments.htm. Under each tier, district courts are authorized to impose a penalty for each violation that is the greater of the "gross amount of pecuniary gain" to such defendant from the violation or the applicable maximum penalty amount for that tier. 15 U.S.C. §§ 77t(d)(2) & 78u(d)(3).

In determining the appropriate civil penalty, courts weigh the following factors:

> (1) the egregiousness of the violations at issue, (2) defendants'
> scienter, (3) the repeated nature of the violations, (4) defendants'
> failure to admit to their wrongdoing; (5) whether defendants'
> conduct created substantial losses or the risk of substantial losses
> to other persons; (6) defendants' lack of cooperation and honesty
> with authorities, if any; and (7) whether the penalty that would
> otherwise be appropriate should be reduced due to defendants'
> demonstrated current and future financial condition.

*SEC v. Lybrand*, 281 F. Supp. 2d 726, 730 (S.D.N.Y. 2003). Taken together here, these factors

weigh in favor of a significant penalty for each of the Defendants.

With respect to the first, second, and third factors, the Defendants' conduct was

egregious, they acted with a high degree of scienter, and their conduct was repeated. As the

Court must accept and deem true for this motion, DE 175 at 4, 14, Laura and Sichenzio

repeatedly told investors falsehoods, including that PAI owned the patents to the cold-cracking

technologies and that investors would earn returns that were plainly impossible. Compl. at ¶¶ 22-

31. They failed to disclose that Laura personally owed large amounts of money to Sichenzio, Gil

de Rubio, and others from unrelated ventures that had suffered significant losses due to Laura's

mismanagement. Compl. at ¶ 86. These misrepresentations were particularly egregious, given the

length of time during which the fraud occurred, when both Defendants knew the promised

payouts would never materialize. DE 170 at 26-27.

Specifically with respect to Laura, he repeatedly told investors that their investments

would be used to buy equipment, machinery, and cold-cracking demonstrations. Compl. at ¶¶ 45-

46. In reality, Laura spent investor funds lavishly on himself. For instance, after getting an

investor to invest money on the promise to build carbon activator units, he almost immediately

spent $50,000 on a luxury box suite at the Meadowlands stadium and on concert tickets. Compl.

at ¶¶ 29-30. In short order, he paid himself $170,000 in cash, paid his white-collar defense

lawyer, and spent investor funds on personal expenses like alcohol and gym fees. Compl. at ¶ 31.

Furthermore, as this Court found, Laura also acted as an unregistered broker, DE 170 at 33, while committing the fraud here, rendering his conduct more egregious.

As for Sichenzio, he spent years perpetuating the fraud scheme by bringing new investors into the fold, lying to them about the PAI Companies' "exclusive" license to the cold-cracking technology, the use of investor funds, and prospective oil revenues. Compl. at ¶¶ 22-31, 53-54, 69, 71. All the while, Sichenzio failed to disclose to numerous investors that he was receiving large payments of investor funds from Pristec. Compl. at ¶¶ 36, 52-53. He then lied about these funds, telling investors that they were his investments in the project, but telling FINRA and SEC that the same amounts were loans. Compl. at ¶ 96.

With respect to the fourth factor, the Defendants have failed to admit their wrongdoing. Neither their deposition testimony in this case nor their consent judgments admit to any misconduct or show any contrition for the pecuniary harm they have caused investors.

As for the fifth factor, their conduct created substantial losses to investors—almost $12 million worth. Compl. at ¶¶ 3, 5, 12; *see also* Facts Section II (setting forth amount of victims' pecuniary harm). And with respect to the sixth factor, Sichenzio lied during the SEC's and FINRA's investigations, as described above. Compl. at ¶ 96.[7]

In light of these factors, the Court should impose on Laura and Sichenzio civil penalties equal to the amount of *net* pecuniary gain they each obtained: $4,262,060 and $1,794,976, respectively. The Court could impose a much higher penalty against each of them under any of

---

[7]    While courts may also consider a defendant's ability to pay, it is not a dispositive factor and the burden rests on Defendants to establish an inability to pay. *See Amerindo,* 2014 WL 2112032, at *13 ("[E]ven though the final factor—whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition—could be a mitigating factor, the defendant normally bears the burden of demonstrating that her or his financial condition justifies a reduced fine.").

the three tiers set forth above based on their gross pecuniary gain. "[B]ecause the civil penalties statutes focus on the *gross* amount of pecuniary gain—as opposed to disgorgement, which is focused on simple gains—defendants are not entitled to deduct money returned to victims. Otherwise, a defendant who paid back all gains before judgment could practically nullify the statutory penalty." *SEC v. Amerindo Inv. Advisors Inc.*, No. 05 Civ. 5231 (RJS), 2014 WL 2112032, at *11 (S.D.N.Y. May 6, 2014) (emphasis in original). But the requested penalty amounts account for each Defendant's relative culpability in the scheme and are substantial enough to achieve the goal of deterring future fraud. Indeed, "[d]isgorgement alone is an insufficient remedy, since there is little deterrent in a rule that allows a violator to keep the profits if []he is not detected, and requires only a return of ill-gotten gains if []he is caught." *SEC v. Inorganic Recycling Corp.*, No. 99 Civ. 10159 (GEL), 2002 WL 1968341, at *4 (S.D.N.Y. Aug. 23, 2002) (rejecting an inability-to-pay argument and imposing third-tier penalties).

## CONCLUSION

For these reasons, the SEC respectfully requests that the Court grant the SEC's motion for monetary relief in its entirety and enter final judgments against Laura and Sichenzio in the form of the proposed judgments attached as Exhibits F and G to the Suthammanont Declaration.

Dated: November 17, 2023        Respectfully submitted,

/s/ Victor Suthammanont

_____
Victor Suthammanont
Hayden Brockett
Margaret D. Spillane
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-1000
New York, New York 10004-2616
(212) 336-5674
suthammanontv@sec.gov (Suthammanont)