# EXHIBIT AC

1              UNITED STATES DISTRICT COURT

2             EASTERN DISTRICT OF NEW YORK

3

4    SECURITIES AND EXCHANGE          )
     COMMISSION,                      )
5                                     )
                 Plaintiff,           )
6                                     )
       vs.                            ) Civil Action No.
7                                     ) 18-CV-5075(NGG)(VMS)
     JOSEPH M. LAURA, ANTHONY R.      )
8    SICHENZIO, and WALTER GIL DE RUBIO, )
                                      )
9                Defendants.          )
     _____)

10

11

12

13         Videotaped deposition of JOSEPH

14   MARTELLI, taken by Plaintiff on April 14, 2021,

15   commencing at 10:30 a.m. and ending at 5:10 p.m.,

16   pursuant to notice, conducted remotely, before

17   Christina Diaz, a Certified Realtime Captioner,

18   Certified Realtime and Registered Merit Reporter

19   and Notary Public within and for the State of

20   New York.

21

22

23

24

25

                                                        2

```
 1   APPEARANCES:

 2   For the Plaintiff:

 3        SECURITIES AND EXCHANGE COMMISSION
          BY:  MARGARET SPILLANE, ESQ.
 4             VICTOR SUTHAMMANONT, ESQ.
               KEVIN McGRATH, ESQ.
 5        200 Vesey Street
          Suite 400
 6        New York, NY 10281-1022
          212.336.1100
 7        SpillaneM@sec.gov
          suthammanontv@sec.gov
 8        McGrathK@sec.gov

 9   For Defendants Joseph Laura, Anthony Sichenzio and
     Witness Joseph Martelli:
10
          PECKAR & ABRAMSON, P.C.
11        BY:  KEVIN J. O'CONNOR, ESQ.
          70 Grand Avenue
12        River Edge, NJ 07661
          201.343.3434
13        Koconnor@pecklaw.com www.pecklaw.com

14   ALSO PRESENT:

15        TIM HUNTER, Videographer

16

17

18

19

20

21

22

23

24

25
                                                      3
```

|  |  |  |
|---|---|---|
|  | 1 | Wednesday, April 14, 2021 |
|  | 2 | 10:30 A.M. - 5:10 P.M. E.S.T. |
| 10:28:25 | 3 | --oOo-- |
| 10:28:25 | 4 | THE VIDEOGRAPHER:  Good morning.  Here |
| 10:30:31 | 5 | begins the videotaped deposition of Joseph |
| 10:30:34 | 6 | Martelli in the matter of the SEC v. Laura, |
| 10:30:37 | 7 | et al.  This deposition is being held via |
| 10:30:40 | 8 | Webex.  Today's date is April 14th, 2021. |
| 10:30:45 | 9 | The time on the record is 10:30 a.m.  My name |
| 10:30:50 | 10 | is Tim Hunter.  I'm your legal videographer. |
| 10:30:53 | 11 | Counsel, would you please introduce |
| 10:30:54 | 12 | yourselves and state whom you represent for |
| 10:30:56 | 13 | the record, starting with noticing counsel. |
| 10:30:59 | 14 | And the witness will be sworn. |
| 10:31:03 | 15 | MS. SPILLANE:  Good morning.  My name is |
| 10:31:06 | 16 | Margaret Spillane.  I represent the |
| 10:31:07 | 17 | plaintiff, Securities and Exchange |
| 10:31:08 | 18 | Commission, in this action.  Also appearing |
| 10:31:10 | 19 | today is my colleague, Victor Suthammanont. |
| 10:31:14 | 20 | And at some point, our colleague, Kevin |
| 10:31:19 | 21 | McGrath, will also join.  And he will |
| 10:31:21 | 22 | announce his appearance or I will when he |
| 10:31:23 | 23 | does join. |
| 10:31:24 | 24 | MR. O'CONNOR:  Good morning, everyone. |
| 10:31:28 | 25 | Kevin O'Connor on behalf of Joseph Laura and |

8

| | | |
|---|---|---|
| 10:31:30 | 1 | Anthony Sichenzio and also representing the |
| 10:31:31 | 2 | witness today, Mr. Joseph Martelli. |
| | 3 | |
| | 4 | J O S E P H   M A R T E L L I, |
| | 5 | having been remotely sworn as |
| | 6 | stipulated by the parties, was |
| | 7 | examined and testified as follows: |
| | 8 | |
| 10:31:49 | 9 | EXAMINATION |
| 10:31:49 | 10 | BY MS. SPILLANE: |
| 10:31:50 | 11 | |
| 10:31:50 | 12 | Q.   Good morning, Mr. Martelli.  As I said, |
| 10:31:54 | 13 | my name is Margaret Spillane.  I'm a staff attorney |
| 10:31:59 | 14 | with the Securities and Exchange Commission.  I |
| 10:32:01 | 15 | appreciate your time in appearing today. |
| 10:32:04 | 16 | I wanted to ask you before we begin if |
| 10:32:06 | 17 | you have ever provided testimony in a deposition |
| 10:32:09 | 18 | previously? |
| 10:32:09 | 19 | A.   No. |
| 10:32:12 | 20 | Q.   Okay.  Let me just go over a couple of |
| 10:32:15 | 21 | ground rules before we get started.  The court |
| 10:32:17 | 22 | reporter, Ms. Diaz, is making a record of today's |
| 10:32:20 | 23 | conversation.  She takes down everything we say, |
| 10:32:23 | 24 | but she can't record gestures such as nodding your |
| 10:32:27 | 25 | head.  We do have a videographer today, so those |

9

```
10:37:14   1        The only -- I mean, I have my timekeeper app
10:37:20   2        on.  It's not something he would even know to
10:37:22   3        use.  I do have the folder with the documents
10:37:24   4        that you sent.
10:37:27   5             MS. SPILLANE:  Understood.
10:37:27   6   BY MS. SPILLANE:
10:37:34   7        Q.   And that agreement concerning
10:37:35   8   communications and extraneous materials or
10:37:38   9   documents would also apply to any personal
10:37:41  10   electronic device that you have in front of you
10:37:42  11   such as your phone or anyone else's phone.
10:37:47  12        A.   It's off.
10:37:50  13        Q.   So please refrain from reviewing that
10:37:52  14   while we're on the record.  And to the extent that
10:37:54  15   there are any communications or documents that you
10:37:56  16   review while we're off the record, we would ask
10:37:59  17   that you -- that they be discussed and included on
10:38:05  18   the record.
10:38:06  19             Do you understand?
10:38:12  20        A.   Yes.
10:38:13  21        Q.   Okay.  Can you please provide your full
10:38:16  22   name and address for the record?
10:38:17  23        A.   Joseph Martelli.  82 Shinnecock Hill
10:38:24  24   Court, Howell, New Jersey 07731.
10:38:29  25        Q.   Okay.  And do you have a middle name?
```

14

10:38:31 1      A.   Paul.

10:38:33 2      Q.   Okay.  And are you a junior, a senior,

10:38:36 3  anything like that?

10:38:37 4      A.   No.

10:38:38 5      Q.   Okay.  Do you have any relatives that

10:38:42 6  are also named Joseph Martelli?

10:38:45 7      A.   Yes.

10:38:45 8      Q.   And who is that or are they?

10:38:49 9      A.   My father.

10:38:52 10     Q.   Okay.  And what's his middle name, if he

10:38:54 11 has one?

10:39:01 12     A.   He doesn't.

10:39:02 13     Q.   Okay.  And how long has the -- I think

10:39:03 14 you said Shinnecock.  How long has that been your

10:39:08 15 address?  How long has that been your residence?

10:39:10 16     A.   Since October 2019, I think, or

10:39:16 17 October --

10:39:17 18     Q.   Okay.  Where were you living before

10:39:19 19 that?

10:39:20 20     A.   In Mountainside, New Jersey.

10:39:23 21     Q.   What was the address in Mountainside?

10:39:27 22     A.   I think it was 930 Mountain Avenue.

10:39:33 23     Q.   Okay.  The current address, do you rent

10:39:35 24 or own that property?

10:39:36 25     A.   Rent.

15

| | | |
|---|---|---|
| 10:39:39 | 1 | Q.    Okay.  And the prior address? |
| 10:39:43 | 2 | A.    Rent. |
| 10:39:44 | 3 | Q.    And how long did you live at 930 |
| 10:39:49 | 4 | Mountain Avenue? |
| 10:39:51 | 5 | A.    About seven years. |
| 10:39:58 | 6 | Q.    Okay.  So 2012, that would make it? |
| 10:40:03 | 7 | A.    2011. |
| 10:40:05 | 8 | Q.    Okay.  And what about before that? |
| 10:40:07 | 9 | A.    Before that, St. Louis Missouri. |
| 10:40:14 | 10 | Q.    And when did you move to New Jersey? |
| 10:40:17 | 11 | A.    The end of -- very end of 2010. |
| 10:40:26 | 12 | Q.    Okay.  And so you were living in St. |
| 10:40:29 | 13 | Louis Missouri for all of 2010 until you moved to |
| 10:40:34 | 14 | New Jersey? |
| 10:40:38 | 15 | A.    Yes. |
| 10:40:39 | 16 | Q.    Okay.  What month in 2010 did you move? |
| 10:40:44 | 17 | A.    October, I believe. |
| 10:40:50 | 18 | Q.    Okay.  And were you living in St. Louis |
| 10:40:56 | 19 | Missouri during 2009? |
| 10:40:58 | 20 | A.    Yes. |
| 10:40:58 | 21 | Q.    Okay.  All of 2009? |
| 10:41:00 | 22 | A.    Yes. |
| 10:41:07 | 23 | Q.    Okay.  And what was the reason you moved |
| 10:41:09 | 24 | back to New Jersey? |
| 10:41:10 | 25 | A.    I moved to come work for Pristec. |

16

| 10:41:20 | 1 | MS. SPILLANE:  Okay.  If we could turn |
| 10:41:22 | 2 | to exhibit -- Claimant's Exhibit 229, please. |
| 10:41:31 | 3 | (Claimant's Exhibit 229, Letter dated |
| 10:41:31 | 4 | 2/2/21, with attachment, six pages, was |
| 10:41:32 | 5 | marked for identification) |
| 10:41:45 | 6 | MR. O'CONNOR:  Okay. |
| 10:41:45 | 7 | BY MS. SPILLANE: |
| 10:41:46 | 8 | Q.   Mr. Martelli, do you recognize this |
| 10:41:47 | 9 | document? |
| 10:41:56 | 10 | MR. O'CONNOR:  Let me show you the whole |
| 10:41:58 | 11 | thing.  Okay. |
| 10:42:23 | 12 | A.   Yes. |
| 10:42:24 | 13 | BY MS. SPILLANE: |
| 10:42:24 | 14 | Q.   How are you familiar with this document? |
| 10:42:29 | 15 | A.   It was served to me. |
| 10:42:33 | 16 | Q.   Okay.  And are you here today pursuant |
| 10:42:35 | 17 | to this subpoena? |
| 10:42:36 | 18 | A.   Yes. |
| 10:42:38 | 19 | Q.   Okay.  And did you do anything to |
| 10:42:43 | 20 | prepare for today's deposition? |
| 10:42:48 | 21 | A.   Just speak to my representation. |
| 10:42:54 | 22 | Q.   And that's Mr. O'Connor? |
| 10:42:56 | 23 | A.   Yes. |
| 10:42:58 | 24 | Q.   Okay.  Was there anyone else present |
| 10:43:03 | 25 | during that conversation? |

17

| | | |
|---|---|---|
| 10:54:51 | 1 | BY MS. SPILLANE: |
| 10:54:52 | 2 | Q. Is that right? |
| 10:54:53 | 3 | MR. O'CONNOR: He said he didn't have |
| 10:54:54 | 4 | time to order them. That's what he just told |
| 10:54:57 | 5 | you. |
| 10:54:59 | 6 | MS. SPILLANE: And I asked the question, |
| 10:55:00 | 7 | which is: Do you believe that these are |
| 10:55:02 | 8 | documents that exist that are in your |
| 10:55:04 | 9 | control? |
| 10:55:05 | 10 | MR. O'CONNOR: No. We all know that |
| 10:55:08 | 11 | that's a legal definition. Control -- you |
| 10:55:11 | 12 | and I both know that. So I object and it |
| 10:55:14 | 13 | misstates testimony. |
| 10:55:16 | 14 | MS. SPILLANE: Okay. Let me ask it |
| 10:55:18 | 15 | differently then. |
| 10:55:19 | 16 | BY MS. SPILLANE: |
| 10:55:19 | 17 | Q. Mr. Martelli, do you believe that you |
| 10:55:22 | 18 | received checks that would have -- that you would |
| 10:55:25 | 19 | have cashed through your personal bank account? |
| 10:55:32 | 20 | A. Yes. |
| 10:55:35 | 21 | Q. Okay. And did you do anything to try to |
| 10:55:37 | 22 | order copies of evidence of those canceled checks? |
| 10:55:43 | 23 | A. At the time, I spoke to the bank. And |
| 10:55:50 | 24 | they explained to me that without giving them exact |
| 10:55:53 | 25 | checks, it was going to cost like $20 an hour for |

27

10:55:56  1    them to research it or to find every check that was

10:56:01  2    given to me.  At the time, I didn't have that --

10:56:08  3         Q.    Okay.  All right.  So let me ask it

10:56:08  4    then.

10:56:11  5         So you believe that there are documents

10:56:12  6    under your control that do relate to our document

10:56:17  7    request?

10:56:17  8         MR. O'CONNOR:  Objection.  Misstates

10:56:18  9    evidence.  Calls for a legal conclusion.  As

10:56:20 10    we know, control is not defined as something

10:56:23 11    you order from a bank.  Objection.

10:56:28 12    BY MS. SPILLANE:

10:56:28 13         Q.    So did you order those checks interest

10:56:31 14    from the bank, Mr. Martelli?

10:56:32 15         A.    No.

10:56:32 16         Q.    Okay.  All right.  So you said you

10:56:39 17    looked -- I think your testimony was you looked

10:56:41 18    through your stuff, and then you mentioned bank

10:56:43 19    statements.

10:56:44 20         Did you find evidence in your bank

10:56:47 21    statements of payments that you had received from

10:56:50 22    any of the persons or entities listed in the

10:56:54 23    request number 1 on PDF page 6?

10:57:00 24         A.    No.

10:57:05 25         Q.    Okay.  And other than bank statements,

28

| | | |
|---|---|---|
| 10:58:19 | 1 | A. Well, I just know I don't. |
| 10:58:24 | 2 | Q. Okay. And how are you sure that you |
| 10:58:26 | 3 | don't have any responsive documents on your |
| 10:58:29 | 4 | computer or on your phone? |
| 10:58:33 | 5 | A. Because I use my phone and my computer |
| 10:58:36 | 6 | mostly for personal stuff and because I know what's |
| 10:58:38 | 7 | on them. |
| 10:58:41 | 8 | Q. Okay. So what about paper files, did |
| 10:58:46 | 9 | you review any paper files besides bank statements? |
| 10:58:51 | 10 | A. No. |
| 10:58:52 | 11 | Q. Okay. And do you have any paper files |
| 10:58:56 | 12 | related to the individuals or entities listed in |
| 10:58:59 | 13 | request number 1 on PDF page 6 of Exhibit 229? |
| 10:59:03 | 14 | A. No. |
| 10:59:05 | 15 | Q. Okay. And did you at any time have any |
| 10:59:12 | 16 | paper documents related to those entities or |
| 10:59:15 | 17 | related to any of the requests in this subpoena? |
| 10:59:22 | 18 | A. As far as Ally Financial or Katherine |
| 10:59:28 | 19 | Gardiner Martelli, we had paperwork as far as the |
| 10:59:33 | 20 | truck payments being made and as far as her |
| 10:59:35 | 21 | personal stuff. But when we got divorced, she took |
| 10:59:38 | 22 | everything with her. |
| 10:59:39 | 23 | Q. Okay. So you would view all of those |
| 10:59:41 | 24 | items as personal items? I'm trying to understand. |
| 10:59:48 | 25 | A. Personal as far as like -- |

30

| | | |
|---|---|---|
| 10:59:48 | 1 | Q.   Yes.  I mean -- |
| 10:59:50 | 2 | A.   You have Ally Financial on here I see. |
| 10:59:53 | 3 | That was regarding the truck payments.  You have my |
| 10:59:57 | 4 | ex-wife's name on here.  I mean, I'm just saying we |
| 11:00:03 | 5 | had documents like old bank statements sitting |
| 11:00:05 | 6 | around or whatever in a file cabinet.  But other |
| 11:00:08 | 7 | than that, I don't have anything that has to do |
| 11:00:10 | 8 | with Katherine Martelli, Ally Financial, Rebecca |
| 11:00:15 | 9 | Carranza, Gregory DelliSanti, any of them. |
| 11:00:18 | 10 | Q.   Okay.  And then the rest of the document |
| 11:00:21 | 11 | requests as well, which also concern, for example, |
| 11:00:24 | 12 | request number 7, which requests all communications |
| 11:00:27 | 13 | between you and a number of individuals and |
| 11:00:31 | 14 | entities, including Pristec AG, Pristec America and |
| 11:00:35 | 15 | Innovative Crude Technologies, Mr. Laura and |
| 11:00:38 | 16 | Mr. Sichenzio, et cetera? |
| 11:00:39 | 17 | A.   Yes. |
| 11:00:41 | 18 | Q.   Do you see that? |
| 11:00:42 | 19 | A.   No, I have none of that. |
| 11:00:44 | 20 | Q.   Okay.  You don't have any communications |
| 11:00:46 | 21 | between you and any of those individuals or |
| 11:00:47 | 22 | entities? |
| 11:00:48 | 23 | A.   Just talking on the phone with Joe |
| 11:00:52 | 24 | Laura, I mean.  But other than that, I don't have |
| 11:00:56 | 25 | documents or anything else. |

31

```
11:03:13   1    other.
11:03:17   2    BY MS. SPILLANE:
11:03:17   3        Q.    You have personal texts and you're not
11:03:19   4    -- what is your testimony today?  Is that that
11:03:21   5    you're not sure that you have any text messages
11:03:24   6    with Mr. Laura concerning business matters?  Is
11:03:28   7    that your testimony?
11:03:29   8        A.    My testimony is that I don't have any
11:03:33   9    documents or anything like that that have gone back
11:03:37  10    and forth between me and Joe Laura on my phone that
11:03:43  11    are communications --
11:03:43  12        Q.    Okay.
11:03:46  13        A.    Sorry, go ahead.
11:03:47  14              -- that are communications, personal,
11:03:52  15    unless it is like, "I need you to pick me up," "I
11:03:54  16    need you to be here at a certain time."  Stuff like
11:03:57  17    that.  I mean, that's it.
11:03:58  18        Q.    Okay.  And so when you say, "I need you
11:04:03  19    to be here at a certain time," or pick stuff up, is
11:04:05  20    that a communication related to Pristec AG, Pristec
11:04:09  21    America or Innovative Crude Technologies?
11:04:13  22              MR. O'CONNOR:  I'm going to just object.
11:04:15  23        You have to remember your subpoena sought
11:04:18  24        records during a relevant period, so I want
11:04:19  25        that to be clear to the witness.
```

                                                              34

| | | |
|---|---|---|
| 11:04:21 | 1 | Do you understand that? |
| 11:04:22 | 2 | THE WITNESS:  No, I don't. |
| 11:04:23 | 3 | MR. O'CONNOR:  Look at paragraphs 9. |
| 11:04:26 | 4 | The relevant period is December 2017. |
| 11:04:29 | 5 | THE WITNESS:  Oh, okay. |
| 11:04:30 | 6 | MR. O'CONNOR:  So when she's asking you |
| 11:04:31 | 7 | if you have things, keep that in mind. |
| 11:04:34 | 8 | THE WITNESS:  Okay.  Then I have nothing |
| 11:04:36 | 9 | from that time.  I don't keep my texts that |
| 11:04:38 | 10 | long.  And I don't have documents on my phone |
| 11:04:40 | 11 | from that time for sure. |
| 11:04:42 | 12 | BY MS. SPILLANE: |
| 11:04:43 | 13 | Q.    Okay.  And how long have you had the |
| 11:04:44 | 14 | phone that you are currently using? |
| 11:04:50 | 15 | A.    This specific phone or the phone number? |
| 11:04:53 | 16 | Q.    Why don't you answer the specific phone |
| 11:04:56 | 17 | and then the phone number. |
| 11:04:59 | 18 | A.    The specific phone, maybe a year.  And |
| 11:05:04 | 19 | the phone number, pretty much since after I moved |
| 11:05:09 | 20 | here in 2011 maybe, beginning of 2011. |
| 11:05:16 | 21 | Q.    Okay.  And what about your computer? |
| 11:05:19 | 22 | You have a computer, right? |
| 11:05:21 | 23 | A.    Yes.  My computer is maybe three years |
| 11:05:25 | 24 | old. |
| 11:05:28 | 25 | Q.    Okay.  And what e-mail address do you |

35

11:05:29  1    use, if you use one, for your communications with

11:05:34  2    Mr. Laura?

11:05:36  3        A.    That would be martelli26@yahoo.com.

11:05:45  4    Same one --

11:05:47  5        Q.    Okay.  And how long have -- I'm sorry?

11:05:49  6        A.    Yes.  I've had that e-mail address since

11:05:51  7    I'm like 20 years old or something.

11:05:54  8        Q.    Okay.  And did you search that e-mail

11:05:57  9    address for -- that e-mail account for potentially

11:06:00 10    responsive documents?

11:06:02 11        A.    You know, I did look at it, but I didn't

11:06:12 12    see anything in there during those time periods

11:06:18 13    that I could think of.

11:06:18 14        Q.    Okay.  So you did search that e-mail

11:06:20 15    account?

11:06:21 16        A.    Yes.  I actually, did go through there.

11:06:31 17        Q.    Okay.  All right.  Let me just ask some

11:06:33 18    specific questions here.  You mentioned Katherine

11:06:39 19    Martelli as your ex-wife, is that correct?

11:06:41 20        A.    Yes.

11:06:41 21        Q.    Okay.  And when were the households

11:06:48 22    separated?

11:06:50 23        A.    I think about three years ago.

11:06:59 24        Q.    Okay.  So is that 2018?

11:07:03 25        A.    I'm not 100 percent sure, but I believe

                                                                    36

| 11:07:06 | 1 | it was like a month before Christmas.  I think that |
| 11:07:11 | 2 | would be -- let's see -- yes, I think it might be |
| 11:07:13 | 3 | 2018. |
| 11:07:16 | 4 | Q.   So November of 2018? |
| 11:07:19 | 5 | A.   Yes, but I'm not 100 percent.  It could |
| 11:07:22 | 6 | have been 2017. |
| 11:07:29 | 7 | Q.   Okay.  And when were you married to |
| 11:07:31 | 8 | Ms. Martelli?  When did you get married? |
| 11:07:35 | 9 | A.   You know what?  I don't even know the |
| 11:07:38 | 10 | year we got married. |
| 11:07:39 | 11 | Q.   Okay.  And you mentioned, I believe, in |
| 11:07:43 | 12 | your earlier testimony that there may have been |
| 11:07:46 | 13 | some documents related to her that would have been |
| 11:07:50 | 14 | otherwise responsive to the subpoena.  That's my |
| 11:07:55 | 15 | paraphrase. |
| 11:07:57 | 16 | Do I have it basically correct? |
| 11:08:00 | 17 | A.   Yes. |
| 11:08:00 | 18 | Q.   Okay.  And can you describe what those |
| 11:08:06 | 19 | documents are -- |
| 11:08:09 | 20 | A.   Yes. |
| 11:08:10 | 21 | Q.   -- that you would have had or had? |
| 11:08:12 | 22 | A.   Yes.  The documents that she would have |
| 11:08:15 | 23 | had in her name would have been Ally Financial |
| 11:08:18 | 24 | documents or possibly the insurance on the truck as |
| 11:08:27 | 25 | well.  So maybe like Liberty Mutual or -- I don't |

37

11:08:31  1   remember exactly the insurance company, but...

11:08:39  2        Q.   Okay.  And why did she have those

11:08:42  3   documents?

11:08:42  4        A.   When I first moved here, she did Joe

11:08:47  5   Laura a favor and helped him to get a truck for

11:08:53  6   transportation.

11:08:56  7        Q.   Okay.  And can you explain how that came

11:08:59  8   about?

11:09:03  9        A.   Joe's credit wasn't good, so he couldn't

11:09:06 10   get the truck on his own.  So my wife helped him to

11:09:10 11   get the truck, used her credit.

11:09:15 12        Q.   Okay.  And so then was the truck in her

11:09:18 13   name or his name -- or Mr. Laura's name?

11:09:21 14        A.   In her name, I believe.

11:09:23 15        Q.   Okay.  But you viewed it as Mr. Laura's

11:09:29 16   truck, is that right?

11:09:32 17        A.   Yes.  He used the truck.

11:09:34 18        Q.   Okay.  And was it parked at Mr. Laura's

11:09:38 19   residence during the time it was in use?

11:09:44 20        A.   Yes.

11:09:47 21        Q.   Okay.  And did Ms. -- I want to do this

11:09:50 22   correctly.  How would you prefer that I refer to

11:09:53 23   her, Ms. Martelli?

11:09:56 24        A.   Martelli is fine.

11:10:01 25        Q.   Okay.  Did Ms. Martelli have a different

38

11:10:03  1   car that she used?

11:10:04  2          A.    Yes.

11:10:06  3          Q.    Okay.  And what about you, did you have

11:10:08  4   a different car?

11:10:10  5          A.    The same car, me and my wife shared a

11:10:14  6   car.

11:10:17  7          Q.    Okay.  And during the time period

11:10:18  8   referred to in the subpoena, what car was that that

11:10:22  9   you and your wife used?

11:10:24 10          A.    A Honda Accord.

11:10:27 11          Q.    Okay.  But the car then was in

11:10:34 12   Ms. Martelli's name, correct?  I believe you may

11:10:38 13   have already testified to that, but I just want to

11:10:40 14   make sure I understand.

11:10:41 15                Is that right?

11:10:42 16          A.    Yes.  Yes.  But I think Gardiner was the

11:10:45 17   name on it, though.

11:10:48 18          Q.    Okay.  And the loan was also in your

11:10:53 19   wife's name -- your ex-wife's name?

11:10:56 20          A.    Yes.

11:11:03 21          Q.    Okay.  And when you say the truck, I

11:11:04 22   just want to make sure I know what we're talking

11:11:08 23   about.  That was a Chevy Tahoe, is that right?

11:11:16 24          A.    Yes.

11:11:17 25          Q.    Okay.  And what color was that car?

39

11:11:20  1        A.    That was black.

11:11:26  2        Q.    Okay.  And do you see in request number

11:11:27  3    2 on PDF 6 of Exhibit 229 there's two VIN numbers

11:11:32  4    listed there?  Do you happen to know which of those

11:11:34  5    two VIN numbers was attached to the black Chevy

11:11:42  6    Tahoe that was in your wife's name?

11:11:43  7        A.    No.

11:11:48  8        Q.    Okay.  Where is that car now, do you

11:11:53  9    know?

11:11:53 10        A.    I don't know where that car is.

11:11:56 11        Q.    Okay.  When is the last time you knew

11:11:57 12    where that car was?

11:11:58 13            MR. O'CONNOR:  I'm going to object.  I'm

11:12:00 14        not clear what you're talking about.  The

11:12:02 15        truck or the car?

11:12:03 16            MS. SPILLANE:  The black Chevy Tahoe.

11:12:06 17            MR. O'CONNOR:  The truck.

11:12:07 18        A.    The black Chevy Tahoe, actually -- you

11:12:10 19    know what?  The last time -- we turned that in for

11:12:14 20    Joe, because it had been driven like 70,000 miles

11:12:21 21    in two years or something.  We turned that in and

11:12:24 22    he got another Tahoe in my wife's name, a white

11:12:24 23    Tahoe.

11:12:30 24    BY MS. SPILLANE:

11:12:30 25        Q.    Okay.  So two Chevy Tahoes then.  First,

                                                          40

| | | |
|---|---|---|
| 11:12:33 | 1 | a black one and then a white one, and these were |
| 11:12:35 | 2 | both in your wife's name, is that right? |
| 11:12:40 | 3 | A.    Yes. |
| 11:12:40 | 4 | Q.    But they were both Mr. Laura's trucks? |
| 11:12:43 | 5 | A.    Yes. |
| 11:12:46 | 6 | Q.    Okay.  And both of them were parked at |
| 11:12:48 | 7 | his house -- |
| 11:12:51 | 8 | A.    Yes. |
| 11:12:51 | 9 | Q.    -- while they were in use?  Okay. |
| 11:12:55 | 10 | And then the car loan -- was there a car |
| 11:12:59 | 11 | loan associated with the white Chevy Tahoe also? |
| 11:13:05 | 12 | A.    Yes. |
| 11:13:05 | 13 | Q.    And do you know who the lender was? |
| 11:13:13 | 14 | A.    I think it might have been Ally |
| 11:13:19 | 15 | Financial. |
| 11:13:19 | 16 | Q.    But you're not sure? |
| 11:13:21 | 17 | A.    Not 100 percent sure, but I think so. |
| 11:13:23 | 18 | Q.    Okay.  But you do know that the loan was |
| 11:13:26 | 19 | in your wife's name, is that right? |
| 11:13:27 | 20 | A.    Yes. |
| 11:13:34 | 21 | Q.    Okay.  And do you know about when you |
| 11:13:35 | 22 | turned in the black Chevy Tahoe for Mr. Laura? |
| 11:13:48 | 23 | A.    Maybe 2012. |
| 11:13:57 | 24 | Q.    Okay.  And so the white Chevy Tahoe, is |
| 11:13:59 | 25 | that -- does Mr. Laura still use that truck? |

41

| | | |
|---|---|---|
| 11:14:03 | 1 | A.    No. |
| 11:14:07 | 2 | Q.    Okay.  Do you know when the last time |
| 11:14:10 | 3 | Mr. Laura used that truck was? |
| 11:14:15 | 4 | A.    No. |
| 11:14:16 | 5 | Q.    Do you know what happened to that truck? |
| 11:14:22 | 6 | A.    No. |
| 11:14:23 | 7 | Q.    When is the last time you are aware of |
| 11:14:27 | 8 | Mr. Laura using that truck? |
| 11:14:33 | 9 | A.    To be honest with you, I don't know.  I |
| 11:14:35 | 10 | have no clue. |
| 11:14:38 | 11 | Q.    Okay.  All right.  Did you ever drive |
| 11:14:39 | 12 | the black Chevy Tahoe? |
| 11:14:41 | 13 | A.    Yes. |
| 11:14:46 | 14 | Q.    Okay.  What about your wife, did she |
| 11:14:48 | 15 | ever drive it? |
| 11:14:48 | 16 | A.    No. |
| 11:14:53 | 17 | Q.    Okay.  What about the white Chevy Tahoe, |
| 11:14:56 | 18 | did you ever drive that truck? |
| 11:14:58 | 19 | A.    Yes. |
| 11:14:58 | 20 | Q.    And what about your wife, did she drive |
| 11:15:03 | 21 | it? |
| 11:15:03 | 22 | A.    No. |
| 11:15:03 | 23 | Q.    Okay.  And the insurance on the white |
| 11:15:09 | 24 | Chevy Tahoe, was that also in your ex-wife's name? |
| 11:15:13 | 25 | A.    Yes.  She was on it. |

42

| 11:15:18 | 1 | Q. And was anyone else on it, as far as you |
| 11:15:20 | 2 | know? |
| 11:15:22 | 3 | A. I'm pretty sure I was on it because I |
| 11:15:26 | 4 | drove those trucks. I don't remember if Joe was on |
| 11:15:29 | 5 | it or not. |
| 11:15:30 | 6 | Q. You don't remember if Joe was on it did |
| 11:15:32 | 7 | you say? |
| 11:15:32 | 8 | A. No, I don't remember. |
| 11:15:35 | 9 | Q. Okay. But he was driving both of them |
| 11:15:38 | 10 | during the period that we -- |
| 11:15:42 | 11 | A. Yes. |
| 11:15:43 | 12 | Q. -- specified in the subpoena, correct? |
| 11:15:46 | 13 | Okay. All right. |
| 11:15:48 | 14 | And I'll get into this some. |
| 11:15:55 | 15 | And you searched your records for |
| 11:15:58 | 16 | documents related to the insurance for those |
| 11:16:00 | 17 | vehicles as well as for the loan? |
| 11:16:05 | 18 | A. I wouldn't have that. I wouldn't have |
| 11:16:10 | 19 | that. |
| 11:16:12 | 20 | Q. Okay. And did you ever have that? |
| 11:16:14 | 21 | A. Well, when me and her were married and |
| 11:16:21 | 22 | we had our paperwork and stuff together, then yes. |
| 11:16:24 | 23 | Q. Okay. All right. So do you know if |
| 11:16:25 | 24 | there's still any amounts outstanding on the car |
| 11:16:29 | 25 | loans? |

43

| | | |
|---|---|---|
| 11:16:32 | 1 | A. No. They were paid off. |
| 11:16:36 | 2 | Q. Okay. All right. And, sorry, you know |
| 11:16:38 | 3 | that they were paid off or you don't know? |
| 11:16:41 | 4 | A. I know they were, because they were in |
| 11:16:43 | 5 | my ex-wife's name. |
| 11:16:48 | 6 | Q. Okay. And do you know when they were |
| 11:16:50 | 7 | paid off? |
| 11:16:50 | 8 | A. No. Maybe five years. I'm sorry. |
| 11:17:01 | 9 | Q. Okay. And were the deeds ever -- was |
| 11:17:02 | 10 | the ownership documents -- were they ever moved out |
| 11:17:06 | 11 | of your wife's name into someone else's name, as |
| 11:17:09 | 12 | far as you know? |
| 11:17:13 | 13 | A. You know what? I'm pretty sure she |
| 11:17:16 | 14 | moved them into Joe's at some point. I'm not 100 |
| 11:17:20 | 15 | percent positive, but I'm pretty sure she did. |
| 11:17:23 | 16 | Q. Okay. And what makes you pretty sure of |
| 11:17:24 | 17 | that? |
| 11:17:26 | 18 | A. Just because we never had the truck. I |
| 11:17:29 | 19 | mean -- so I'm pretty sure she would have done that |
| 11:17:32 | 20 | after he paid it off. |
| 11:17:36 | 21 | Q. After who paid it off? |
| 11:17:37 | 22 | A. Excuse me? |
| 11:17:41 | 23 | Q. You said after -- I think you said |
| 11:17:42 | 24 | "after he paid it off." I just wanted to know who |
| 11:17:45 | 25 | the "he" was that you were referring to? |

44

| | | |
|---|---|---|
| 11:17:47 | 1 | A.    Yes.   Joseph Laura. |
| 11:17:52 | 2 | Q.    Okay.  So was Mr. Laura making the |
| 11:17:55 | 3 | payments on the car loans while it was in your |
| 11:17:59 | 4 | wife's name? |
| 11:18:00 | 5 | A.    Yes. |
| 11:18:04 | 6 | Q.    Okay.  Were you involved at all in the |
| 11:18:05 | 7 | payments that were being made? |
| 11:18:12 | 8 | A.    What do you mean by "involved"? |
| 11:18:13 | 9 | Q.    Well, for example, were you ever getting |
| 11:18:17 | 10 | loan documents or your wife getting loan documents |
| 11:18:20 | 11 | that you were facilitating with Mr. Laura to ensure |
| 11:18:23 | 12 | that they got paid? |
| 11:18:24 | 13 | A.    No.  I mean, my wife would get the |
| 11:18:30 | 14 | statements from Ally, and then Joe would write a |
| 11:18:33 | 15 | check or however he did it with her to pay the car. |
| 11:18:36 | 16 | Q.    Okay.  And were you involved in that |
| 11:18:38 | 17 | process? |
| 11:18:41 | 18 | A.    I mean, sometimes I would, yes, write |
| 11:18:44 | 19 | the checks out of her account or my account or |
| 11:18:47 | 20 | wherever.  Other than that, not really. |
| 11:18:52 | 21 | Q.    Okay.  So were there some payments that |
| 11:18:54 | 22 | were coming from your account on the vehicles? |
| 11:19:02 | 23 | A.    You know what?  I'm not sure.  Actually, |
| 11:19:04 | 24 | I don't think so.  I think they probably all came |
| 11:19:07 | 25 | from her account or from his, whatever.  I don't |

45

11:19:16  1   remember.

11:19:16  2       Q.    Okay.  And did you and your wife have a

11:19:18  3   joint account while you were married that you would

11:19:20  4   have used for -- that she would have used for those

11:19:24  5   payments?

11:19:24  6       A.    No.

11:19:24  7       Q.    Okay.  She had her own account, is that

11:19:29  8   right?

11:19:29  9       A.    Yes.

11:19:36 10       Q.    Okay.  All right.  And you indicated

11:19:42 11   that you -- in request number 1, that you are

11:19:46 12   familiar with other individuals referenced there,

11:19:49 13   Rebecca Carranza and Gregory DelliSanti.

11:19:54 14             Who do you know Ms. Carranza to be?

11:19:58 15       A.    That's my mother -- ex-mother-in-law.

11:20:03 16       Q.    Okay.  And you searched documents

11:20:08 17   related to her that would have been responsive to

11:20:10 18   request number 1.  You searched for those

11:20:15 19   documents, is that right?

11:20:15 20       A.    Yes.  I definitely have nothing from

11:20:17 21   her.

11:20:20 22       Q.    Okay.  And Mr. DelliSanti, who is he?

11:20:24 23       A.    That's my landlord at 930 Mountain

11:20:29 24   Avenue.

11:20:30 25       Q.    Okay.  And are you aware of any payments

46

| | | |
|---|---|---|
| 11:20:32 | 1 | that were made to him for your benefit during the |
| 11:20:36 | 2 | relevant period? |
| 11:20:41 | 3 | A.    I know when I first moved here that |
| 11:20:47 | 4 | Pristec helped me get into that place, because I |
| 11:20:50 | 5 | didn't have money to make the move.  So I'm pretty |
| 11:20:53 | 6 | sure that there's a check written to him when we |
| 11:20:55 | 7 | first moved here.  Other than that, nothing. |
| 11:21:02 | 8 | Q.    Okay.  But you don't have any -- you |
| 11:21:05 | 9 | don't have any documents related to that? |
| 11:21:06 | 10 | A.    No. |
| 11:21:07 | 11 | Q.    Okay.  Do you have any documents related |
| 11:21:08 | 12 | to any other payments that were -- that may have |
| 11:21:12 | 13 | been made in connection with your move from |
| 11:21:16 | 14 | Missouri to New Jersey? |
| 11:21:20 | 15 | A.    No.  That's the only thing that I'm |
| 11:21:23 | 16 | pretty sure he paid. |
| 11:21:26 | 17 | Q.    Okay.  When you say "he," you mean |
| 11:21:29 | 18 | Mr. Laura? |
| 11:21:29 | 19 | A.    Yes.  Pristec. |
| 11:21:33 | 20 | Q.    Okay.  And how do you know whether the |
| 11:21:39 | 21 | payments were made by Mr. Laura or Pristec? |
| 11:21:46 | 22 | A.    I'm not really sure.  I don't know what |
| 11:21:49 | 23 | the check -- who the check was from, if it was from |
| 11:21:52 | 24 | Pristec or from Joe Laura.  I'm not sure. |
| 11:21:56 | 25 | Q.    Okay.  All right.  Let me ask it this |

47

| | | |
|---|---|---|
| 11:21:57 | 1 | way then. |
| 11:21:58 | 2 | Did Mr. Laura ever represent to you that |
| 11:22:00 | 3 | he was making payments on your behalf from his |
| 11:22:03 | 4 | personal account? |
| 11:22:06 | 5 | A.   No, he didn't. |
| 11:22:07 | 6 | Q.   Okay.  What about that he was making |
| 11:22:11 | 7 | payments on your behalf related to this move from |
| 11:22:14 | 8 | business accounts? |
| 11:22:15 | 9 | A.   He didn't state anything.  He just |
| 11:22:20 | 10 | helped me to get into the house.  And he wrote a |
| 11:22:23 | 11 | check.  I honestly don't know if that was a Pristec |
| 11:22:26 | 12 | check or a Joseph Laura check. |
| 11:22:29 | 13 | Q.   Okay.  Did you have any agreement with |
| 11:22:32 | 14 | him about -- any written agreement with Mr. Laura |
| 11:22:37 | 15 | about that move? |
| 11:22:38 | 16 | A.   No. |
| 11:22:38 | 17 | Q.   Okay.  How did it come about that he |
| 11:22:44 | 18 | paid those expenses then for your move into that |
| 11:22:46 | 19 | home? |
| 11:22:47 | 20 | A.   He knew -- I mean, I was moving out to |
| 11:22:53 | 21 | work with him.  He knew I didn't have really any |
| 11:22:55 | 22 | money.  So he was -- that was -- he just said, "If |
| 11:23:00 | 23 | you come out here, I'll help you with your moving |
| 11:23:03 | 24 | expenses if you can't make it out here otherwise." |
| 11:23:06 | 25 | And we couldn't, so...  Not moving expenses, but |

48

| | | |
|---|---|---|
| 11:23:11 | 1 | moving in.  I guess that's it. |
| 11:23:16 | 2 | Q.    Okay.  What were you doing work-wise in |
| 11:23:18 | 3 | Missouri prior to moving to New Jersey? |
| 11:23:21 | 4 | A.    Nothing.  I was a stay-at-home dad. |
| 11:23:29 | 5 | Q.    Okay.  All right.  I'll ask a couple of |
| 11:23:33 | 6 | other questions later, but let me see. |
| 11:23:37 | 7 | So with respect to request number 1, did |
| 11:23:42 | 8 | you search any of your other financial records |
| 11:23:46 | 9 | besides bank statements, like tax documents, |
| 11:23:49 | 10 | receipts, any other insurance documents, leases, |
| 11:23:52 | 11 | things of that nature? |
| 11:23:58 | 12 | A.    I don't really have that many other |
| 11:24:00 | 13 | documents.  Yes.  I mean, I looked through what I |
| 11:24:05 | 14 | had. |
| 11:24:05 | 15 | Q.    Okay.  And do you have tax documents |
| 11:24:07 | 16 | that would be related to any payments made for your |
| 11:24:10 | 17 | benefit by any of those entities or individuals? |
| 11:24:14 | 18 | A.    I don't have them personally, but |
| 11:24:21 | 19 | from -- yes.  I don't have them personally. |
| 11:24:22 | 20 | Q.    Okay.  Does someone else have them? |
| 11:24:28 | 21 | A.    2011, I think, 2012.  I tried to get |
| 11:24:32 | 22 | those documents from the accountant that did it for |
| 11:24:36 | 23 | me, but they said it was going too far back.  They |
| 11:24:40 | 24 | didn't have them. |
| 11:24:41 | 25 | Q.    Okay.  And for the other time periods, |

49

11:24:45 1   2012 through 2017, did you search for any tax

11:24:50 2   documents?

11:24:50 3      A.   2012 or 2013 through 2017, I just had to

11:24:57 4   file them all recently.  So I just filed all those

11:25:01 5   back taxes.

11:25:07 6      Q.   Okay.  So there were no documents

11:25:08 7   related to tax filings prior to whenever you just

11:25:13 8   did the recent filing you're referring to in your

11:25:15 9   answer?

11:25:16 10      A.   Yes.  Prior to...

11:25:23 11      Q.   Prior to when?  I'm sorry?

11:25:25 12      A.   I believe 2011, 2012, and then I just

11:25:29 13   filed 2013 moving forward.

11:25:35 14      Q.   Okay.  And when was that filing --

11:25:38 15      A.   I'm waiting for a response.

11:25:38 16      Q.   -- the recent one?

11:25:40 17      A.   I just sent them out, yes.

11:25:43 18      Q.   So you sent them out in 2021?

11:25:47 19      A.   Yes.

11:25:48 20      Q.   Okay.  And do those tax filings made

11:25:54 21   reference to payments that you received or were

11:25:58 22   made for your benefit from the individuals or

11:26:03 23   entities listed in request number 1?

11:26:05 24      A.   Yes.

11:26:09 25      Q.   Okay.  All right.  But they were not

50

11:26:11 1    produced to us in response to the subpoena?

11:26:17 2        A.    No.  I just got them off.

11:26:17 3        Q.    Is that correct?

11:26:19 4        A.    Yes.

11:26:21 5        Q.    Okay.  All right.  Let me just move on

11:26:27 6    through these requests.

11:26:29 7             Okay.  So request number 4 -- request

11:26:36 8    numbers 3 and 4 related to any agreements you had

11:26:40 9    with Pristec or Innovative Crude Technologies or

11:26:44 10   any documents concerning services provided by you

11:26:46 11   to Pristec or Innovative.

11:26:49 12            Is it your testimony that you have no

11:26:51 13   documents that meet that criteria from the relevant

11:26:57 14   time period?

11:26:58 15       A.    No.

11:27:02 16       Q.    Okay.  That's not your testimony or you

11:27:04 17   don't have any documents?

11:27:05 18       A.    I don't have those documents.

11:27:11 19       Q.    Okay.  Were those documents -- was there

11:27:12 20   ever an employment agreement or any investment

11:27:15 21   agreement or debt instrument between you and

11:27:19 22   Pristec or Innovative Crude Technologies?

11:27:22 23       A.    No.  No agreement.  Nothing on paper.

11:27:31 24       Q.    Okay, And any documents concerning

11:27:34 25   services that you provided to Pristec or Innovative

51

11:27:39 1  Crude Technologies, you don't have any documents --

11:27:42 2  you never had any documents like that?

11:27:43 3         A.    No.

11:27:45 4         Q.    Okay.  You never kept a record of any of

11:27:49 5  the services that you provided?

11:27:53 6         A.    No.  I mean, I know -- I knew what I had

11:27:55 7  provided at that time, and that was it.

11:28:00 8         Q.    Okay.  When you say you knew, you

11:28:05 9  just -- that's a reference to that you kept a

11:28:08 10 record in your head but created no documents?  I

11:28:11 11 just want to make sure I understand your testimony.

11:28:13 12        A.    Yes.

11:28:14 13        Q.    Okay.  So no time sheets, no calendars,

11:28:24 14 no diaries?

11:28:26 15        A.    No.

11:28:27 16        Q.    Nothing like that?

11:28:27 17        A.    No.  I didn't work by the hour really,

11:28:30 18 so...

11:28:31 19        Q.    Okay.  Did you keep a log of any of the

11:28:36 20 trips that you provided?

11:28:38 21        A.    Trips that I provided?

11:28:42 22        Q.    Well, a log of any of the services that

11:28:46 23 you provided?

11:28:49 24        A.    No.

11:28:49 25        Q.    Okay.  All right.  And I believe you

52

| | | |
|---|---|---|
| 11:28:54 | 1 | already testified that you believe there are text |
| 11:29:01 | 2 | messages between yourself and Mr. Laura, but you're |
| 11:29:03 | 3 | not sure whether they relate to the relevant time |
| 11:29:06 | 4 | period or to the services that you may have been |
| 11:29:12 | 5 | providing to Pristec or Innovative, is that right? |
| 11:29:15 | 6 | MR. O'CONNOR:  Objection.  Misstates |
| 11:29:16 | 7 | testimony. |
| 11:29:17 | 8 | You can answer.  You can answer. |
| 11:29:21 | 9 | THE WITNESS:  I can answer.  Okay. |
| 11:29:23 | 10 | A.    No, not from that time period. |
| 11:29:25 | 11 | BY MS. SPILLANE: |
| 11:29:25 | 12 | Q.    Okay.  You know that you don't have any |
| 11:29:27 | 13 | from that time period, is that -- I just want to |
| 11:29:31 | 14 | make sure. |
| 11:29:31 | 15 | A.    Yes. |
| 11:29:34 | 16 | Q.    Okay.  Do you believe you would have had |
| 11:29:36 | 17 | text messages from that time period?  You would |
| 11:29:41 | 18 | communicate with him by text, but just don't have |
| 11:29:44 | 19 | those records anymore, is that right? |
| 11:29:45 | 20 | A.    Yes.  We communicated by text. |
| 11:29:53 | 21 | Q.    Okay.  All right.  So item number 6, do |
| 11:29:59 | 22 | any of these individuals listed owe you any debt |
| 11:30:05 | 23 | currently or did they ever owe you any debt? |
| 11:30:11 | 24 | A.    No, not personally. |
| 11:30:18 | 25 | Q.    All right.  I believe we covered number |

53

| | |
|---|---|
| 11:58:04 | 1 |
| 11:58:08 | 2 |
| 11:58:09 | 3 |
| 11:58:14 | 4 |
| 11:58:15 | 5 |
| 11:58:21 | 6 |
| 11:58:24 | 7 |
| 11:58:26 | 8 |
| 11:58:26 | 9 |
| 11:58:28 | 10 |
| 11:58:31 | 11 |
| 12:11:19 | 12 |
| 12:21:46 | 13 |
| 12:21:49 | 14 |
| 12:21:49 | 15 |
| 12:21:55 | 16 |
| 12:22:00 | 17 |
| 12:22:05 | 18 |
| 12:22:08 | 19 |
| 12:22:11 | 20 |
| 12:22:12 | 21 |
| 12:22:12 | 22 |
| 12:22:20 | 23 |
| 12:22:23 | 24 |
| 12:22:26 | 25 |

Q.    Okay.  He never mentioned -- Mr. Laura never mentioned any of that to you?

A.    No.

MS. SPILLANE:  Okay.  All right.  I think this is a good time for a break.  So we'll take ten minutes, if that's okay. Let's go off the record, please.

MR. O'CONNOR:  Okay.  Sure.  Yes.

THE VIDEOGRAPHER:  And we're going off the record at 11:58 a.m.

(Recess)

THE VIDEOGRAPHER:  And we're back on the record at 12:21 p.m.

BY MS. SPILLANE:

Q.    Okay.  Mr. Martelli, I understand during the break that you did identify some relevant text messages on your cell phone from the responsive period and that you do intend to produce those documents to the SEC.

Is that correct?

A.    Yes.

Q.    Okay.  I wanted to ask you if you are an investor in Pristec America.

A.    No.

Q.    Are you an investor in Innovative Crude

76

| | | |
|---|---|---|
| 12:22:32 | 1 | Technologies? |
| 12:22:32 | 2 | A.   No. |
| 12:22:34 | 3 | Q.   Are you an investor in Pristec AG? |
| 12:22:37 | 4 | A.   No. |
| 12:22:41 | 5 | Q.   Okay.  Do you have any ownership |
| 12:22:45 | 6 | interest in any of those entities? |
| 12:22:51 | 7 | A.   No. |
| 12:22:52 | 8 | Q.   Were you ever asked to invest in any of |
| 12:22:54 | 9 | those entities? |
| 12:22:58 | 10 | A.   No. |
| 12:23:01 | 11 | Q.   Did Mr. Laura ever suggest to you that |
| 12:23:06 | 12 | you would at some point be provided with an equity |
| 12:23:09 | 13 | interest in any of those entities? |
| 12:23:11 | 14 | A.   No. |
| 12:23:13 | 15 | Q.   Have you ever invested in any other |
| 12:23:22 | 16 | project that Mr. Laura, Mr. Sichenzio or Mr. Gil de |
| 12:23:27 | 17 | Rubio were or are involved in? |
| 12:23:28 | 18 | A.   No. |
| 12:23:30 | 19 | Q.   Okay.  Are you familiar with an entity |
| 12:23:33 | 20 | called 1530 Glenwood LLC? |
| 12:23:37 | 21 | A.   No. |
| 12:23:38 | 22 | Q.   Are you familiar with an entity called |
| 12:23:42 | 23 | Robbins Lane? |
| 12:23:48 | 24 | A.   No. |
| 12:23:48 | 25 | Q.   Are you familiar with an entity called |

77

```
12:31:48   1        Q.    Okay.  And at some point, there were
12:31:52   2   discussions about you coming -- moving back to New
12:31:56   3   Jersey, is that right?
12:32:00   4        A.    Yes.  Later on.  Not for -- we had been
12:32:03   5   talking for at least years before anything like
12:32:08   6   that happened.
12:32:11   7        Q.    Okay.  And how did it come about that
12:32:14   8   you started discussing moving back to New Jersey
12:32:16   9   with Mr. Laura?
12:32:19  10        A.    Well, it came about actually when I got
12:32:21  11   married.  So he came to my wedding because my
12:32:27  12   father wasn't there and everything.  So he just
12:32:29  13   came to support me.  And when he was there, he just
12:32:34  14   discussed this new company that he was involved
12:32:36  15   with, this great technology, and basically just
12:32:39  16   told me all the great things about it and said, you
12:32:44  17   know, "If you're interested, I'd be interested in
12:32:47  18   having you come out and help me with whatever."  It
12:32:54  19   was -- we made the decision pretty quick, and then
12:32:56  20   we -- my wife said let's give it a shot.  This is a
12:33:01  21   big opportunity.  And we moved out not too long
12:33:08  22   after that.  I just can't remember exactly -- well,
12:33:10  23   yes, around the end of 2010, so... yes.
12:33:15  24        Q.    Okay.  And you mentioned that Mr. Laura
12:33:20  25   was talking to you about a company that he was
```

84

```
12:33:22  1   involved with.
12:33:23  2           What did he mention to you, if you can
12:33:26  3   remember?
12:33:29  4       A.   Honestly, I just remember him explaining
12:33:31  5   the technology to me and just him really believing
12:33:38  6   -- him really thinking that this thing was going to
12:33:41  7   hit it off big in this short period of time.  I
12:33:43  8   just remember he was excited about it.  He was
12:33:49  9   like, "This could be a big opportunity for you."
12:33:51 10   That's really what we talked about.  And at the
12:33:53 11   time, like I said, I was -- I needed a new
12:33:55 12   opportunity, so I jumped on it.
12:34:02 13       Q.   Okay.  And did he mention anyone else
12:34:03 14   involved in the business --
12:34:06 15       A.   No.
12:34:07 16       Q.   -- at that time?
12:34:07 17       A.   No.
12:34:08 18       Q.   Okay.  Did he mention what the
12:34:14 19   organization was called, anything like that?
12:34:18 20       A.   To be honest with you, I could not tell
12:34:21 21   you the ins and outs of that conversation.  I just
12:34:26 22   remember that he was excited.  I remember specific
12:34:29 23   things, that we were by the pool side at a hotel.
12:34:32 24   I don't remember all of it.  I just remember he was
12:34:34 25   so excited.  I got excited.  And I don't remember
```

85

| | |
|---|---|
| 12:34:39 | 1 | specifics, though, like names or company names or |
| 12:34:42 | 2 | whatever, but I'm sure it was Pristec. |
| 12:34:45 | 3 |      Q.    Okay.  Why are sure it was Pristec? |
| 12:34:48 | 4 |      A.    Because what other -- I mean, that's the |
| 12:34:51 | 5 | only company I know him to be involved in at that |
| 12:35:00 | 6 | time. |
| 12:35:00 | 7 |      Q.    Okay.  And what did you understand |
| 12:35:02 | 8 | Mr. Laura's role to be with the company that he was |
| 12:35:04 | 9 | talking about at that time? |
| 12:35:07 | 10 |      A.    I didn't really understand a specific |
| 12:35:09 | 11 | role.  He just said he was working with some |
| 12:35:13 | 12 | gentleman from Austria.  I don't know.  He didn't |
| 12:35:17 | 13 | specify a specific role. |
| 12:35:21 | 14 |      Q.    Okay.  Did he tell you whether he had |
| 12:35:22 | 15 | invested in this company or that the -- |
| 12:35:26 | 16 |      A.    No. |
| 12:35:26 | 17 |      Q.    Okay.  Did he tell you whether he had |
| 12:35:30 | 18 | any kind of ownership interest? |
| 12:35:33 | 19 |      A.    You know, you're -- I don't remember |
| 12:35:35 | 20 | these things.  So if I -- if there's something -- |
| 12:35:40 | 21 | when you're asking, if there's something specific I |
| 12:35:40 | 22 | remember, I'll just tell you, but I don't remember |
| 12:35:42 | 23 | that. |
| 12:35:48 | 24 |      Q.    Okay.  And you described a sort of idea |
| 12:35:50 | 25 | that there would be an opportunity for you.  What |

86

| | | |
|---|---|---|
| 12:35:57 | 1 | initially when you were still in Missouri did you |
| 12:35:59 | 2 | discuss?  Did Mr. Laura describe what that |
| 12:36:03 | 3 | opportunity would be for you? |
| 12:36:04 | 4 | A.   He basically just said, you know, once |
| 12:36:11 | 5 | this technology gets off the ground and starts |
| 12:36:15 | 6 | making big money, that I'd be able to have a good |
| 12:36:18 | 7 | place with the company and that I'd be making a lot |
| 12:36:20 | 8 | of money.  That was enough for me to, you know -- |
| 12:36:24 | 9 | between that and my trust for him and love for him |
| 12:36:26 | 10 | as an individual, I was like, "Let's do this, |
| 12:36:30 | 11 | babe."  She was for it, so we did it. |
| 12:36:37 | 12 | Q.   And what did you understand from your |
| 12:36:38 | 13 | conversation with Mr. Laura that you would be doing |
| 12:36:40 | 14 | for the company? |
| 12:36:44 | 15 | A.   He really told me he just needed help. |
| 12:36:46 | 16 | He needed help.  Basically told me with whatever it |
| 12:36:50 | 17 | was that he needed help with, that I'd be willing |
| 12:36:52 | 18 | to help him.  And I said yes. |
| 12:36:59 | 19 | Q.   Okay.  Did he give any description of |
| 12:37:00 | 20 | what it is that he would need help with? |
| 12:37:03 | 21 | A.   Not in particular.  I mean, driving him |
| 12:37:07 | 22 | around.  I mean, that's driving -- yes, that's |
| 12:37:13 | 23 | really what he said, driving him around, helping |
| 12:37:15 | 24 | him if he needed help with paperwork or doing stuff |
| 12:37:18 | 25 | on the computer or -- basically, just like an |

87

12:37:22  1    assistant, basically.

12:37:30  2        Q.    Okay.  And did you discuss compensation

12:37:33  3    arrangements at that time?

12:37:34  4        A.    I'm sure -- I don't remember at that

12:37:38  5    time, but I'm sure we did at some point, because I

12:37:41  6    would have wanted to know what I was making before

12:37:43  7    I came out here.

12:37:45  8        Q.    Okay.  And about how long before you --

12:37:51  9    was there in between when Mr. Laura made this

12:37:53 10    proposal to you and when you actually moved out to

12:37:56 11    New Jersey?

12:37:57 12        A.    I felt like it happened within one year,

12:38:00 13    because I tried to put my house up for sale and I

12:38:05 14    remember we stayed as long as we could.  But at

12:38:07 15    some point, you know -- I don't remember.  Maybe a

12:38:13 16    year after I spoke to him or maybe between eight

12:38:15 17    months and a year.

12:38:20 18        Q.    Okay.  And do you know if there were

12:38:22 19    other candidates for the position that Mr. Laura

12:38:27 20    had?

12:38:27 21        A.    No, I didn't know that.

12:38:30 22        Q.    No.  I'm just asking if you knew if

12:38:35 23    there were --

12:38:35 24        A.    No, I don't know.

12:38:39 25        Q.    -- other candidates.  Okay.

                                                                      88

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

12:38:42 1          Did you ever see like a written job

12:38:44 2 description?

12:38:45 3       A.    No.

12:38:48 4       Q.    Okay.  So in between the time you first

12:38:50 5 began talk with Mr. Laura about helping him out and

12:38:57 6 when you actually moved out, was there someone else

12:39:01 7 providing the services for Mr. Laura?

12:39:04 8       A.    I don't know.  I have no idea.  Probably

12:39:07 9 not, but I don't know.

12:39:11 10       Q.    Okay.  All right.  Did Mr. Laura suggest

12:39:15 11 that you needed any kind of training or any sort of

12:39:22 12 educational background or supplementing before you

12:39:24 13 would come to work for him?

12:39:25 14       A.    No.

12:39:25 15       Q.    Okay.  Let's see.  And did Mr. Lawyer

12:39:38 16 suggest that you would also be providing services

12:39:40 17 to anyone else who was associated with the company?

12:39:46 18       A.    No.

12:39:47 19       Q.    Okay.  What about Mr. Sichenzio, did you

12:39:53 20 ever have any conversations with him before you --

12:39:55 21       A.    No.

12:39:55 22       Q.    -- moved back to New Jersey or moved out

12:39:59 23 to New Jersey?

12:39:59 24       A.    Never.

12:40:00 25       Q.    Okay.  What about Walter Gil de Rubio?

89

12:46:18  1        Q.    Okay.  And you were not taking direction

12:46:20  2    from anyone else related to the company, is that

12:46:23  3    right?

12:46:23  4        A.    No.  No.

12:46:30  5        Q.    Okay.  I'm sorry.  You were not taking

12:46:32  6    directions from anyone else, correct?

12:46:34  7        A.    No, I wasn't.  Yes.

12:46:35  8        Q.    Okay.  Sorry.  That was a bad question

12:46:40  9    on my part.

12:46:42 10        Okay.  And so why don't you just

12:46:44 11    describe generally what responsibilities you had in

12:46:48 12    2010, when you moved to New Jersey?

12:46:51 13        A.    Really, in 2010, I was like -- I didn't

12:47:02 14    do much.  In 2011, the beginning of 2011, we would

12:47:05 15    be driving.  I mean, the main thing I did honestly

12:47:08 16    was a lot of driving.  Constantly driving.  Driving

12:47:12 17    out of state.  Driving everywhere.  And then just

12:47:17 18    basically anything that -- if Joe said, "Hey,

12:47:20 19    listen, I need 400 copies of this," I'd run to

12:47:24 20    Staples for him.  Just basic assistant stuff.

12:47:30 21        Q.    Sure.

12:47:31 22        A.    And like I said, he doesn't know his way

12:47:34 23    around PowerPoint and all that, so I would help him

12:47:39 24    with that.  Basically, I was a -- I want to say I

12:47:42 25    was a driver even though I did a lot of other

                                                              95

12:47:44   1    things, but just little stuff.

12:47:46   2        Q.    Okay.  So you were mainly a driver, is

12:47:49   3    that right?

12:47:49   4        A.    Yes, mainly.  But I have helped Joe on

12:47:52   5    different occasions with different stuff, but...

12:47:55   6        Q.    Sure.

12:47:56   7              Well, let' say -- so in 2010, it sounds

12:47:59   8    like -- I don't want to mischaracterize your

12:48:01   9    testimony, but I think you said you didn't do much

12:48:04  10    in 2010.

12:48:05  11              Is that right?

12:48:05  12        A.    Well, I don't think I got here until

12:48:09  13    like -- I want to say the end of October, so maybe

12:48:11  14    for the first two months.  I don't remember that

12:48:15  15    far back as to exactly what I was doing, but I

12:48:17  16    actually -- we were -- actually, it was like I

12:48:21  17    was -- I'm sorry.  It was like I was -- when I

12:48:22  18    first got here, I was going like -- it felt like I

12:48:25  19    was going seven days a week with this guy, driving

12:48:28  20    from this meeting to that meeting to -- everywhere.

12:48:32  21    I mean, it seemed like -- at first, I was like,

12:48:34  22    man, this is crazy.  So I guess I was working the

12:48:41  23    end of 2010.

12:48:46  24        Q.    Okay.  And about -- and that was mainly

12:48:48  25    driving?

96

```
12:48:49  1        A.    Yes, mainly driving.  I mean, like I

12:48:55  2   said, yes, mainly driving.  Helping him with, like

12:48:59  3   I said, doing PowerPoint, doing charts graphs,

12:49:08  4   whatever.  But that's it, yes.

12:49:09  5        Q.    Okay.  And did you have an understanding

12:49:10  6   of what the purpose of what you were -- the charts

12:49:12  7   and graphs that you were doing, what the purpose of

12:49:14  8   them was?

12:49:16  9        A.    Not in particular.  Joe might just say,

12:49:19 10   "Hey, can you straighten this out or do this for

12:49:22 11   me?"  I was just basically data entry is basically

12:49:25 12   what you would call it.

12:49:29 13        Q.    Okay.  And did you have a computer for

12:49:33 14   your use --

12:49:33 15        A.    No.

12:49:34 16        Q.    -- in your apartment or -- no?

12:49:36 17        A.    Not for -- not to work with Joe.  When

12:49:38 18   I'd go over, I'd have to use his stuff.

12:49:43 19        Q.    Okay.  Go over -- and where did this

12:49:45 20   stake take place?

12:49:46 21        A.    Usually, it took place in his office at

12:49:49 22   his home.

12:49:51 23        Q.    Wherever Joe was living at the time?

12:49:53 24        A.    Yes.

12:50:01 25        Q.    Okay.  So you didn't have a computer
```

                                                              97

| | | |
|---|---|---|
| 12:50:02 | 1 | that was for your use for business stuff wherever |
| 12:50:05 | 2 | you were? |
| 12:50:06 | 3 | A.    No. |
| 12:50:07 | 4 | Q.    Is that right? |
| 12:50:07 | 5 | A.    No, I didn't. |
| 12:50:08 | 6 | Q.    Okay.  And there was no Pristec office? |
| 12:50:14 | 7 | A.    No. |
| 12:50:15 | 8 | MR. O'CONNOR:  Objection. |
| 12:50:17 | 9 | Go ahead.  You can answer. |
| 12:50:19 | 10 | Misstates testimony. |
| 12:50:20 | 11 | You can answer. |
| 12:50:24 | 12 | A.    No Pristec office. |
| 12:50:29 | 13 | BY MS. SPILLANE: |
| 12:50:29 | 14 | Q.    And the computer that you used, was that |
| 12:50:32 | 15 | Mr. Laura's computer? |
| 12:50:33 | 16 | A.    Yes. |
| 12:50:38 | 17 | Q.    Okay.  So let's just take it sort of |
| 12:50:41 | 18 | year by year, but let's say in 2011, what |
| 12:50:45 | 19 | proportion of your work was driving and what |
| 12:50:48 | 20 | proportion was other assistant work? |
| 12:50:51 | 21 | A.    80 percent driving, 20 percent other |
| 12:50:58 | 22 | stuff. |
| 12:51:00 | 23 | Q.    Okay.  And so when you were driving -- I |
| 12:51:05 | 24 | think you testified earlier you didn't -- there was |
| 12:51:07 | 25 | no like time sheet or log or any calendar that |

98

| | | |
|---|---|---|
| 12:51:10 | 1 | tracked any of those trips, is that right? |
| 12:51:12 | 2 | A.    No. |
| 12:51:15 | 3 | Q.    Okay.  And where -- you said you would |
| 12:51:22 | 4 | go in different states.  What different states did |
| 12:51:25 | 5 | you take trips to? |
| 12:51:26 | 6 | A.    Everywhere.  I've been to Connecticut, |
| 12:51:30 | 7 | Maryland.  I've been anywhere -- anywhere -- I |
| 12:51:37 | 8 | don't want to say anywhere on the East Coast, but |
| 12:51:40 | 9 | we were travelling like all over.  I mean, most of |
| 12:51:43 | 10 | the meetings were like New York City or local, but |
| 12:51:46 | 11 | it just seemed like we were driving everywhere all |
| 12:51:49 | 12 | the time, meeting with people all the time, or he |
| 12:51:52 | 13 | was meeting with people all the time.  Honestly, it |
| 12:51:55 | 14 | seemed like it was just nonstop. |
| 12:52:03 | 15 | Q.    Okay.  And so you generally made trips |
| 12:52:10 | 16 | driving, correct? |
| 12:52:11 | 17 | A.    I'm sorry, what? |
| 12:52:11 | 18 | Q.    These are trips that you took for |
| 12:52:14 | 19 | Mr. Laura driving, is that right? |
| 12:52:16 | 20 | A.    Yes. |
| 12:52:18 | 21 | Q.    Okay.  I just am confirming, did you go |
| 12:52:21 | 22 | with him on any trips that required a flight on an |
| 12:52:26 | 23 | airplane? |
| 12:52:28 | 24 | A.    Yes.  Actually, I've been with him twice |
| 12:52:32 | 25 | to Austria in Europe. |

99

| | | |
|---|---|---|
| 12:52:35 | 1 | Q.    And when was that? |
| 12:52:36 | 2 | A.    The beginning of -- like when I first |
| 12:52:41 | 3 | got here, maybe the beginning of 2011 or the very |
| 12:52:45 | 4 | end of 2008, and then once again -- I feel like not |
| 12:52:49 | 5 | that long later.  Maybe six months later or |
| 12:52:53 | 6 | something.  I'm not sure of the exact dates. |
| 12:52:56 | 7 | Q.    I think you may have said 2008, did you |
| 12:52:59 | 8 | mean -- end of 2008.  Did you mean the end of 2010? |
| 12:53:02 | 9 | A.    Yes, definitely not 2008.  End of 2010 |
| 12:53:07 | 10 | or beginning of 2011, around then. |
| 12:53:13 | 11 | Q.    Okay.  But you didn't accompany |
| 12:53:15 | 12 | Mr. Laura on trips outside of the East Coast |
| 12:53:18 | 13 | outside of driving distance, is that right? |
| 12:53:24 | 14 | A.    Only the two trips to Austria.  Other |
| 12:53:27 | 15 | than that -- |
| 12:53:27 | 16 | Q.    Right.  Setting those aside. |
| 12:53:32 | 17 | A.    No. |
| 12:53:37 | 18 | Q.    Okay.  And what was the -- let's start |
| 12:53:40 | 19 | with the first trip to Austria. |
| 12:53:41 | 20 | What was the purpose of that trip, as |
| 12:53:43 | 21 | far as you know? |
| 12:53:44 | 22 | A.    I'm not sure exactly what Joe was doing |
| 12:53:48 | 23 | there.  He said that it was important.  He wanted |
| 12:53:50 | 24 | to introduce me to Rudy and to Miguel and basically |
| 12:53:56 | 25 | just so I could see around the facility and |

100

| 12:53:58 | 1 | whatever else.  I think he really wanted them to |
| 12:54:00 | 2 | meet me, because he said I was going to be work |
| 12:54:04 | 3 | with the company for years to come.  So that was |
| 12:54:12 | 4 | the purpose of going. |
| 12:54:13 | 5 | Q.   Okay.  And did you have any direct |
| 12:54:14 | 6 | communications with any of those individuals? |
| 12:54:16 | 7 | A.   Sure.  With Rudy and Miguel. |
| 12:54:21 | 8 | Q.   During what time period? |
| 12:54:25 | 9 | A.   It would be the same time -- just at |
| 12:54:29 | 10 | that time, just while I was there on the trip.  I |
| 12:54:31 | 11 | didn't speak to them after that. |
| 12:54:36 | 12 | Q.   Okay.  At any appointment after that, |
| 12:54:38 | 13 | you didn't speak with them?  Just while you were |
| 12:54:42 | 14 | there on the trip? |
| 12:54:43 | 15 | MR. O'CONNOR:  You're talking about for |
| 12:54:45 | 16 | Pristec matters? |
| 12:54:47 | 17 | MS. SPILLANE:  Correct. |
| 12:54:48 | 18 | MR. O'CONNOR:  Okay. |
| 12:54:48 | 19 | A.   I may have seen them or talked to them a |
| 12:54:53 | 20 | couple of times after that, but not on the phone or |
| 12:54:55 | 21 | anything like that. |
| 12:54:58 | 22 | BY MS. SPILLANE: |
| 12:54:58 | 23 | Q.   Okay.  What about by e-mail or by text? |
| 12:55:02 | 24 | A.   No, not at all. |
| 12:55:03 | 25 | Q.   Okay.  So Mr. Laura said he wanted you |

101

12:55:10   1    to meet those individuals, but then did you

12:55:12   2    actually do anything with them or for them in the

12:55:18   3    years thereafter?

12:55:20   4        A.    Oh, no.  Not specifically for them.

12:55:25   5        Q.    Okay.  All right.  So let's just try to

12:55:33   6    get a general proportion.  I think you said in

12:55:36   7    2011, it was 80 percent driving, 20 percent other

12:55:39   8    stuff.

12:55:39   9              What about in the years following, did

12:55:42  10    that change?

12:55:44  11        A.    You know what?  Mostly driving a lot.  A

12:55:50  12    lot.  Just year after year after year.

12:55:53  13        Q.    So, again, a percentage that you

12:55:57  14    could --

12:55:57  15        A.    A percentage, I would say 80/20, 80/20.

12:56:02  16    Towards the end, I wasn't getting paid properly, so

12:56:04  17    I was doing a lot less work for him, because he

12:56:07  18    wasn't paying me what he told me he was going to

12:56:09  19    pay me in the beginning.  So he had me doing a lot

12:56:13  20    less work because I was getting paid a lot less.

12:56:18  21        Q.    Okay.  And when did it -- when did you

12:56:20  22    start to notice that you were getting paid a lot

12:56:23  23    less than Mr. Laura had told you he would pay you?

12:56:28  24        A.    Basically like the first year was great.

12:56:30  25    I was like this is great.  The second year, about

                                                              102

```
12:56:32  1    halfway through the second year or whenever -- this
12:56:35  2    is not exact month.  I don't know months, but
12:56:37  3    basically that second year, it started to fall off.
12:56:41  4    And he started telling me like we don't have as
12:56:44  5    much money.  And basically my work started to -- I
12:56:49  6    didn't do as much work.  But yes, he was still
12:56:52  7    calling me, do this, do that, taking him all over
12:56:56  8    the place, but it was a little messed up.  I was in
12:56:58  9    a bad spot then.
12:57:00 10        Q.    Okay.  It's my understanding at some
12:57:06 11    point -- well, let me ask it this way.
12:57:08 12              When I asked you whether there was any
12:57:10 13    written employment agreement, you said there was
12:57:12 14    nothing written.
12:57:14 15              Did you have some kind of spoken
12:57:17 16    agreement with Mr. Laura as to what your job would
12:57:20 17    be and how much you would be compensated?
12:57:23 18        A.    Basically, he told me in the beginning.
12:57:25 19    He was like, "I'm going to give you five grand a
12:57:28 20    month before taxes."  And that's -- but that didn't
12:57:35 21    last until -- that lasted like the first year, and
12:57:38 22    then it was -- from my recollection, it was just
12:57:41 23    sporadic and a lot less than that after that and to
12:57:47 24    the point where it got pretty bad.  I was like
12:57:49 25    struggling.
```

                                                                    103

| | | |
|---|---|---|
| 12:57:50 | 1 | Q.   Okay.  And were you formally an employee |
| 12:57:58 | 2 | at any point during those years, 2010 to 2017? |
| 12:58:04 | 3 | A.   Was I formally an employee? |
| 12:58:08 | 4 | Q.   Formally. |
| 12:58:10 | 5 | A.   Oh, formally an employee.  Yes.  For the |
| 12:58:15 | 6 | first year or so, I was considered an employee. |
| 12:58:18 | 7 | Then after that, it was like, okay, now you're -- |
| 12:58:22 | 8 | you're going to be 1099 or whatever.  You're going |
| 12:58:25 | 9 | to be still working for the company, but you're not |
| 12:58:28 | 10 | going to be on the pay -- like a W-2'd employee. |
| 12:58:37 | 11 | Q.   So you were W-2'd or the first how many |
| 12:58:41 | 12 | years? |
| 12:58:41 | 13 | A.   I think the first year or two.  And then |
| 12:58:43 | 14 | after that, ever since then, like 2013 or '14, it's |
| 12:58:50 | 15 | just been just 1099 or whatever, you know. |
| 12:58:55 | 16 | Q.   Okay.  And so then for the first two |
| 12:59:00 | 17 | years, did you receive any benefits? |
| 12:59:04 | 18 | A.   Like health care? |
| 12:59:06 | 19 | Q.   Like health care. |
| 12:59:08 | 20 | A.   No. |
| 12:59:15 | 21 | Q.   Okay.  Any sort of compensation in kind |
| 12:59:18 | 22 | other than paychecks that you received? |
| 12:59:21 | 23 | A.   No.  Nothing. |
| 12:59:24 | 24 | Q.   Any like sort of equity promises, like I |
| 12:59:27 | 25 | know I couldn't pay you X, but you'll get some kind |

104

| | |
|---|---|
| 12:59:32 | 1 |
| 12:59:35 | 2 |
| 12:59:38 | 3 |
| 12:59:42 | 4 |
| 12:59:44 | 5 |
| 12:59:47 | 6 |
| 12:59:49 | 7 |
| 12:59:52 | 8 |
| 12:59:54 | 9 |
| 13:00:01 | 10 |
| 13:00:02 | 11 |
| 13:00:07 | 12 |
| 13:00:09 | 13 |
| 13:00:12 | 14 |
| 13:00:16 | 15 |
| 13:00:20 | 16 |
| 13:00:22 | 17 |
| 13:00:26 | 18 |
| 13:00:29 | 19 |
| 13:00:33 | 20 |
| 13:00:36 | 21 |
| 13:00:39 | 22 |
| 13:00:42 | 23 |
| 13:00:46 | 24 |
| 13:00:49 | 25 |

of interest in any kind of business entity,

anything like that?

     A.   Nothing.  I probably should have, but

no, nothing.

     Q.   Okay.  And then so -- I just want to

understand.  So you were being paid less after the

first couple of years when you were no longer an

employee.

          How many hours about you were working a

week, did that change?

     A.   Yes.  Up until the third year, it

changed.  I wasn't working as much.  Because before

that, I was working like seven days a week it felt

like, to the point where I was like, man, this is

too much.  But then, once my pay started dropping,

then it was reasonable work hours at that point.

It was like still working, still driving a lot and

whatever, but it was not like all weekend.  It

wasn't just like all the time.

     Q.   Okay.  Can you give an estimate about

how many hours per week you were working in the

first -- let's say in 2011, 2012?

     A.   Oh, my God.  How many hours?  How many

hours are in the week?  I would say on average, 12

hours a day running around.

105

13:00:54 1      Q.     Seven days a week?

13:00:58 2      A.     Six days a week, I would say, on

13:01:00 3  average.

13:01:03 4      Q.     Okay.  And then in 2013, 2014, 2015,

13:01:08 5  2016, 2017?

13:01:10 6      A.     I mean, four or five days a week.  More

13:01:18 7  -- on average, maybe eight hours a day, nine hours

13:01:21 8  a day.  I feel like I worked so many hours that --

13:01:29 9  I've worked a lot for this company.

13:01:34 10     Q.     Okay.  Let's see.  And at any point, was

13:01:36 11 there any kind of written agreement for the work

13:01:38 12 that you would be doing?

13:01:40 13     A.     No.

13:01:46 14     Q.     Okay.  And when you switched from being

13:01:48 15 an employee to a 1099, was there any -- other than

13:01:54 16 the reduced hours, was there any change in the type

13:01:57 17 of work that you were doing?

13:02:01 18     A.     No.  Same thing, just not as much of it.

13:02:05 19     Q.     Okay.  And were you working any other

13:02:08 20 jobs at the time?

13:02:09 21     A.     No.

13:02:11 22     Q.     Okay.  So between 2010 and 2017, you

13:02:15 23 were just working for Mr. Laura?

13:02:17 24     A.     Yes.

13:02:24 25     Q.     Okay.  And let's see.  When did you stop

106

| | | |
|---|---|---|
| 13:02:28 | 1 | working for Mr. Laura, if in fact you have stopped? |
| 13:02:32 | 2 | MR. O'CONNOR:  For Pristec you're |
| 13:02:33 | 3 | talking about? |
| 13:02:37 | 4 | MS. SPILLANE:  Well, let me ask. |
| 13:02:38 | 5 | BY MS. SPILLANE: |
| 13:02:39 | 6 | Q.    Have you been continuously working at |
| 13:02:42 | 7 | Mr. Laura's direction since 2010? |
| 13:02:45 | 8 | MR. O'CONNOR:  You're not to disclose |
| 13:02:48 | 9 | your work for NVT.  You can answer as it |
| 13:02:50 | 10 | relates to Pristec. |
| 13:02:51 | 11 | A.    Yes.  As it relates to Pristec, I worked |
| 13:02:53 | 12 | with him all the way until around 2018. |
| 13:02:59 | 13 | BY MS. SPILLANE: |
| 13:02:59 | 14 | Q.    Okay.  And when in 2018 did you stop |
| 13:03:03 | 15 | doing work for Mr. Laura related to Pristec? |
| 13:03:07 | 16 | A.    I'm not even sure of the exact date. |
| 13:03:09 | 17 | I'm trying to think.  Honestly, I'm not positive. |
| 13:03:17 | 18 | I don't want to give you a false answer. |
| 13:03:23 | 19 | Q.    And when were you last paid by Pristec |
| 13:03:25 | 20 | for work related to Pristec or Innovative Crude |
| 13:03:32 | 21 | Technologies? |
| 13:03:32 | 22 | A.    In 2018.  I'm not sure of the exact |
| 13:03:35 | 23 | date, but definitely in 2018. |
| 13:03:47 | 24 | Q.    Okay. |
| 13:03:47 | 25 | MS. SPILLANE:  Kevin, how are you on |

107

| | | |
|---|---|---|
| 13:03:49 | 1 | time?  Do you have your lunch on its way |
| 13:03:51 | 2 | or -- |
| 13:03:52 | 3 | MR. O'CONNOR:  No.  We're going to run |
| 13:03:53 | 4 | out, and then I'm going to make those copies |
| 13:03:55 | 5 | of the texts.  So I think we need to take a |
| 13:04:00 | 6 | full hour, because I need 10 to 15 minutes to |
| 13:04:03 | 7 | do the texts.  Okay? |
| 13:04:05 | 8 | MS. SPILLANE:  Okay.  All right.  So |
| 13:04:07 | 9 | just give me another couple of minutes, and |
| 13:04:09 | 10 | then we'll take a break in a few minutes. |
| 13:04:11 | 11 | BY MS. SPILLANE: |
| 13:04:11 | 12 | Q.    All right.  So I just want to make sure |
| 13:04:16 | 13 | I understand how the driving responsibilities |
| 13:04:17 | 14 | worked.  I think you testified earlier that the car |
| 13:04:21 | 15 | -- the truck that you drove was parked at |
| 13:04:26 | 16 | Mr. Laura's residence. |
| 13:04:28 | 17 | Is that right? |
| 13:04:28 | 18 | A.    Yes. |
| 13:04:33 | 19 | Q.    Okay.  And how is it that -- what was |
| 13:04:35 | 20 | your working process?  How did you know when he |
| 13:04:41 | 21 | needed you to drive? |
| 13:04:43 | 22 | A.    I was on call like all the time.  Joe |
| 13:04:45 | 23 | would just call and say, "Hey, this is what we're |
| 13:04:49 | 24 | doing," or he would call the night before, "Hey, |
| 13:04:52 | 25 | we're leaving at this time.  Be ready," and then he |

108

13:04:55  1   would come.  We lived like five minutes from each

13:04:58  2   other, so he would just come right over and we'd

13:05:00  3   go.

13:05:01  4       Q.   Okay.  He would come and pick you up, is

13:05:03  5   that right?

13:05:03  6       A.   Yes.

13:05:03  7       Q.   Okay.  And then can you just state --

13:05:09  8   which states do you recall having driven to with

13:05:15  9   Mr. Laura for Pristec work?

13:05:17 10       A.   Well, New Jersey, New York, Maryland.

13:05:26 11   We were down in D.C. several times.  Connecticut,

13:05:33 12   Pennsylvania.  We were in more places than that.  I

13:05:39 13   just can't think of all of them, you know.

13:05:42 14       Q.   Okay.  And did you ever drive Mr. Laura

13:05:44 15   for personal reasons?

13:05:47 16       A.   No.

13:05:48 17       Q.   Did you ever drive his family members?

13:05:51 18       A.   No.

13:05:52 19       Q.   Okay.  Let's see.  It's my understanding

13:06:05 20   that Mr. Laura sometimes traveled outside of areas

13:06:09 21   where he could -- where you could drive him, is

13:06:12 22   that right?

13:06:12 23       A.   Yes.

13:06:16 24       Q.   Okay.  And other than the two trips to

13:06:19 25   Austria you mentioned, you did not accompany him on

109

13:06:22  1    those trips, is that right?

13:06:22  2         A.    Yes, that is right.

13:06:28  3         Q.    Okay.  And what was your -- what would

13:06:31  4    you be doing when Mr. Laura was on trips outside of

13:06:36  5    your driving area, whether it was outside of the

13:06:38  6    country or other states?

13:06:41  7         A.    Whatever he needed.  If he needed help

13:06:43  8    with something back here -- most of the time, when

13:06:49  9    he would go somewhere, that would be like my chance

13:06:50 10    to have some time off.  But there were many times

13:06:53 11    where I had to do different things.  Same stuff,

13:06:55 12    though.  I was always doing the same thing,

13:06:59 13    driving, doing some computer work.  But if he

13:07:02 14    wasn't there, I didn't have access to his computer,

13:07:05 15    so really I didn't do that while he was gone.  It

13:07:08 16    was basically like my few days off when I did take

13:07:13 17    -- I loved those times.

13:07:16 18         Q.    I'm sure.

13:07:18 19               And what about the truck, when Mr. Laura

13:07:24 20    was out of town?

13:07:26 21         A.    It stayed at his house.

13:07:31 22         Q.    Okay.  And let's see.  Did Mr. Laura

13:07:40 23    have his own car in addition to -- a second car in

13:07:47 24    addition to the trucks that were in your wife's

13:07:50 25    name?

                                                           110

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

13:07:51  1        A.      No.  That was his main -- that was his

13:07:56  2    main mode of transportation.

13:07:58  3        Q.      Okay.  So when he was using it for --

13:08:04  4    when he was using the car for non-business

13:08:06  5    purposes, you didn't drive him?  He drove himself?

13:08:09  6        A.      Oh, yes.  Yes.

13:08:11  7        Q.      Okay.  Let's see.  Were there times

13:08:18  8    during the workweek when Mr. Laura told you, hey, I

13:08:23  9    don't need you today because I'm doing work for

13:08:26  10   some other business entity or something that wasn't

13:08:29  11   related to Pristec?

13:08:30  12       A.      No.  He didn't discuss those type of

13:08:36  13   things with me.  I mean, there were times when he

13:08:39  14   was doing work I would imagine for Pristec and he

13:08:41  15   didn't need me because there was nothing I could do

13:08:43  16   to help him at that moment.  But I don't know about

13:08:45  17   other -- working for other stuff.  I don't know

13:08:48  18   anything about that.

13:08:49  19       Q.      Okay.  Well, were you aware that

13:08:56  20   Mr. Laura was an attorney during some of this time

13:09:00  21   period?

13:09:01  22       A.      I didn't know.  I didn't know he was an

13:09:03  23   attorney.  He told me he was an attorney in the

13:09:06  24   past.  I didn't know he was an attorney any time

13:09:09  25   recently.

                                                                111

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

13:09:10  1      Q.    Okay.  And are you aware of whether he

13:09:13  2   did any work related to his position as an attorney

13:09:17  3   during the time period when you were working for

13:09:20  4   him?

13:09:20  5      A.    No.  Not that I'm aware of.

13:09:24  6      Q.    Okay.  So you can't -- were there any

13:09:30  7   instances where he said, you know, I have to go

13:09:32  8   help with a mediation for my other business and so

13:09:37  9   I don't need you tomorrow, or anything like that?

13:09:39  10     A.    No.  No.  He didn't really explain -- he

13:09:43  11  didn't explain too much to me.  If he said, "I have

13:09:44  12  to go do something else," I was like, thank you,

13:09:50  13  good luck.

13:09:50  14     Q.    Okay.  Did he explain to you the purpose

13:09:53  15  of whatever -- when he would say come tomorrow, we

13:09:58  16  need to drive here, did he explain to you what the

13:10:00  17  purpose was in every instance?

13:10:04  18     A.    No.  No, not at all.  Not in every

13:10:08  19  instance.  I mean, he'd say this is where we need

13:10:11  20  to go.  Okay.  I didn't ask questions.  I'd get in

13:10:13  21  the car and go drive him.  I'm sure there are times

13:10:16  22  where he said, oh, yes, we're going to see this

13:10:17  23  person for whatever.  But I wouldn't remember

13:10:19  24  specific stuff because it was just like, "Hey, pick

13:10:22  25  you up at 6:00 in the morning.  We probably won't

112

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

| | | |
|---|---|---|
| 13:10:26 | 1 | be home until 10:00.  You ready to go?"  "Yes, I'm |
| 13:10:31 | 2 | ready." |
| 13:10:32 | 3 | Q.    Okay.  And so were there times when he |
| 13:10:34 | 4 | would just tell you where you're going but not |
| 13:10:39 | 5 | specifically what the purpose was of where you were |
| 13:10:40 | 6 | going? |
| 13:10:41 | 7 | A.    A lot of the time. |
| 13:10:49 | 8 | MS. SPILLANE:  Okay.  All right.  I |
| 13:10:50 | 9 | think this is a good time for us to take a |
| 13:10:52 | 10 | break, so we'll go off the record.  Kevin, I |
| 13:10:56 | 11 | think you said you need an hour? |
| 13:10:56 | 12 | MR. O'CONNOR:  Yes.  We'll be back at |
| 13:11:09 | 13 | 2:10, looks like 2:11 or so.  And in the |
| | 14 | meantime, we'll eat something, and I'll try |
| | 15 | to get you those texts.  Okay? |
| | 16 | MS. SPILLANE:  Okay. |
| | 17 | MR. O'CONNOR:  I'm not going to tell you |
| | 18 | that they're too exciting, but I'll get them |
| | 19 | to you.  All right. |
| | 20 | MS. SPILLANE:  Okay.  Thank you.  I |
| 13:11:11 | 21 | appreciate it. |
| 13:11:30 | 22 | THE VIDEOGRAPHER:  And we're going off |
| 13:11:31 | 23 | the record at 1:11 p.m. |
| 13:13:14 | 24 | (Lunch recess:  1:11 p.m.) |
| | 25 | |

113

```
13:13:14   1                    AFTERNOON SESSION

14:11:30   2                        2:12 p.m.

14:11:30   3            THE VIDEOGRAPHER:  And we're back on the

14:12:19   4      record at 2:12 p.m.

14:12:21   5

14:12:21   6            EXAMINATION CONTINUED

14:12:21   7   BY MS. SPILLANE:

14:12:22   8

14:12:24   9      Q.    Mr. Martelli, before we went on the

14:12:29  10   lunch break, we had talked a little bit about your

14:12:35  11   duties as a driver for Mr. Laura.  And in

14:12:40  12   particular, you mentioned that when there were

14:12:44  13   meetings with Anthony Posio, that you would often

14:12:50  14   leave and just go someplace else.

14:12:52  15            Do you remember that?

14:12:53  16      A.    Yes.

14:12:59  17      Q.    Okay.  And you also said generally that

14:13:01  18   you would drive Mr. Laura to meetings and sometimes

14:13:10  19   would not be participating in them?

14:13:14  20      A.    Yes.

14:13:14  21      Q.    Is that correct?

14:13:15  22      A.    Yes.

14:13:15  23      Q.    Okay.  So I wanted to ask, as a general

14:13:18  24   matter, if you were driving Mr. Laura to meetings

14:13:25  25   let's say in Manhattan, what were the logistics of
```

                                                                    114

| | | |
|---|---|---|
| 14:13:30 | 1 | how that would work once you arrived at the |
| 14:13:34 | 2 | location where Mr. Laura had instructed you to |
| 14:13:36 | 3 | drive? |
| 14:13:39 | 4 | A.   Most of the time, just trying to find a |
| 14:13:42 | 5 | place to park, waiting outside for him to come out. |
| 14:13:47 | 6 | Q.   Okay.  And you mentioned that sometimes |
| 14:13:51 | 7 | there were meetings -- days that were 6:00 a.m. to |
| 14:13:57 | 8 | 10:00 p.m. |
| 14:13:57 | 9 | So you would just be waiting outside for |
| 14:14:01 | 10 | Mr. Laura for that entire time? |
| 14:14:04 | 11 | A.   No.  No.  Most of the times, if that was |
| 14:14:07 | 12 | the case, it was a meeting here, a meeting there, |
| 14:14:11 | 13 | driving two hours here, an hour and a half back |
| 14:14:15 | 14 | there, most of it was driving.  I mean, there have |
| 14:14:17 | 15 | been times where I sat in the car for longer |
| 14:14:21 | 16 | periods.  But most of the time, I'm trying to |
| 14:14:24 | 17 | accomplish something else, whatever it is, while he |
| 14:14:26 | 18 | was in that meeting.  Whether it's going to Staples |
| 14:14:28 | 19 | for him, whether it's running some copies, |
| 14:14:30 | 20 | whatever.  Anything that I could do to contribute. |
| 14:14:36 | 21 | Q.   That also included -- I mean, about how |
| 14:14:40 | 22 | much of the time would you say was filled with |
| 14:14:44 | 23 | doing other work versus sitting and waiting for |
| 14:14:49 | 24 | Mr. Laura? |
| 14:14:49 | 25 | A.   Overall, I thought we already discussed |

115

| | | |
|---|---|---|
| 14:14:52 | 1 | it.  It was 80 percent driving, 20 percent working |
| 14:14:55 | 2 | for that first year or so.  So that's basically |
| 14:15:01 | 3 | what it is, I mean... |
| 14:15:04 | 4 | Q.    Okay.  So the sitting in the car waiting |
| 14:15:07 | 5 | for Mr. Laura, that goes into the driving bucket? |
| 14:15:12 | 6 | A.    Yes. |
| 14:15:12 | 7 | Q.    Is that right? |
| 14:15:12 | 8 | A.    Yes. |
| 14:15:13 | 9 | Q.    So when you said 80 percent driving, how |
| 14:15:19 | 10 | much of that would you estimate was waiting for |
| 14:15:24 | 11 | Mr. Laura? |
| 14:15:26 | 12 | A.    Maybe 10 percent.  Maybe 10 percent of |
| 14:15:32 | 13 | the time, I would have to wait or -- yes. |
| 14:15:34 | 14 | Q.    Okay.  And was the parking paid parking |
| 14:15:39 | 15 | or garages, street parking, what?  How did that |
| 14:15:47 | 16 | work? |
| 14:15:48 | 17 | A.    You know, normally, I would find a |
| 14:15:53 | 18 | place.  I would drive until I found a place.  So |
| 14:15:56 | 19 | that way, he didn't have to pay anything for the |
| 14:15:58 | 20 | parking.  Maybe once or twice, I got paid parking. |
| 14:16:01 | 21 | I mean, it was so rare.  It was not fun, let's put |
| 14:16:04 | 22 | it that way. |
| 14:16:16 | 23 | MS. SPILLANE:  Okay.  All right.  So if |
| 14:16:19 | 24 | you could just pull up Exhibit 234, please. |
| 14:16:23 | 25 | (Claimant's Exhibit 234, Photocopy of |

116

14:16:23  1       Check, bearing Production Nos.

14:16:23  2       SEC-Northfield-E 44, was marked for

14:16:23  3       identification)

14:16:26  4   BY MS. SPILLANE:

14:16:27  5       Q.    Are you ready?

14:16:48  6       A.    Oh, yes.  Yes.

14:16:50  7       Q.    Okay.  If you could just let me know

14:16:52  8   when I ask you to pull up an exhibit if you're

14:16:55  9   ready for questions or not.  I don't know what you

14:16:58 10   feel like you need to review.

14:17:01 11          Exhibit 234, do you recognize this

14:17:05 12   exhibit?

14:17:07 13       A.    Do I recognize it?  I mean, I know that

14:17:10 14   check to Ally.  I don't know what that other 3,000

14:17:14 15   is.

14:17:16 16       Q.    Okay.  And so was that a check that

14:17:20 17   related to the car loans that you were discussing

14:17:22 18   earlier in your testimony?

14:17:25 19       A.    I believe so.  The account number is

14:17:27 20   right on there, so yes.  That's the only thing we

14:17:32 21   would have paid to Ally.

14:17:34 22       Q.    Okay.  You didn't have any other car

14:17:36 23   loans with Ally under your wife's name?

14:17:39 24       A.    No.  No.

14:17:43 25       Q.    Okay.  And so sitting here today, you

117

14:17:45  1   look at that account number and you recognize it as

14:17:47  2   the account number that related to the Chevy Tahoe

14:17:55  3   truck you testified about earlier?

14:17:57  4        A.   No.  I don't recognize the account

14:17:59  5   number per se, but for $886, that's about how much

14:18:03  6   the Tahoe cost.

14:18:10  7        Q.   Okay.  And when you say you know that's

14:18:12  8   how much the Tahoe cost, do you mean -- how many --

14:18:17  9   or with what frequency were the $886 payments made?

14:18:24 10   Was that a monthly payment?

14:18:25 11        A.   Yes.

14:18:30 12        Q.   Okay.  And as far as you know -- you can

14:18:31 13   see that it says Pristec America, Incorporated, at

14:18:36 14   the top of the check, correct?

14:18:38 15        A.   Yes.

14:18:42 16        Q.   As far as you know, was Pristec paying

14:18:43 17   the car loan from the inception of the loan?

14:18:50 18        A.   You know what?  I don't remember.  I

14:18:53 19   would just try and get the money for the car to get

14:18:56 20   it paid.  So maybe they were Pristec.  Maybe it was

14:19:00 21   in Joe Laura's name.  I'm not 100 percent positive.

14:19:06 22        Q.   Okay.  Did you personally pay anything

14:19:08 23   toward that car loan at any point?

14:19:14 24        A.   I don't know if I wrote a check out of

14:19:15 25   my account at one point.  But no, I never paid any

                                                              118

14:19:19  1   of my own personal money for that car.

14:19:22  2        Q.    Okay.  And what about your wife, did she

14:19:24  3   pay any of her own money?

14:19:26  4        A.    No.

14:19:26  5        Q.    Okay.  And did you have any -- were

14:19:32  6   there any agreements that you had with Mr. Laura

14:19:34  7   about the payments on the loan?

14:19:36  8        A.    No.  Verbal.  Make the payments.

14:19:40  9        Q.    And what was the -- sorry.  I cut you

14:19:44 10   off.  Can you just describe again what the

14:19:47 11   agreement was?

14:19:47 12        A.    We didn't really have an agreement.

14:19:51 13   It's just like, "Joe, are you going to make these

14:19:55 14   payments?"  "Yes."  "Okay.  Good."

14:19:58 15        Q.    And the agreement was also that the loan

14:20:02 16   would be in your wife's name, correct?

14:20:04 17        A.    Yes.

14:20:10 18        Q.    Okay.  And as far as you know, were

14:20:11 19   those loan payments always made?

14:20:13 20        A.    You know what?  There was a couple times

14:20:19 21   where he was late.  And overall, the truck was paid

14:20:24 22   off at some point, but there was a couple of times

14:20:27 23   where there was a 30-day late on my wife's credit

14:20:30 24   that she wanted to kill me over.

14:20:33 25        Q.    And did it get -- did those get paid

                                                              119

14:20:34   1    off?

14:20:34   2             A.    Yes.  Overall, they did, yes.

14:20:37   3             Q.    Okay.  And when the -- I think we may

14:20:43   4    have discussed this earlier, but what happened to

14:20:45   5    the truck once it was paid off?  Was it then

14:20:51   6    transferred to Mr. Laura's name?

14:20:53   7             A.    Yes.  We did go over that already, but

14:20:57   8    I'm not really sure.  I would imagine that it was,

14:20:59   9    because once it was paid off, I don't see why my

14:21:03  10    wife wouldn't have signed it over to him.  I'm

14:21:07  11    pretty sure she did.

14:21:08  12             Q.    Okay.  And what about the insurance?

14:21:12  13    Once it was paid off, was then the insurance

14:21:15  14    transferred to Mr. Laura's name?

14:21:16  15             A.    Yes.  That would have been, because we

14:21:19  16    didn't keep paying it.

14:21:24  17             Q.    Okay.  And this check is from November

14:21:25  18    of 2010.

14:21:29  19             A.    Right.

14:21:29  20             Q.    Would this have also applied to -- and I

14:21:33  21    think your testimony was that that was the -- that

14:21:36  22    would have been first the black Chevy Tahoe, is

14:21:42  23    that right?

14:21:42  24             A.    Yes, that was.  So that would have been

14:21:46  25    the black one.

                                                                    120

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

14:21:47  1      Q.    Okay.  And then the white Chevy Tahoe,

14:21:52  2  was that also paid through -- was that a loan with

14:21:55  3  Ally Financial?

14:21:56  4      A.    I'm not 100 percent sure.  I feel like

14:22:00  5  it was, but I'm not 100 percent sure.

14:22:05  6      Q.    Okay.  Okay.  And that was also in your

14:22:07  7  wife's name?

14:22:08  8      A.    Yes.

14:22:09  9      Q.    That loan?  Okay.

14:22:12  10          And as far as you know, were the

14:22:13  11  payments on that loan made by Pristec America?

14:22:17  12      A.    Again, it was the same thing, like when

14:22:19  13  it was time to make the payment.  It was just like,

14:22:22  14  you know, let's go.  Where are we making this

14:22:25  15  payment from?  Maybe it was made from a bankcard.

14:22:28  16  Maybe it was made from a check.  Whatever we'd get

14:22:30  17  the payment in on time, but I'm not sure exactly.

14:22:33  18      Q.    Okay.  Okay.  And I think you testified

14:22:37  19  also with respect to the white Chevy Tahoe that you

14:22:41  20  weren't sure what happened to it, that truck, when

14:22:46  21  it was paid off, when the loan was paid off, is

14:22:49  22  that right?

14:22:49  23      A.    Correct.  Yes.

14:22:53  24          MS. SPILLANE:  Okay.  Can I have you

14:22:54  25  pull up Exhibit 235, please?

121

14:22:58  1          (Claimant's Exhibit 235, Letter dated

14:22:58  2      5/23/19 bearing Production Nos. SEC-LIBERTY-E

14:23:05  3      1 through 57, was marked for identification)

14:23:05  4   BY MS. SPILLANE:

14:23:05  5      Q.    And you can just turn to PDF 2.

14:23:11  6      A.    Okay.

14:23:18  7            (Witness reviewing document).

14:23:20  8            Okay.

14:23:21  9      Q.    On PDF 2, there's two vehicles listed as

14:23:25  10  covered by the policy.

14:23:27  11          Do you see that?

14:23:28  12     A.    Yes.

14:23:28  13     Q.    A 2012 Chevy Tahoe and a 2011 Honda

14:23:36  14  Accord?

14:23:36  15     A.    Yes.

14:23:37  16     Q.    And whose car was the 2011 Honda Accord?

14:23:43  17     A.    The Honda Accord was in my wife's name.

14:23:47  18  It's her car.

14:23:48  19     Q.    Okay.  And was that -- I think you

14:23:50  20  referenced in your testimony earlier that you and

14:23:52  21  your wife shared a car.

14:23:54  22          Is that the car you were referring to?

14:23:59  23     A.    Yes.

14:24:01  24     Q.    Okay.  And both of these cars, both the

14:24:05  25  -- and the Chevy Tahoe truck that's listed there,

122

14:24:09   1    was that the -- was that Mr. Laura's car that

14:24:15   2    you've been referring to in today's testimony?

14:24:18   3         A.    Yes.  Yes.

14:24:20   4         Q.    Okay.  And so both of these cars are on

14:24:23   5    this same policy, correct?

14:24:29   6         A.    Yes.

14:24:30   7         Q.    Okay.  And do you see where it says

14:24:31   8    named insured above that, where it says Katherine

14:24:35   9    Gardiner and Joseph Martelli?

14:24:36  10              Do you see that?

14:24:37  11         A.    Yes.

14:24:37  12         Q.    Does that look accurate to you?

14:24:43  13         A.    Yes.

14:24:44  14         Q.    Okay.  And so I think before, I had

14:24:45  15    asked you whether Mr. Laura was on any of these --

14:24:49  16    well, let me just say directly.

14:24:52  17              So this is a Liberty Mutual insurance

14:24:56  18    policy for your car and Mr. Laura's car, correct?

14:25:04  19         A.    Yes.

14:25:07  20         Q.    And I think you had said earlier that

14:25:09  21    you weren't sure whether Mr. Laura was listed on

14:25:12  22    that policy.  And does this refresh your

14:25:17  23    recollection as to whether he was or was not?

14:25:20  24         A.    Yes.

14:25:24  25         Q.    Okay.  And so does it appear to you that

123

14:25:26  1    he was not actually listed on that policy?

14:25:29  2         A.    Yes.

14:25:39  3              MS. SPILLANE:  Okay.  If I could ask you

14:25:41  4    to turn to Exhibit 236, please.

14:25:44  5              (Claimant's Exhibit 236, Liberty Mutual

14:25:44  6    Letter and Policy bearing Production Nos.

14:25:44  7    SEC-LIBERTY-E 58 through 408, was marked for

14:25:44  8    identification)

14:25:59  9    BY MS. SPILLANE:

14:25:59 10         Q.    Again, PDF 2 of Exhibit 236.

14:26:03 11         A.    Okay.

14:26:04 12         Q.    The vehicles covered by the policy in

14:26:06 13    this case appear to be a Chevy Tahoe and a Ford

14:26:15 14    F150.

14:26:15 15              Do you see that?

14:26:16 16         A.    Yes.

14:26:16 17         Q.    And whose car was the Ford F150, if you

14:26:20 18    know?

14:26:20 19         A.    That was our truck that we brought here

14:26:23 20    when we moved here from St. Louis -- or that my

14:26:27 21    wife brought here from St. Louis.

14:26:29 22         Q.    Okay.  So that was not Mr. Laura's

14:26:32 23    vehicle, is that right?

14:26:33 24         A.    No.  No.

14:26:36 25         Q.    Okay.  But the Chevy Tahoe listed above

124

14:26:39  1    it was one of the Chevy trucks that were

14:26:46  2    Mr. Laura's, is that right?

14:26:46  3         A.    Yes.

14:26:51  4         Q.    Okay.  Was there -- given that both your

14:26:55  5    personal car and Mr. Laura's car were listed in the

14:26:58  6    same policy, was there an agreement as to -- as to

14:27:04  7    whether to proportion out the payments for the

14:27:08  8    policy?

14:27:11  9         A.    An agreement, no.  It was just I would

14:27:13  10   pay mine and he'd pay his.  No agreements.

14:27:18  11        Q.    Okay.  And how did you know which was

14:27:20  12   which?

14:27:20  13        A.    Well, if you look under, it says vehicle

14:27:23  14   1, vehicle 2.  I mean, that's how you can tell

14:27:32  15   which vehicle is insured for how much.

14:27:34  16        Q.    Okay.  So can you describe how it worked

14:27:39  17   with you and Mr. Laura to understand what he was

14:27:41  18   paying and what you would be responsible for?  Did

14:27:41  19   you have a conversation on a monthly basis or

14:27:47  20   how --

14:27:47  21        A.    Joe was paying the full amount.  Okay.

14:27:51  22   Joe was paying the full amount on his car, on the

14:27:58  23   Tahoe that he was using.  And we were paying the --

14:27:59  24   in particular years, it was an $800 premium for the

14:28:02  25   Ford.  That's what we would pay on our end.

125

14:28:05  1      Q.   Okay.  And so those payments -- so

14:28:09  2  partial payments would come out of -- would they

14:28:11  3  come out of your wife's account or your account?

14:28:14  4      A.   Probably both.  I mean, maybe mostly out

14:28:18  5  of her account because -- but we both paid bills

14:28:22  6  and everything from both of our accounts.

14:28:25  7      Q.   Okay.  So it's your testimony that

14:28:28  8  Mr. Laura was not paying for any portion of the

14:28:33  9  insurance that was attributable to your personal

14:28:35 10  car, is that right?

14:28:37 11      A.   No.  He didn't pay for my car.

14:28:43 12      Q.   If you could turn to PDF page 4 of

14:28:50 13  Exhibit 236.  And at the top, there's a reference

14:29:05 14  to the loss payee on vehicle 1 as Ally Financial.

14:29:09 15           Do you see that?

14:29:10 16      A.   Yes.

14:29:13 17      Q.   Okay.  And is that an indication that

14:29:18 18  Ally Financial was the lender for vehicle 1, which

14:29:21 19  is the Chevy truck?

14:29:24 20      A.   Yes.  So it looks like we kept it -- the

14:29:29 21  second one was Ally as well, it looks like, I

14:29:33 22  think.

14:29:33 23      Q.   Sorry.  The second vehicle you mean or

14:29:38 24  the second --

14:29:38 25      A.   No.  The second Tahoe.

126

| | | |
|---|---|---|
| 14:29:41 | 1 | Q.    I see. |
| 14:29:42 | 2 | Well, just to clarify, if you look at |
| 14:29:44 | 3 | the top of the page, PDF page 2, there's an |
| 14:29:50 | 4 | indication on Exhibit 236 that it relates to the |
| 14:29:53 | 5 | policy period of 2010 -- October 2010 through |
| 14:29:58 | 6 | October 2011. |
| 14:30:02 | 7 | A.    Okay. |
| 14:30:03 | 8 | Q.    And Exhibit 235 appears to be 2012 |
| 14:30:08 | 9 | through 2013. |
| 14:30:13 | 10 | A.    Okay. |
| 14:30:14 | 11 | Q.    Does that comport with your recollection |
| 14:30:18 | 12 | that the loss payee on the first -- that the lender |
| 14:30:20 | 13 | on the first truck was Ally Financial? |
| 14:30:24 | 14 | A.    Yes, I think so. |
| 14:30:28 | 15 | Q.    Okay.  And also on the second truck? |
| 14:30:32 | 16 | A.    I believe it was Ally Financial. |
| 14:30:40 | 17 | Q.    Okay.  I believe you testified that |
| 14:30:41 | 18 | Mr. Laura didn't have any other vehicle he was -- |
| 14:30:48 | 19 | any other personal vehicle, is that right? |
| 14:30:50 | 20 | A.    No.  I mean, he couldn't get a car |
| 14:30:53 | 21 | because of his credit. |
| 14:30:59 | 22 | Q.    Okay.  So if you could -- on Exhibit |
| 14:31:05 | 23 | 236, if you could scroll to PDF 336, I'll represent |
| 14:31:25 | 24 | to you this was a composite document that was |
| 14:31:27 | 25 | produced to us this way by the producing party, |

127

| | | |
|---|---|---|
| 14:31:31 | 1 | so -- |
| 14:31:32 | 2 | A.   Okay. |
| 14:31:33 | 3 | Q.   -- it's from a number of different time |
| 14:31:36 | 4 | periods.  You should feel free to scroll through as |
| 14:31:39 | 5 | many pages as you need. |
| 14:31:41 | 6 | A.   What is this?  I don't even understand |
| 14:31:43 | 7 | what some of this says. |
| 14:31:46 | 8 | Q.   Yes.  I mean, you can feel free to |
| 14:31:50 | 9 | scroll through, but I will -- I can say I'll |
| 14:31:54 | 10 | represent to you that they appear to be -- they |
| 14:31:58 | 11 | appear to be notes of communications between the |
| 14:32:04 | 12 | insurer and the customer.  But you can look through |
| 14:32:08 | 13 | and tell me if they refresh your recollection as to |
| 14:32:12 | 14 | any communications you might have had with -- you |
| 14:32:16 | 15 | or your wife might have had with the insurer on |
| 14:32:21 | 16 | this policy. |
| 14:32:23 | 17 | MR. O'CONNOR:  I'm just going to object |
| 14:32:24 | 18 | to the question to the extent that you're |
| 14:32:27 | 19 | testifying about what the document is.  He's |
| 14:32:30 | 20 | certainly welcome to look at it and tell you |
| 14:32:34 | 21 | whether he's seen it and whether it refreshes |
| 14:32:36 | 22 | his recollection. |
| 14:32:37 | 23 | A.   I don't recall any of that.  I mean, |
| 14:32:41 | 24 | I don't know.  I don't know technically what this |
| 14:32:41 | 25 | is. |

128

| | | |
|---|---|---|
| 14:32:45 | 1 | BY MS. SPILLANE: |
| 14:32:45 | 2 | Q.   Okay. |
| 14:32:49 | 3 | A.   I don't understand what the point of |
| 14:32:50 | 4 | this is here or what I'm supposed to be answering |
| 14:32:54 | 5 | here. |
| 14:32:55 | 6 | Q.   Yes.  That's because I haven't asked a |
| 14:32:57 | 7 | question yet, other than to invite you to review |
| 14:33:02 | 8 | the document, and then your lawyer placed an |
| 14:33:05 | 9 | objection onto the record.  So I will now ask you |
| 14:33:09 | 10 | to direct your attention to the entry that appears |
| 14:33:12 | 11 | to be related to October 12, 2014. |
| 14:33:18 | 12 | Do you see that? |
| 14:33:18 | 13 | MR. O'CONNOR:  Which page are we looking |
| 14:33:21 | 14 | at? |
| 14:33:22 | 15 | MS. SPILLANE:  On PDF page 336. |
| 14:33:29 | 16 | A.   (Witness reviewing document). |
| 14:33:35 | 17 | 2014. |
| 14:33:37 | 18 | MR. O'CONNOR:  What's the date again? |
| 14:33:39 | 19 | BY MS. SPILLANE: |
| 14:33:39 | 20 | Q.   For 10/12/2014. |
| 14:33:42 | 21 | A.   Yes, I see it. |
| 14:33:44 | 22 | Q.   At 11:27 a.m. |
| 14:33:45 | 23 | Okay.  So there seems to be a reference |
| 14:33:49 | 24 | there to a canceled policy.  Do you see that? |
| 14:33:52 | 25 | A.   I guess, yes. |

129

14:33:55  1        Q.    "CANX POL," and then a few backslashes,

14:34:00  2   and it then says "Rates, GEICO," and then two

14:34:05  3   backslashes, "CANX EFF 10/14."

14:34:09  4              Do you see that?

14:34:10  5        A.    Yes.

14:34:16  6        Q.    Okay.  Do you have a recollection of

14:34:18  7   canceling this Liberty Mutual insurance policy in

14:34:27  8   or around October of 2014?

14:34:28  9        A.    I don't know the date, but we definitely

14:34:32 10   stopped using Liberty Mutual, and I think we went

14:34:35 11   to GEICO.

14:34:37 12        Q.    Okay.  And do you think that that was

14:34:38 13   around October of 2014?

14:34:44 14        A.    I don't want to say.  I'm not sure, but

14:34:46 15   it sounds about -- it could be right.  Yes.

14:34:51 16        Q.    Okay.  And so do you have -- I just want

14:34:56 17   to make sure I understand your testimony.

14:34:58 18              Do you recall moving -- that this car

14:35:00 19   insurance was moved from Liberty Mutual to GEICO,

14:35:03 20   apart from the document?

14:35:09 21        A.    Yes.  Yes.  I recall changing from

14:35:11 22   Liberty Mutual to GEICO.  My wife did it, but I

14:35:14 23   recall me getting stuff in the mail from GEICO,

14:35:17 24   so...

14:35:18 25        Q.    Okay.  And did that also include the --

                                                                130

14:35:22  1    Mr. Laura's truck?

14:35:25  2         A.   I would imagine it did, yes.  We

14:35:28  3    wouldn't leave him behind, because you get a

14:35:33  4    discount if you have both cars, so I'm sure we

14:35:36  5    brought him to GEICO, too.

14:35:38  6         Q.   Okay.  And did the payment arrangements

14:35:40  7    with respect to Mr. Laura's -- the insurance on

14:35:44  8    Mr. Laura's truck, did that also follow when the

14:35:49  9    policy moved to GEICO?

14:35:56 10         A.   Yes.

14:35:57 11         Q.   Okay.  And so when the policy moved to

14:35:58 12    GEICO, Mr. Laura was handling the payments for his

14:36:03 13    truck?

14:36:04 14         A.   Yes.

14:36:06 15         Q.   Okay.  If I could ask you to turn back

14:36:14 16    to page 3 -- and, sorry, just to confirm, did that

14:36:21 17    understanding remain throughout the entire period

14:36:25 18    that that -- that Mr. Laura was using that truck?

14:36:30 19         A.   Yes.

14:36:31 20         Q.   Okay.  And do you know at what point, if

14:36:37 21    ever, you stopped paying for the insurance on -- I

14:36:43 22    mean, he stopped paying for the insurance on that

14:36:45 23    truck through a policy associated with your wife?

14:36:49 24         A.   No.  It would have been -- it would have

14:36:53 25    been after he paid off the truck at some point.

                                                              131

| | | |
|---|---|---|
| 14:36:55 | 1 | I'm sure it wasn't -- I'm sure it was right after |
| 14:36:58 | 2 | he paid off the truck. |
| 14:36:59 | 3 | Q.    Okay.  If I could ask you to turn to |
| 14:37:06 | 4 | page PDF 3 of Exhibit 236. |
| 14:37:25 | 5 | MR. O'CONNOR:  Yes. |
| 14:37:28 | 6 | MS. SPILLANE:  I'm sorry.  Hold on one |
| 14:37:30 | 7 | second. |
| 14:37:32 | 8 | I'm sorry.  Actually, I'll have you open |
| 14:37:50 | 9 | up Exhibit 237. |
| 14:37:51 | 10 | (Claimant's Exhibit 237, Liberty Mutual |
| 14:37:51 | 11 | Statement of Account bearing Production Nos. |
| 14:37:51 | 12 | SEC-LIBERTY-E 434 through 468, was marked for |
| 14:37:52 | 13 | identification) |
| 14:37:59 | 14 | BY MS. SPILLANE: |
| 14:37:59 | 15 | Q.    And it will again be PDF page 3. |
| 14:38:26 | 16 | A.    (Witness reviewing document). |
| 14:38:26 | 17 | Okay. |
| 14:38:27 | 18 | Q.    Okay.  Do you see there's a reference to |
| 14:38:29 | 19 | payment detail on that page -- |
| 14:38:30 | 20 | A.    Yes. |
| 14:38:32 | 21 | Q.    -- to a Visa ending in 8486? |
| 14:38:37 | 22 | Do you see that? |
| 14:38:38 | 23 | A.    Yes. |
| 14:38:39 | 24 | Q.    Do you know whether that's a payment |
| 14:38:43 | 25 | that was -- whether that was a Visa that was |

132

14:38:48  1  associated with you or with someone else?

14:38:52  2      A.    I don't remember.  I don't think that's

14:38:55  3  mine.

14:38:58  4      Q.    Okay.  So would that have been a payment

14:38:59  5  that Mr. Laura made on -- into the policy?

14:39:04  6      A.    It may have been.  It would either be

14:39:08  7  him or us, so I don't know.  I don't remember a

14:39:13  8  Visa.

14:39:15  9      Q.    Okay.  And can you turn to the next

14:39:17 10  page, PDF page 4?

14:39:25 11      A.    Okay.

14:39:27 12      Q.    And that's a check from -- a copy of a

14:39:28 13  check from Innovative Crude Technologies

14:39:33 14  Incorporated.

14:39:34 15      A.    Okay.

14:39:34 16      Q.    Do you see that?

14:39:35 17      A.    Yes.

14:39:35 18      Q.    For $2,050?

14:39:39 19      A.    Yes.

14:39:40 20      Q.    Okay.  And if you scroll up to -- back

14:39:44 21  up to page 2, you can see a listing of that check

14:39:53 22  on -- associated with October 21, 2013.

14:39:57 23          Do you see that?

14:39:58 24      A.    Yes.

14:40:03 25      Q.    That seems to be a large proportion of

133

14:40:06  1    the amount owing for that year from Innovative

14:40:13  2    Crude Technologies.

14:40:14  3         A.   Okay.

14:40:16  4              MR. O'CONNOR:  Was that a testimony or

14:40:17  5         was that a question?

14:40:19  6              MS. SPILLANE:  Excuse me.  Excuse me.

14:40:19  7    BY MS. SPILLANE:

14:40:19  8         Q.   Was there a point where the arrangement

14:40:22  9    in terms of how much Mr. Laura was paying on the

14:40:27 10    policy changed in 2013?

14:40:31 11         A.   No.

14:40:33 12         Q.   Okay.  And so do you know how it came

14:40:35 13    about that $2,050 was paid on the policy in October

14:40:40 14    of 2013 by Innovative Crude Technologies?

14:40:45 15         A.   No.  I mean, it was paying -- it could

14:40:48 16    be a number of reasons.  It could be that Pristec

14:40:52 17    or Innovative Crude owes me like 10 trillion

14:40:57 18    dollars.  It could just be that Joe put a certain

14:40:59 19    amount up on one check and I'm getting taxed.  But

14:41:02 20    it could have been a million different things.  I

14:41:05 21    don't know.  I mean...

14:41:05 22         Q.   Okay.  Were any of those million things

14:41:07 23    documented in any way?

14:41:09 24         A.   No.  None of them.

14:41:13 25         Q.   Okay.  And do you have any recollection

                                                             134

```
14:41:14  1    of which one of those things it might have actually
14:41:17  2    been?
14:41:21  3         A.    No.
14:41:22  4         Q.    Okay.  And if it was a payment that was
14:41:24  5    made in lieu of compensation to you, do you know
14:41:28  6    whether it was included in payroll documentation --
14:41:31  7         A.    No.
14:41:32  8         Q.    -- about your compensation?
14:41:33  9         A.    No.
14:41:34  10        Q.    Okay.  Do you recall receiving similar
14:41:41  11   documents like this from the GEICO the policy while
14:41:48  12   it was still being billed to you and your wife?
14:41:51  13        A.    No.
14:41:54  14        Q.    Okay.  If you scroll down to page 15, in
14:42:01  15   Exhibit 237, there's another large check written
14:42:18  16   out of the Pristec America, Incorporated, account.
14:42:20  17              Do you see that?
14:42:21  18        A.    Yes.
14:42:21  19        Q.    Okay.  And on PDF page 24 -- and that
14:42:30  20   check is for October 2012.
14:42:34  21              Do you see that?
14:42:35  22        A.    Yes.
14:42:40  23        Q.    Okay.  Do you have any understanding as
14:42:44  24   to why the payment in 2012 was made from a Pristec
14:42:48  25   America account and the payment in 2013 was made
```

135

| | | |
|---|---|---|
| 14:42:50 | 1 | from an Innovative Crude Technologies account? |
| 14:42:54 | 2 | A.    I have no idea.  No clue. |
| 14:42:54 | 3 | Q.    Okay. |
| 14:43:10 | 4 | A.    Look, that one was written by me. |
| 14:43:18 | 5 | Another one by me.  That's my wife. |
| 14:43:41 | 6 | Q.    And if you could look -- sorry -- at PDF |
| 14:43:47 | 7 | 27, do you see that?  It's a check on Pristec |
| 14:43:57 | 8 | America from September 27th, 2011.  Do you see |
| 14:44:00 | 9 | that? |
| 14:44:00 | 10 | A.    Yes. |
| 14:44:01 | 11 | Q.    Okay.  And if you scroll to page 26, |
| 14:44:07 | 12 | you'll see that the renewal premium was $2,962 and |
| 14:44:22 | 13 | $2,199 was paid by Pristec America. |
| 14:44:26 | 14 | Do you see that? |
| 14:44:27 | 15 | A.    Yes. |
| 14:44:27 | 16 | Q.    Okay.  Did that refresh your |
| 14:44:31 | 17 | recollection at all as to what the agreement was in |
| 14:44:35 | 18 | terms of -- |
| 14:44:36 | 19 | A.    No.  No. |
| 14:44:38 | 20 | Q.    -- what Mr. Laura was directing payments |
| 14:44:41 | 21 | for with respect to this policy? |
| 14:44:43 | 22 | A.    No. |
| 14:44:45 | 23 | Q.    Okay.  All right.  Let's see.  So are |
| 14:44:53 | 24 | you aware of any other insurance company after |
| 14:44:56 | 25 | GEICO that was insuring Mr. Laura's truck? |

136

```
14:45:01  1        A.    No.

14:45:01  2        Q.    Okay.  And when you were reviewing your

14:45:09  3   files for documents responsive to the SEC's

14:45:13  4   subpoena, did you review for documents related to

14:45:19  5   the GEICO policy?

14:45:22  6        A.    No.  I don't have any.

14:45:26  7             MR. O'CONNOR:  You said what?  What did

14:45:28  8        you say?

14:45:28  9             THE WITNESS:  I don't have any of that.

14:45:30 10             MR. O'CONNOR:  I'd appreciate it if you

14:45:32 11        let him finish, please.

14:45:39 12   BY MS. SPILLANE:

14:45:39 13        Q.    While you were driving for Mr. Laura,

14:45:42 14   how were expenses paid on the -- expenses related

14:45:46 15   to the vehicle paid?

14:45:50 16        A.    I don't know.  Cash.  I mean, a lot of

14:45:55 17   it is cash.  I couldn't tell you what each expense

14:45:59 18   was paid with, but I would just -- he's always

14:46:03 19   putting cash out, so...

14:46:05 20        Q.    Who's he?

14:46:07 21        A.    What?

14:46:10 22        Q.    Who is the "he"?  You said he was always

14:46:13 23   putting cash out.  Who's he?

14:46:16 24        A.    Oh, Joseph Laura.

14:46:19 25        Q.    Okay.  Did you ever put out cash for any
```

137

| | | |
|---|---|---|
| 14:46:23 | 1 | expenses related to the car? |
| 14:46:25 | 2 | A. No. |
| 14:46:28 | 3 | Q. Okay. And were there -- did you ever |
| 14:46:32 | 4 | put out -- make payments on a credit card or by |
| 14:46:36 | 5 | check related to either of those cars, other than |
| 14:46:40 | 6 | what we've -- |
| 14:46:40 | 7 | A. I have no clue. |
| 14:46:42 | 8 | Q. -- already talked about with the |
| 14:46:43 | 9 | insurance? |
| 14:46:44 | 10 | A. I don't remember. I don't know these |
| 14:46:45 | 11 | things. I mean, I don't remember. |
| 14:46:54 | 12 | Q. Okay. Was part of your job to keep |
| 14:46:56 | 13 | track of maintenance or other expenses related to |
| 14:46:59 | 14 | the car? |
| 14:47:00 | 15 | A. No. |
| 14:47:03 | 16 | Q. Do you know if Mr. Laura kept track of |
| 14:47:08 | 17 | expenses related to the car? |
| 14:47:09 | 18 | A. I wouldn't know. |
| 14:47:14 | 19 | Q. Okay. What about gas? Was it also part |
| 14:47:16 | 20 | of your job to fill the car with gas on occasion? |
| 14:47:21 | 21 | A. Yes. If the car ran low on gas, we |
| 14:47:27 | 22 | would stop at the gas station and fill up the gas |
| 14:47:31 | 23 | tank. |
| 14:47:32 | 24 | Q. Okay. And who paid for that? |
| 14:47:34 | 25 | A. Joseph Laura. |

138

14:47:38  1      Q.    Okay.  With cash or credit cards or --

14:47:44  2      A.    If I had to give my best recollection, I

14:47:47  3  would say he used mostly cash.

14:47:50  4      Q.    Okay.  If he was using the car, he would

14:47:57  5  be -- you wouldn't be necessarily aware of -- if

14:48:01  6  you weren't there with him when he was using the

14:48:04  7  car, you wouldn't be aware of how he was paying for

14:48:06  8  that, is that correct?

14:48:07  9      A.    Yes, that is correct.  If he was by

14:48:11 10  himself, I wouldn't know how he paid for the gas.

14:48:14 11      Q.    Okay.  And did you keep track of how

14:48:18 12  often the car was filled?

14:48:20 13      A.    I didn't keep track of anything, but I

14:48:23 14  would say that we had to fill that truck up, seemed

14:48:29 15  like every day.

14:48:31 16      Q.    Okay.  But you didn't keep track?

14:48:34 17      A.    No.

14:48:35 18      Q.    Confirming?

14:48:35 19      A.    No.

14:48:36 20      Q.    Okay.  All right.  So I wanted to switch

14:48:41 21  gears a little bit to talk about the other duties

14:48:46 22  that you had as a helper.

14:48:55 23          I think you've kind of described

14:48:58 24  generally that you sometimes went to Staples and

14:49:02 25  made copies and you sometimes fixed PowerPoints.

                                                      139

```
14:49:08   1              Were there other jobs that you did?
14:49:10   2              MR. O'CONNOR:  Objection.  Asked and
14:49:11   3         answered.
14:49:11   4              You can answer again.
14:49:14   5              THE WITNESS:  I should answer?
14:49:15   6              MR. O'CONNOR:  You've answered it many
14:49:17   7         times.  Just go ahead and answer it again.
14:49:18   8         A.    Yes.  I mean, it's the same thing that I
14:49:22   9    told you before.  I mean, I can't remember every
14:49:26  10    little thing I did for Joe, but that's basically
14:49:29  11    what I did, helped him with his core computer
14:49:33  12    skills and would run around to Staples, to FedEx,
14:49:39  13    whatever it was, yes.
14:49:40  14    BY MS. SPILLANE:
14:49:40  15         Q.    Okay.  So we have would run around to
14:49:43  16    Staples.  We have would run around to FedEx.  And
14:49:48  17    you would help him with PowerPoints I think is what
14:49:52  18    you provided some details before.
14:49:58  19              What other of the core computer skills
14:50:02  20    did you help for Mr. Laura?
14:50:04  21         A.    That's it.
14:50:09  22         Q.    Okay.  What kind of PowerPoints did you
14:50:11  23    help him with?
14:50:14  24         A.    I helped him with whatever he needed.
14:50:19  25         Q.    Okay.  I'm just asking for any other
```

                                                                 140

14:50:21  1    examples you have besides helping him with a

14:50:24  2    PowerPoint with the computer.

14:50:27  3        A.    I don't know.  If I -- I didn't keep

14:50:29  4    track of everything I ever did for him.  I mean, if

14:50:31  5    he needed help with something, I helped him,

14:50:35  6    whatever it was.  If it had to do with the

14:50:36  7    computer, if it had to do with going somewhere, if

14:50:39  8    it had to do with dropping something off for him,

14:50:42  9    shipping something out, making copies, whatever it

14:50:44 10    was, I was moving around a lot.  That's all I can

14:50:49 11    say.

14:50:49 12        Q.    Okay.  I'm just asking for any other

14:50:53 13    details that you can recall besides the ones that

14:50:56 14    you've mentioned.

14:50:56 15        A.    That's it.

14:50:57 16        Q.    It sounds like you can't recall any

14:51:00 17    other details, is that right?

14:51:01 18        A.    Yes, that's right.

14:51:02 19        Q.    Okay.  And I don't want to characterize

14:51:07 20    your testimony.  I just want to have it clear,

14:51:10 21    but -- and it's also true that there were no

14:51:13 22    records kept of the tasks that you did, is that

14:51:19 23    right?

14:51:19 24        A.    No.  No records.

14:51:22 25        Q.    Okay.  And I think we discussed this

                                                                141

| | | |
|---|---|---|
| 14:51:25 | 1 | with reference to investor contracts, but did you |
| 14:51:30 | 2 | have any general responsibilities with respect to |
| 14:51:32 | 3 | file management for Mr. Laura? |
| 14:51:34 | 4 | A.   No. |
| 14:51:38 | 5 | Q.   Okay.  So did you ever go with him to |
| 14:51:42 | 6 | some kind of like file storage location, any sort |
| 14:51:46 | 7 | of warehouse or anything like that? |
| 14:51:47 | 8 | A.   No.  I went with him to Staples, Office |
| 14:51:52 | 9 | Depot, Office Max.  That's about it. |
| 14:51:52 | 10 | Q.   Sure. |
| 14:51:54 | 11 | A.   No storage locations. |
| 14:51:58 | 12 | Q.   Okay.  And are you aware of where |
| 14:52:00 | 13 | Mr. Laura kept -- if Mr. Laura kept any files, |
| 14:52:06 | 14 | paper files with respect to Pristec America? |
| 14:52:10 | 15 | A.   I would say he kept them in his home |
| 14:52:13 | 16 | office. |
| 14:52:16 | 17 | Q.   Okay.  And his home office in -- at his |
| 14:52:20 | 18 | home in New Jersey, correct? |
| 14:52:21 | 19 | A.   Sure.  Yes. |
| 14:52:22 | 20 | Q.   Okay.  And you're not aware of any other |
| 14:52:26 | 21 | location where he might have been keeping paper |
| 14:52:30 | 22 | files, is that right? |
| 14:52:31 | 23 | A.   No.  I'm not aware. |
| 14:52:37 | 24 | Q.   Okay.  And, again, I know that we asked |
| 14:52:40 | 25 | this with respect to investors, but I wanted to |

142

```
14:52:42  1    talk more broadly about business meetings that were
14:52:46  2    not with investors.
14:52:47  3              Did you ever attend any of those?
14:52:51  4    Setting aside the two trips to Austria.
14:52:54  5        A.   You said business meetings that weren't
14:52:57  6    with investors?  What did you say?  I'm sorry.
14:52:59  7        Q.   Right.  I think we talked specifically
14:53:01  8    about investor meetings previously.  And my
14:53:04  9    recollection of your testimony was that you said
14:53:08 10    that you did not attend any of those meetings and
14:53:11 11    that on some occasions with respect to Anthony
14:53:18 12    Posio, you specifically left when there was Pristec
14:53:22 13    investor information being discussed.
14:53:23 14              Did I recall your testimony correctly?
14:53:30 15        A.   Yes.
14:53:31 16        Q.   And now I want to ask about other
14:53:32 17    business meetings.
14:53:33 18              Did you attend any other business
14:53:34 19    meetings besides the two in Austria that we talked
14:53:40 20    about before?
14:53:43 21        A.   Business meetings, no, not really.  I
14:53:48 22    mean, not that I can think of.
14:53:50 23        Q.   Okay.  So you can't recall having
14:53:53 24    attended any of them?
14:53:54 25        A.   No, not really.
```

143

14:54:01  1        Q.   Okay.  I just want to make sure that you

14:54:02  2   don't -- when you say not really, that you don't --

14:54:04  3   you're not having -- you don't have some

14:54:04  4   recollection of having attended some business

14:54:06  5   meetings that you might want to testify about.

14:54:11  6        A.   No, nothing that I can think about right

14:54:14  7   now.  I mean, to be honest with you.  Most of the

14:54:16  8   time, I was always outside whenever he was talking

14:54:18  9   business or doing whatever, so...

14:54:21 10        Q.   Got it.  Okay.

14:54:25 11             And you said you didn't have any

14:54:27 12   communications with investors and with respect to

14:54:34 13   Pristec AG and Mr. Nuerk, the people that you met

14:54:41 14   in Austria.  Your communications were basically

14:54:43 15   limited to that time when you were actually there

14:54:45 16   in Austria.

14:54:46 17             Did I recall your testimony correctly

14:54:52 18   about that?

14:54:53 19        A.   Yes.

14:54:53 20        Q.   Okay.  And so the people or entities

14:54:54 21   that were involved in other business meetings, not

14:54:57 22   investors, not Austria, did you ever have any

14:55:01 23   communications directly with any of those people,

14:55:04 24   people involved in those meetings?

14:55:09 25        A.   Can you repeat that question?

                                                                144

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

14:55:12  1        Q.    Yes, I can.  So did you have any direct

14:55:16  2   communications with the people involved in

14:55:17  3   Mr. Laura's business meetings that didn't relate --

14:55:21  4   that weren't investor meetings and weren't the two

14:55:23  5   trips to Austria?

14:55:24  6        A.    No.

14:55:33  7        Q.    Okay.  All right.  So with respect to

14:55:35  8   salary, I think your testimony generally earlier

14:55:37  9   was that you expected at the beginning that you

14:55:43  10  were going to be paid $5,000 a month, is that

14:55:47  11  right?

14:55:47  12       A.    Yes, before taxes.

14:55:54  13       Q.    Okay.  And was the pay to be based on

14:55:56  14  hours or --

14:56:00  15       A.    It was just basically whenever I need

14:56:02  16  you -- whenever I need you, I need you.  I don't

14:56:07  17  want any excuses.  If I need you to do work for me,

14:56:10  18  then I need you to do work.  And I said that's

14:56:12  19  fine.

14:56:14  20       Q.    Okay.  And were there to be any bonuses

14:56:18  21  or any other -- any compensations besides the

14:56:24  22  $5,000 a month?

14:56:25  23       A.    No.  Yes.  When we hit it big, I was

14:56:29  24  going to have a big position with the company.

14:56:32  25       Q.    Okay.  And what did you understand "a

                                                              145

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

14:56:34  1   big position with the company" to mean?

14:56:36  2        A.   I'm sorry.  I was kidding with that.

14:56:40  3   I'm just saying, yes, that was my hopes that one

14:56:43  4   day, if Pristec did something big, that I would

14:56:47  5   have a better position with the company and make

14:56:49  6   more money.

14:56:52  7        Q.   And what kind of position would that

14:56:55  8   have been?

14:56:57  9        A.   Any position that made more money.  No

14:57:02  10  specific position in mind.

14:57:06  11       Q.   Okay.  Had you and Mr. Laura discussed

14:57:11  12  generally what that would entail?

14:57:13  13       A.   No.

14:57:13  14       Q.   Okay.  And the assistant duties that you

14:57:23  15  were providing to Mr. Laura throughout -- from 2010

14:57:28  16  on, did they change or increase or grow in

14:57:37  17  complexity at all?

14:57:40  18       A.   I'm sorry.  I feel like I've heard all

14:57:42  19  these questions before, but can you repeat that?

14:57:45  20       Q.   Did the duties change in complexity over

14:57:49  21  the years?

14:57:50  22       A.   No.

14:57:51  23       Q.   In other words, was Mr. Laura providing

14:57:53  24  you with additional experience that would have

14:57:58  25  allowed you to become more involved in the business

                                                              146

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

14:58:01 1    end of the company?

14:58:05 2         A.    Not really.

14:58:07 3         Q.    Okay.  All right.  I understand that you

14:58:17 4    were paid -- I think you testified earlier that you

14:58:19 5    received checks from Mr. Laura.

14:58:23 6               Was there ever any other way that you

14:58:25 7    were paid your compensation?

14:58:31 8         A.    No.  I mean, no, not that I can think

14:58:35 9    of.  I didn't get paid what I was supposed to get

14:58:39 10   paid from Pristec even, so...

14:58:43 11        Q.    All right.  And so just to ask a follow

14:58:46 12   up about that, when you say you weren't paid what

14:58:51 13   you were supposed to receive, what do you mean by

14:58:53 14   that?

14:58:53 15        A.    I just am saying I just feel like I did

14:58:58 16   more work than I got paid for.  I worked my butt

14:59:04 17   off.  Excuse me.  I worked many hours, like I said,

14:59:07 18   driving around, doing whatever.  And when things

14:59:09 19   didn't go so well for the company, I was willing to

14:59:14 20   take one for the team and not get paid a lot, but I

14:59:16 21   feel like I've done a lot of work for what I've

14:59:19 22   been paid.

14:59:22 23        Q.    Okay.  I think, though, you testified

14:59:25 24   earlier that you don't have any -- Mr. Laura or

14:59:30 25   Pristec or the companies, they don't owe you any

147

14:59:33  1  money currently, is that right?

14:59:34  2      A.    No.  They don't technically owe me

14:59:37  3  money.

14:59:40  4      Q.    Is there some non-technical way that

14:59:42  5  they owe you money?  Is there some other kind of

14:59:45  6  agreement that you have about money that you're

14:59:47  7  owed?

14:59:48  8      A.    No, there was no agreement.  That's the

14:59:51  9  problem.

14:59:54  10     Q.    Okay.  What do you mean that was the

14:59:56  11  problem?

14:59:56  12     A.    I just mean there was no agreement, so

14:59:58  13  therefore I got paid what I got paid to do whatever

15:00:03  14  I did.

15:00:06  15     Q.    Okay.  Do you have the perception that

15:00:09  16  you were treated unfairly?

15:00:11  17     A.    No.  I know Joe did what he could do

15:00:15  18  with the resources that he had, and I appreciated

15:00:21  19  him keeping me around.  I had faith in everything

15:00:25  20  that he was doing at the company and everything

15:00:27  21  that was going on and the stuff that I saw in

15:00:29  22  Austria.  So I really thought that in time, this

15:00:32  23  company was going to be something very big and it

15:00:34  24  was going to make a lot of people a lot of money.

15:00:37  25  And, you know, just it hasn't worked out that way,

148

| | | |
|---|---|---|
| 15:00:41 | 1 | unfortunately.  That's all.  So I was willing to |
| 15:00:43 | 2 | work and, you know, take whatever it was that Joe |
| 15:00:48 | 3 | -- that Pristec could give me at that time.  And I |
| 15:00:52 | 4 | don't think I was treated unfairly, no.  I just was |
| 15:00:57 | 5 | hoping for me, how about that, in the end. |
| 15:01:05 | 6 | MS. SPILLANE:  Understood.  If you could |
| 15:01:06 | 7 | pull up Exhibit 238, please. |
| 15:01:11 | 8 | (Claimant's Exhibit 238, Check |
| 15:01:11 | 9 | Photocopies bearing Production Nos. |
| 15:01:11 | 10 | SEC-Northfield-E 25 through 26, was marked |
| 15:01:11 | 11 | for identification) |
| 15:01:15 | 12 | BY MS. SPILLANE: |
| 15:01:16 | 13 | Q.   Let me know when you're ready. |
| 15:01:17 | 14 | A.   Okay. |
| 15:01:19 | 15 | (Witness reviewing document). |
| 15:01:22 | 16 | MR. O'CONNOR:  Can you see? |
| 15:01:23 | 17 | THE WITNESS:  Yes.  I think it says |
| 15:01:27 | 18 | $5,250.  Yes, we're here. |
| 15:01:33 | 19 | BY MS. SPILLANE: |
| 15:01:33 | 20 | Q.   Okay.  If you scroll to -- I guess it's |
| 15:01:35 | 21 | on the first page. |
| 15:01:36 | 22 | A.   Yes. |
| 15:01:37 | 23 | Q.   I apologize.  It's a little unclear. |
| 15:01:41 | 24 | There's a cashier's check that appears |
| 15:01:45 | 25 | to be written out to Gregory DelliSanti. |

149

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

| | | |
|---|---|---|
| 15:01:49 | 1 | Do you see that? |
| 15:01:50 | 2 | A.   Yes. |
| 15:01:50 | 3 | Q.   Okay.  And then below that, there's a |
| 15:01:53 | 4 | memo which is upside down, but it appears to read, |
| 15:01:57 | 5 | "Advancing money to employee to buy house." |
| 15:02:01 | 6 | Do you see that? |
| 15:02:01 | 7 | A.   Yes, I do see that. |
| 15:02:07 | 8 | Q.   Okay.  And then on the second page, |
| 15:02:08 | 9 | there's a $2,100 check to Coldwell Banker |
| 15:02:08 | 10 | Realtors -- |
| 15:02:08 | 11 | A.   Okay.  Yes. |
| 15:02:17 | 12 | Q.   -- which also has an indication, |
| 15:02:20 | 13 | "Advancing money to employee to buy house?" |
| 15:02:22 | 14 | Do you see that? |
| 15:02:23 | 15 | A.   Yes. |
| 15:02:23 | 16 | Q.   Okay.  Were those -- and we spoke about |
| 15:02:28 | 17 | Mr. DelliSanti earlier, and you said you had some |
| 15:02:35 | 18 | recollection that there was a payment made in |
| 15:02:36 | 19 | connection with your moving to New Jersey. |
| 15:02:38 | 20 | A.   Yes.  Yes. |
| 15:02:39 | 21 | Q.   Is the payment to Mr. DelliSanti one |
| 15:02:43 | 22 | that was for your benefit for moving expenses -- |
| 15:02:47 | 23 | A.   Yes. |
| 15:02:48 | 24 | Q.   -- or for -- okay. |
| 15:02:50 | 25 | A.   Yes. |

150

15:02:50  1        Q.    Was there actually a house purchased?

15:02:53  2        A.    No, not a house purchased.  It was just

15:02:56  3    to move into the rental.

15:03:03  4        Q.    Okay.  Was the check to Coldwell Banker

15:03:07  5    Realtors also in relation to payment for your

15:03:10  6    rental?

15:03:10  7        A.    Yes.

15:03:19  8        Q.    Okay.  And were there other -- seeing

15:03:20  9    these checks, does it refresh your recollection

15:03:21 10    about any other payments that may have been made on

15:03:24 11    your behalf in connection with your moving to New

15:03:30 12    Jersey?

15:03:30 13        A.    No, that's it.  He just helped me get

15:03:34 14    into the house, because I didn't have the 8,000 to

15:03:36 15    get in or whatever it was, 7,000.

15:03:49 16           MS. SPILLANE:  Okay.  All right.  If you

15:03:49 17        could pull up Exhibit 239, please.

15:03:53 18           (Claimant's Exhibit 239, Check

15:03:53 19        Photocopies bearing Production Nos.

15:03:53 20        SEC-Northfield-E 33 through 43, was marked

15:03:53 21        for identification)

15:03:55 22    BY MS. SPILLANE:

15:03:55 23        Q.    And I'll represent to you that this is a

15:03:58 24    document -- the first is a copy of the document

15:04:05 25    that we have with the Bates stamp on it.  The

                                                              151

15:04:07   1    second is a native version of the PDF because the

15:04:11   2    Bates stamped version is difficult to read.

15:04:17   3         A.    Okay.

15:04:17   4         Q.    But, Mr. O'Connor, you can find a copy

15:04:20   5    of that document in your production at that Bates

15:04:24   6    numbers.  And the same goes for the second page of

15:04:26   7    the exhibit, which is -- the first page is

15:04:31   8    Northfield 33, and then second page is Northfield

15:04:34   9    43.

15:04:39  10         A.    Okay.

15:04:39  11         Q.    So you can take a minute to look at

15:04:42  12    these two pages.  The first two pages are the same,

15:04:45  13    and the second two pages are the same underlying

15:04:48  14    document.

15:04:48  15         A.    Okay.  So I guess those were more checks

15:04:52  16    that he gave me for moving.

15:04:55  17         Q.    Okay.  And is that because you're

15:04:57  18    reading the memo line that indicates expense

15:05:00  19    reimbursement for moving and other -- and expenses?

15:05:04  20         A.    I can't really remember that far back,

15:05:07  21    because it was so long ago.  I mean, it was like

15:05:10  22    10, 11 years ago.  But I'm sure if I would have

15:05:13  23    needed more help when I got here, I'm sure he would

15:05:15  24    have helped me out at that time.

15:05:19  25         Q.    Okay.  And so do you have any

152

15:05:20  1    independent recollection of Mr. Laura making these

15:05:28  2    payments to you in relation to moving?

15:05:33  3         A.   Like I said, it's so long ago.  I don't.

15:05:38  4    But I'm sure he did.  If it says it on there, then

15:05:41  5    I'm sure that's what it is.

15:05:42  6         Q.   Okay.  Well, do you have any

15:05:44  7    recollection of a different reason why he would

15:05:47  8    have been making these payments to you?

15:05:49  9         A.   No.  No other reason.

15:06:01  10        Q.   All right.  So on page 2 -- or 1 or 2, I

15:06:09  11   just wanted to ask if that's your signature

15:06:12  12   endorsing the check.

15:06:14  13             THE WITNESS:  She's talking about right

15:06:16  14        here?

15:06:17  15        A.   On Exhibit 239?  I'm trying to...

15:06:19  16   BY MS. SPILLANE:

15:06:19  17        Q.   Yes, on Exhibit 239.

15:06:21  18        A.   Yes.  I just want to make sure, because

15:06:24  19   there's one thing in there.  I really don't

15:06:27  20   recognize it.  But, yes, on the back of those

15:06:29  21   checks is my signature, yes.

15:06:30  22        Q.   Okay.  And so at the time, you had a

15:06:32  23   bank account at Valley National Bank, which is

15:06:35  24   stamped on the endorsed side of the check?

15:06:37  25        A.   Yes.

                                                          153

```
15:06:46  1            MS. SPILLANE:  Okay.  If you could pull
15:06:47  2       up Exhibit 240, please.
15:06:52  3            (Claimant's Exhibit 240, Check
15:06:52  4       Photocopies, bearing Production Nos.
15:06:52  5       SEC-Northfield-E 55 through 475, was marked
15:06:53  6       for identification)
15:06:55  7            MS. SPILLANE:  Mr. O'Connor, I'll just
15:06:56  8       note for the record that Exhibit 240 is a
15:06:59  9       composite exhibit with excerpts from the
15:07:03 10       production from Northfield Bank.  The Bates
15:07:08 11       stamps are indicated on the bottom page of
15:07:16 12       the individual pages that comprise the
15:07:19 13       exhibit.
15:07:24 14            Just take as long as you need to scroll
15:07:27 15       through them.
15:07:28 16            MR. O'CONNOR:  There's 35 pages.  You
15:07:30 17       want him to read the whole thing or...
15:07:32 18            MS. SPILLANE:  Take as long as you need.
15:07:34 19       I'll have some specific questions at certain
15:07:37 20       pages, but the questions are going to be
15:07:40 21       about the dates and the timing of the
15:07:43 22       payments.
15:07:44 23            THE WITNESS:  Okay.
15:07:44 24  BY MS. SPILLANE:
15:07:44 25       Q.   If you want, I can get started.  I just
```

154

| 15:07:47 | 1 | wanted to give you a minute if you need one. |
| 15:07:50 | 2 | A. You can get started. I'll just look at |
| 15:07:52 | 3 | them as we go. |
| 15:07:53 | 4 | Q. Okay. So on PDF page 1, other than the |
| 15:07:58 | 5 | checks for moving expenses, the first checks to you |
| 15:08:03 | 6 | appear to be for services rendered in December of |
| 15:08:09 | 7 | 2010. |
| 15:08:12 | 8 | Does that comport with your recollection |
| 15:08:20 | 9 | of (inaudible) -- |
| 15:08:20 | 10 | MR. O'CONNOR: You broke up there. |
| 15:08:20 | 11 | MS. SPILLANE: Sorry. Can the court |
| 15:08:20 | 12 | reporter read back what I -- the question, |
| 15:08:20 | 13 | however much you got, Ms. Diaz. |
| 15:08:41 | 14 | (Record read) |
| 15:08:43 | 15 | BY MS. SPILLANE: |
| 15:08:43 | 16 | Q. Does that comport with your recollection |
| 15:08:44 | 17 | of when you began providing services for Mr. Laura? |
| 15:08:49 | 18 | A. Yes. Right around that time. |
| 15:08:54 | 19 | Q. Okay. And that is a $5,000 payment that |
| 15:09:03 | 20 | you indicated that you were -- that Mr. Laura had |
| 15:09:07 | 21 | said that he would provide you, is that right? |
| 15:09:09 | 22 | A. Yes. I guess that's it, yes. |
| 15:09:19 | 23 | Q. Okay. And on page 2, there's another |
| 15:09:21 | 24 | payment to you for January 2011 of $5,000 and then |
| 15:09:28 | 25 | in February of 2011. On page 3, the payment is for |

155

| | | |
|---|---|---|
| 15:09:34 | 1 | $3,699.17. |
| 15:09:38 | 2 | Do you see that? |
| 15:09:39 | 3 | A. Okay. Yes. |
| 15:09:40 | 4 | Q. Do you have a recollection of your |
| 15:09:45 | 5 | monthly payment changing in or around February |
| 15:09:49 | 6 | 2011? |
| 15:09:52 | 7 | A. Yes. Yes. |
| 15:09:55 | 8 | Q. And was that how much you were paid on a |
| 15:09:59 | 9 | monthly basis for the rest of that year? |
| 15:10:03 | 10 | A. Yes. Well, that's supposed to be with |
| 15:10:06 | 11 | the taxes taken out of the 5,000. So basically, |
| 15:10:10 | 12 | the employer tax is taken out. So that's basically |
| 15:10:12 | 13 | my check. It's not like a payroll check, but |
| 15:10:16 | 14 | that's with the 1300 taken out to go towards taxes. |
| 15:10:23 | 15 | Q. Okay. And so your salary for 2011 then |
| 15:10:26 | 16 | was 60,000 less 15,000 in taxes. Was that your |
| 15:10:31 | 17 | understanding? |
| 15:10:32 | 18 | A. Yes, something like that. Exactly. |
| 15:10:36 | 19 | Q. Okay. And then if you turn to page PDF |
| 15:10:43 | 20 | 15. I mean, if you want to look at the other |
| 15:10:46 | 21 | checks that we've included there, you're more than |
| 15:10:49 | 22 | welcome to, but my next question will be about |
| 15:10:53 | 23 | payments in 2012 starting at PDF 15. |
| 15:10:57 | 24 | A. Okay. I mean, you're not saying all |
| 15:11:03 | 25 | these checks on here went to me. They just -- some |

156

| | | |
|---|---|---|
| 15:11:05 | 1 | happen to be on the same page with other stuff, |
| 15:11:09 | 2 | right? |
| 15:11:09 | 3 | Q.    Correct.  Yes. |
| 15:11:10 | 4 | A.    Okay. |
| 15:11:11 | 5 | Q.    I didn't want to -- |
| 15:11:11 | 6 | A.    Okay. |
| 15:11:12 | 7 | Q.    I didn't want to redact the pages.  The |
| 15:11:14 | 8 | questions are about the payments to you -- |
| 15:11:17 | 9 | A.    Okay. |
| 15:11:18 | 10 | Q.    -- personally, unless I ask a different |
| 15:11:20 | 11 | question. |
| 15:11:22 | 12 | A.    Okay.  We're going down here. |
| 15:11:32 | 13 | Q.    So PDF 15 is the first payment from |
| 15:11:35 | 14 | January 2012.  It's also for $3,699.17. |
| 15:11:44 | 15 | A.    Okay. |
| 15:11:45 | 16 | Q.    So was this also a reflection of your |
| 15:11:50 | 17 | understanding that you were -- your salary was |
| 15:11:54 | 18 | $60,000 in 2012? |
| 15:11:56 | 19 | A.    Yes.  It was just like month to month. |
| 15:12:00 | 20 | There was no like -- I was just like, yes, okay, |
| 15:12:03 | 21 | I'm going to get this 3,700 a month.  Basically, |
| 15:12:07 | 22 | the rest goes towards taxes. |
| 15:12:09 | 23 | Q.    Okay.  And if you can turn to PDF 28, |
| 15:12:15 | 24 | please. |
| 15:12:17 | 25 | A.    Okay. |

157

```
15:12:28   1          Q.    This is a little hard to read, but if
15:12:29   2    you see the notation on the right, it's for a post
15:12:33   3    date 2013, February 22nd, and the date on this
15:12:38   4    check is January 2013 date.
15:12:43   5              Do you see that?
15:12:44   6          A.    Is it the one for 1671?
15:12:48   7          Q.    Correct.
15:12:49   8          A.    Yes.
15:12:49   9          Q.    Okay.  Did that payment for 2013 -- did
15:12:54  10    that reflect a -- for 1617, did that reflect a
15:12:58  11    reduction in your salary?
15:13:00  12          A.    Yes.  At that point, it was just like --
15:13:05  13    it was like I'm going to give you money whenever I
15:13:10  14    can.  I'll reimburse you for any expenses you have,
15:13:13  15    and we're just having a very hard time right now
15:13:17  16    financially.  And basically -- I don't know if
15:13:22  17    that's exactly when it started, but it might have
15:13:24  18    even been in 2012.  But I started getting paid I
15:13:28  19    think in 2012 less.  But, yes, this definitely is
15:13:33  20    like, okay.
15:13:35  21          Q.    Okay.  So just so I understand, you
15:13:38  22    think you might have been -- you might have started
15:13:40  23    getting paid less in 2012.
15:13:44  24              Is that right?
15:13:45  25          A.    I'm not really sure.  It's 2013.  I
```

158

15:13:49 1   mean, you can see the checks are smaller here.  So

15:13:52 2   I'm not really sure of the exact dates.

15:13:54 3       Q.   Okay.

15:13:54 4       A.   I just know that after the first year or

15:13:56 5   so, it's just like a lot less.

15:14:03 6       Q.   Okay.  And you had a conversation with

15:14:04 7   Mr. Laura where he indicated that the company was

15:14:06 8   struggling financially, is that right?

15:14:11 9       A.   Yes.  And that he couldn't pay me what

15:14:14 10  he was and that he would give me as much work as

15:14:18 11  possible and pay me as much as he possibly could.

15:14:24 12      Q.   Okay.  And do you recall when that

15:14:25 13  conversation took place?

15:14:29 14      A.   No.  I wouldn't be able to tell you like

15:14:32 15  the date or anything or even time of year.

15:14:39 16      Q.   Okay.  Can you give me sort of

15:14:41 17  approximately -- was it before the January 2013

15:14:47 18  payment or after?

15:14:51 19      A.   I really couldn't say without -- I'd

15:14:54 20  just be guessing.

15:15:00 21           MS. SPILLANE:  Okay.  All right.  And if

15:15:02 22      you could pull up Exhibit 241, please.

15:15:04 23           (Claimant's Exhibit 241, Check

15:15:04 24      Photocopies, bearing Production Nos.

15:15:04 25      SEC-Northfield-E 496 through 524, was marked

159

15:15:04 1          for identification)

15:15:05 2   BY MS. SPILLANE:

15:15:06 3       Q.    And I think you mentioned in your -- in

15:15:10 4   one of your prior answers that Mr. Laura told you

15:15:12 5   he would be paying you what he could and then

15:15:16 6   expenses.

15:15:18 7              Is that right?

15:15:19 8       A.    Yes.  But I only had expenses like for

15:15:23 9   the first -- I think it was like for a small

15:15:25 10  portion of 2013 or whatever it was or part of 2012.

15:15:31 11  It was just -- the expenses part was like a small

15:15:35 12  part, but I just declared them on my taxes as

15:15:37 13  income anyway.

15:15:41 14      Q.    Okay.  And what were the expenses for?

15:15:45 15      A.     It was just like -- basically, it was

15:15:47 16  just -- I'm trying to think.  I don't even

15:15:52 17  remember.  It was for maybe -- I can't really

15:15:55 18  remember at this point.

15:16:02 19      Q.    Okay.  Do you have any recollection of

15:16:03 20  ever -- of documenting them at the time?

15:16:10 21      A.     You know what?  Honestly, it's so long

15:16:13 22  ago.  I was having such a tough time then.  It was

15:16:17 23  like the last thing I was thinking about was

15:16:19 24  expenses or whatever.  I was just trying to get by.

15:16:22 25  So I really couldn't tell you an answer and feel

160

15:16:26  1    comfortable with it.

15:16:34  2         Q.    Okay.  And do you recall if Mr. Laura

15:16:36  3    ever asked you to document your expenses?

15:16:42  4         A.    He might have, I think.  I think he did

15:16:44  5    a long time ago.  I think I kept receipts and

15:16:48  6    whatever.  And then I think I just -- at some

15:16:49  7    point, I was just like, you know what -- I was down

15:16:53  8    and out.  My money situation was terrible.  I think

15:16:55  9    I was like, you know what, who cares about this,

15:16:57 10    and just threw them out or whatever.  Going through

15:17:01 11    a divorce.  I was just -- he probably did tell me

15:17:08 12    to keep track of them, and I probably didn't

15:17:10 13    listen.

15:17:12 14         Q.    Okay.  And did Mr. Laura ever ask you to

15:17:15 15    work with any kind of accountant or bookkeeper in

15:17:21 16    relation to the work you were doing for him?

15:17:25 17         A.    No.

15:17:26 18         Q.    Okay.  Did you ever tell you that he had

15:17:28 19    an accountant or bookkeeper for Pristec or

15:17:32 20    Innovative Crude Technologies?

15:17:35 21         A.    I knew that he did just through hearing

15:17:38 22    stuff and whatever else.  I don't know that he told

15:17:41 23    me, but I just knew he had an accountant.

15:17:44 24         Q.    Okay.  And did he ever ask you to

15:17:46 25    provide any documents to the accountant?

                                                          161

| | | |
|---|---|---|
| 15:17:51 | 1 | A.    No.   You mean on behalf of Pristec? |
| 15:17:54 | 2 | Q.    No.   Well, I mean, either on behalf of |
| 15:17:58 | 3 | Pristec or related to any expenses or the |
| 15:18:04 | 4 | compensation that you were receiving. |
| 15:18:06 | 5 | A.    Oh, no.   No. |
| 15:18:12 | 6 | Q.    Okay.   And setting aside whether |
| 15:18:14 | 7 | Mr. Laura ever asked you to, did the accountant |
| 15:18:16 | 8 | ever reach out to you and ask you for any |
| 15:18:19 | 9 | documentation? |
| 15:18:19 | 10 | A.    No. |
| 15:18:29 | 11 | Q.    I think you testified earlier in terms |
| 15:18:31 | 12 | of checks received or payments made by Pristec |
| 15:18:36 | 13 | America versus payments made by Innovative Crude |
| 15:18:40 | 14 | Technologies with respect to the insurance on |
| 15:18:43 | 15 | Mr. Laura's truck.   I wanted to ask you the same |
| 15:18:48 | 16 | question with respect to payments made to you. |
| 15:18:51 | 17 | If you look at Exhibit 240, the checks |
| 15:18:53 | 18 | are made out by Pristec America, Incorporated.   And |
| 15:18:59 | 19 | in Exhibit 241, they're made out by Innovative |
| 15:18:59 | 20 | Crude Technologies, Incorporated. |
| 15:19:06 | 21 | Do you see that? |
| 15:19:06 | 22 | A.    Yes. |
| 15:19:07 | 23 | Q.    Do you have any understanding as to why |
| 15:19:12 | 24 | the entity changed? |
| 15:19:15 | 25 | A.    No.   I have no clue.   And I just |

162

| | | |
|---|---|---|
| 15:19:18 | 1 | realized as I was going through some back stuff, I |
| 15:19:21 | 2 | was like, man, these checks were cut from here, |
| 15:19:24 | 3 | from there.  I was getting my checks, cashing them |
| 15:19:27 | 4 | and just trying to survive.  I have no clue as to |
| 15:19:31 | 5 | why anything is changing on the checks. |
| 15:19:37 | 6 | Q.    Okay.  I asked you before about whether |
| 15:19:40 | 7 | you ever accompanied Mr. Laura to any off-site |
| 15:19:45 | 8 | storage place for files or anything like that.  And |
| 15:19:52 | 9 | you indicated you had not and that your -- let me |
| 15:19:56 | 10 | just ask the question. |
| 15:19:57 | 11 | Are you aware of any other locations |
| 15:20:02 | 12 | besides Mr. Laura's home where he might have been |
| 15:20:05 | 13 | keeping business records? |
| 15:20:08 | 14 | MR. O'CONNOR:  Objection.  Asked and |
| 15:20:09 | 15 | answered. |
| 15:20:09 | 16 | You can answer it again. |
| 15:20:11 | 17 | A.    No, I'm not aware. |
| 15:20:15 | 18 | MS. SPILLANE:  Okay.  I'm going to have |
| 15:20:17 | 19 | to go off the record briefly. |
| 15:20:18 | 20 | MR. O'CONNOR:  Yes.  Can we take two |
| 15:20:20 | 21 | minutes?  Because it's going to rain and I |
| 15:20:22 | 22 | got to get some -- |
| 15:20:22 | 23 | MS. SPILLANE:  Yes.  We'll go off the |
| 15:20:22 | 24 | record.  Can we just go off the record first? |
| 15:20:25 | 25 | MR. O'CONNOR:  Yes. |

163

| | | |
|---|---|---|
| 15:20:26 | 1 | THE VIDEOGRAPHER:  And we're going off |
| 15:20:27 | 2 | the record at 3:20 p.m. |
| 15:20:28 | 3 | (Recess) |
| 15:25:48 | 4 | THE VIDEOGRAPHER:  And we're back on the |
| 15:26:19 | 5 | record at 3:26 p.m. |
| 15:26:21 | 6 | BY MS. SPILLANE: |
| 15:26:21 | 7 | Q.    Mr. Martelli, I had asked you about the |
| 15:26:27 | 8 | payments being made from different entities, and I |
| 15:26:31 | 9 | think you testified that you weren't aware of the |
| 15:26:37 | 10 | reasoning for that. |
| 15:26:38 | 11 | Is that correct? |
| 15:26:39 | 12 | A.    (No verbal response). |
| 15:26:47 | 13 | Q.    I think you may be muted. |
| 15:26:53 | 14 | MR. O'CONNOR:  Sorry about that. |
| 15:26:54 | 15 | A.    Yes, I was aware of that -- I wasn't |
| 15:26:58 | 16 | aware of that.  I'm not sure. |
| 15:26:59 | 17 | BY MS. SPILLANE: |
| 15:26:59 | 18 | Q.    Sorry.  The question was whether you |
| 15:27:00 | 19 | were aware of the reasoning for the payment from |
| 15:27:02 | 20 | the different entities. |
| 15:27:03 | 21 | A.    Oh, no. |
| 15:27:08 | 22 | Q.    Okay.  And so did your duties change at |
| 15:27:10 | 23 | all depending on which entity was paying you? |
| 15:27:18 | 24 | A.    No.  Same thing. |
| 15:27:22 | 25 | MS. SPILLANE:  Okay.  Okay.  Can you |

164

| | | |
|---|---|---|
| 15:32:33 | 1 | I'm not sure. |
| 15:32:34 | 2 | BY MS. SPILLANE: |
| 15:32:34 | 3 | Q.    Okay.  So you don't have any |
| 15:32:35 | 4 | recollection of receiving -- |
| 15:32:38 | 5 | A.    No, I don't. |
| 15:32:38 | 6 | Q.    -- checks made out to cash? |
| 15:32:40 | 7 | A.    I can't really recall. |
| 15:32:43 | 8 | Q.    Okay.  All right.  So if you could go to |
| 15:32:49 | 9 | page PDF 13 of the document. |
| 15:32:53 | 10 | A.    Okay. |
| 15:33:00 | 11 | Q.    This appears to be the beginning of |
| 15:33:02 | 12 | January 2015 -- sorry -- payments in 2015. |
| 15:33:07 | 13 | A.    Yes. |
| 15:33:07 | 14 | Q.    Do you have any -- |
| 15:33:09 | 15 | A.    No, I don't. |
| 15:33:13 | 16 | Q.    Do you recall how much you were paid in |
| 15:33:14 | 17 | 2015? |
| 15:33:17 | 18 | A.    Not exactly.  Probably around the same. |
| 15:33:19 | 19 | I mean, I never really made more than 35,000. |
| 15:33:24 | 20 | Maybe one year.  Something like that.  This year, I |
| 15:33:28 | 21 | think I -- I don't remember specifically, but I |
| 15:33:30 | 22 | think he gave me just a couple of just big checks, |
| 15:33:33 | 23 | because he wouldn't pay for me three months or |
| 15:33:36 | 24 | something like that, then he'd hit me with a big |
| 15:33:39 | 25 | check.  I remember it was like not cool. |

169

| | | |
|---|---|---|
| 15:33:42 | 1 | Q.    Okay.  I'm sorry.  When you say "this |
| 15:33:44 | 2 | year," you're referring to 2015? |
| 15:33:46 | 3 | A.    Yes. |
| 15:33:50 | 4 | Q.    Okay.  And so which don't have to go |
| 15:33:52 | 5 | through all the other pages, but if you want, we |
| 15:33:55 | 6 | can look at 2016.  But my question is going to be |
| 15:33:57 | 7 | the same, which is:  Do you recall how much you |
| 15:33:59 | 8 | were paid in 2016? |
| 15:34:00 | 9 | A.    Yes.  Again, it was not much.  It was |
| 15:34:03 | 10 | probably -- I don't want to say exactly, but it |
| 15:34:06 | 11 | was -- I'm just saying around 30, because I |
| 15:34:09 | 12 | remember when I filed -- one year it was like 25; |
| 15:34:13 | 13 | one year it was 35; one year it was 32; one year it |
| 15:34:17 | 14 | was 28.  So I'm just giving you an estimate. |
| 15:34:18 | 15 | That's it. |
| 15:34:23 | 16 | Q.    Okay.  If you scroll to page 35, that |
| 15:34:26 | 17 | seems to be the beginning of payments made in 2017. |
| 15:34:30 | 18 | A.    Okay. |
| 15:34:34 | 19 | MS. SPILLANE:  And then if you pull up |
| 15:34:38 | 20 | Exhibit 243 -- |
| 15:34:44 | 21 | (Claimant's Exhibit 243, Check |
| 15:34:44 | 22 | Photocopies bearing Production Nos. SEC-TBD-E |
| 15:34:45 | 23 | 69 through 76, was marked for identification) |
| 15:34:52 | 24 | THE WITNESS:  Is that 243? |
| 15:34:54 | 25 | MR. O'CONNOR:  Oh, I'm sorry.  I thought |

170

15:35:02  1       you said -- I'm sorry.  All right.  243, here

15:35:02  2       we go.

15:35:08  3              THE WITNESS:  Yes.  Okay.

15:35:10  4   BY MS. SPILLANE:

15:35:11  5       Q.    Okay.  So on 242, that last page we

15:35:15  6   looked at is a January payment for $2,000 and then

15:35:21  7   additional payments coming from a different bank

15:35:23  8   account which is represented -- again a composite

15:35:30  9   exhibit, Exhibit 243 --

15:35:30 10       A.    Sure.

15:35:33 11       Q.    -- from TD Bank.

15:35:34 12       A.    Okay.

15:35:34 13       Q.    Do you recall in 2017 also being paid

15:35:37 14   from both Bank of America account and then a TD

15:35:42 15   Bank account?

15:35:42 16       A.    As far as recall goes, I would not

15:35:44 17   remember where my checks were from.  But I know

15:35:47 18   during that year, I got some big checks, like a

15:35:52 19   couple big ones, because it was just like so -- I

15:35:58 20   still didn't make that much that year overall

15:36:01 21   anyway.

15:36:01 22       Q.    Okay.  In Exhibit 243, you can see the

15:36:05 23   payments are once again being made by Pristec

15:36:10 24   America, Incorporated.

15:36:10 25       A.    Yes.

                                                                171

| | | |
|---|---|---|
| 15:36:10 | 1 | Q.    Do you see that? |
| 15:36:11 | 2 | A.    Yes. |
| 15:36:11 | 3 | Q.    Do you have any -- did you have any |
| 15:36:13 | 4 | understanding at the time as to why you were -- why |
| 15:36:17 | 5 | the payments were then being made again by Pristec |
| 15:36:21 | 6 | America compared to 2017 when they were -- earlier |
| 15:36:24 | 7 | in 2017 when they were being paid by Innovative |
| 15:36:29 | 8 | Crude Technologies? |
| 15:36:29 | 9 | A.    To be honest with you, I was so happy to |
| 15:36:31 | 10 | get a check at that point, to get those checks.  I |
| 15:36:35 | 11 | didn't care.  It could have said John Wayne paid me |
| 15:36:38 | 12 | that.  I wouldn't have noticed. |
| 15:36:42 | 13 | MS. SPILLANE:  Okay.  Can I ask you to |
| 15:36:44 | 14 | pull up Exhibit 244, please? |
| 15:36:46 | 15 | (Claimant's Exhibit 244, 2012 Form W-3 |
| 15:36:46 | 16 | bearing Production Nos. SEC-SciarrinoJ-E 555 |
| 15:36:47 | 17 | through 567, was marked for identification) |
| 15:36:51 | 18 | THE WITNESS:  Sure. |
| 15:36:52 | 19 | BY MS. SPILLANE: |
| 15:36:52 | 20 | Q.    Just let me know when you're ready? |
| 15:37:00 | 21 | A.    Ready. |
| 15:37:01 | 22 | Q.    Okay.  Do you recognize the document at |
| 15:37:05 | 23 | Exhibit 244? |
| 15:37:08 | 24 | A.    I mean, it was so long ago.  I mean, I |
| 15:37:13 | 25 | guess it's a W-2 or W-3 it says.  W-2, yes.  It was |

172

| | | |
|---|---|---|
| 15:37:21 | 1 | so long ago, because it doesn't even have my right |
| 15:37:24 | 2 | address on it. |
| 15:37:25 | 3 | Q.    That for 2000 -- do you see in the |
| 15:37:29 | 4 | middle of the page it indicates 2012? |
| 15:37:32 | 5 | A.    Yes, I see that. |
| 15:37:34 | 6 | Q.    Do you see that? |
| 15:37:35 | 7 | A.    Yes. |
| 15:37:35 | 8 | Q.    Okay.  And you're free to scroll through |
| 15:37:38 | 9 | the document, but if you can tell me if there's any |
| 15:37:42 | 10 | other items in the document that appear to relate |
| 15:37:45 | 11 | to any other year besides 2012. |
| 15:37:53 | 12 | A.    Yes.  No.  It looks like it's 2012. |
| 15:37:56 | 13 | Q.    Okay.  And do you have a recollection of |
| 15:38:00 | 14 | having seen this document before or any portion of |
| 15:38:03 | 15 | it? |
| 15:38:05 | 16 | A.    No, not really, to be honest with you. |
| 15:38:09 | 17 | Q.    Okay.  Do you remember receiving a W-2? |
| 15:38:12 | 18 | If you scroll to page PDF 2, a W-2 that looked like |
| 15:38:16 | 19 | similar to the one that's on PDF 2 of Exhibit 244? |
| 15:38:22 | 20 | A.    You know what?  I don't have that |
| 15:38:24 | 21 | anywhere in my files.  But when I tried to contact |
| 15:38:26 | 22 | the old accountant that we used, they said they |
| 15:38:30 | 23 | couldn't even go back in the 2000- -- anywhere |
| 15:38:33 | 24 | before like 2013 or '14 for me.  So I had to just |
| 15:38:37 | 25 | -- just recently.  So I haven't seen this, no. |

173

15:38:46  1        Q.     Okay.  Okay.  All right.  So I was going
15:38:47  2    to ask you if you have any understanding as to why
15:38:49  3    it indicates your wages of 24,000 for 2012.
15:38:57  4        A.     No.  It's so long ago, I don't even
15:39:00  5    remember.
15:39:01  6        Q.     Okay.  This does not change your
15:39:03  7    recollection as to your base salary in 2012 being
15:39:10  8    $60,000, correct?
15:39:12  9        A.     I don't know.  I don't remember if my
15:39:13 10    salary was that much in 2012.  Like I said, the
15:39:17 11    first year I was here, 2011, was the year that I
15:39:23 12    got paid properly.  And after that, it was just
15:39:25 13    like -- it was get money when you can.  It was more
15:39:30 14    sporadic.  I couldn't tell you thinking back ten
15:39:33 15    years.  I just know the first year felt like the
15:39:36 16    only good year.  That was it.
15:39:41 17        Q.     The first year being 2011?
15:39:43 18        A.     Yes, the first year of 2011.  I felt
15:39:46 19    like after that, I just kind of wasn't getting paid
15:39:51 20    as much as I should have.
15:39:54 21        Q.     Okay.  Do you recall seeing -- ever
15:39:58 22    receiving any W-2s for 2010 or for any of the years
15:40:05 23    where you understood yourself to be an employee?
15:40:09 24        A.     Yes.  I mean, I think -- I don't have
15:40:14 25    any of that, because I just went to the accountant

                                                          174

15:40:18  1    guy, and he told me whatever, had me sign some

15:40:22  2    documents, and that was it.  They never actually

15:40:24  3    even sent me copies of my 2010 or 2011 or any of

15:40:29  4    those tax returns.

15:40:32  5         Q.    Okay.  All right.  I just -- so just in

15:40:36  6    terms of the amount of 24,000 that's listed on this

15:40:39  7    one for -- on Exhibit 244 for wages for 2012 --

15:40:48  8         A.    Okay.

15:40:49  9         Q.    -- I think you had testified earlier, I

15:40:56 10    would have to go back, but that your payment, you

15:41:00 11    understood it to be 60,000 as salary, but you were

15:41:06 12    only receiving $3,699.17 a month in reflection of a

15:41:14 13    withholding of taxes.

15:41:15 14              Is that not your recollection?

15:41:16 15              MR. O'CONNOR:  Objection.  Misstates

15:41:18 16         testimony.

15:41:19 17         A.    Yes.  I don't remember.

15:41:22 18    BY MS. SPILLANE:

15:41:22 19         Q.    Okay.  Well, the checks will show what

15:41:24 20    they show.  So let me just ask you.  If it's the

15:41:26 21    case that you were paid that your salary and that

15:41:31 22    your payments were more than 24,000 that's

15:41:35 23    indicated on this W-2, do you have any

15:41:38 24    understanding of why that would be?

15:41:42 25         A.    No.

                                                              175

| | | |
|---|---|---|
| 15:41:45 | 1 | Q.    Okay.  And did anyone -- did Mr. Laura |
| 15:41:47 | 2 | talk to you about this W-2 in 2012 or 2013? |
| 15:41:51 | 3 | A.    Honestly, I can't remember that far |
| 15:41:53 | 4 | back, to be honest with you, specific stuff. |
| 15:41:58 | 5 | Q.    Okay.  You don't have any recollection |
| 15:41:59 | 6 | of having that conversation with Mr. -- any kind of |
| 15:42:03 | 7 | conversation about it with Mr. Laura? |
| 15:42:07 | 8 | A.    No. |
| 15:42:07 | 9 | Q.    Okay.  And I think you testified that at |
| 15:42:21 | 10 | some point, you started receiving 1099s, is that |
| 15:42:26 | 11 | right? |
| 15:42:26 | 12 | A.    I never received one, but -- |
| 15:42:35 | 13 | Q.    Understood.  Okay.  So I must have in |
| 15:42:38 | 14 | fact misunderstood. |
| 15:42:39 | 15 |       At some point, you stopped -- you |
| 15:42:40 | 16 | understood that you were no longer an employee, but |
| 15:42:44 | 17 | that you were -- what did you understand your |
| 15:42:46 | 18 | status to be at that point? |
| 15:42:48 | 19 | A.    Basically, that I was going to be like a |
| 15:42:51 | 20 | consultant or a 1099 at that point. |
| 15:42:58 | 21 | Q.    Okay.  What was the conversation with -- |
| 15:42:59 | 22 | was that a conversation with Mr. Laura? |
| 15:43:01 | 23 | A.    Yes.  Again, it's like so long ago.  I |
| 15:43:04 | 24 | just -- I mean, I remember him saying, "Hey, |
| 15:43:08 | 25 | listen, we can't afford to pay you what we were |

176

15:43:11  1   paying you before, and you're going to have to

15:43:14  2   basically be paid as a consultant instead."  So

15:43:21  3   that's when I went back and filed all my own tax

15:43:25  4   returns and everything else.

15:43:28  5        Q.   Okay.  Do you remember when that

15:43:30  6   conversation with Mr. Laura was?

15:43:36  7        A.   No.

15:43:36  8        Q.   Okay.  But you never in fact received

15:43:38  9   any 1099s?

15:43:39 10        A.   No.

15:43:50 11        Q.   Okay.  All right.  So was there anything

15:43:52 12   in relation to the car payments or the car

15:43:57 13   insurance that was included as part of your tax

15:44:03 14   filings, whether at the time or the ones you did

15:44:06 15   recently?

15:44:08 16        A.   I did not understand that question.  Can

15:44:10 17   you ask it again?

15:44:12 18        Q.   Right.  I know that you -- let me ask it

15:44:15 19   this way.

15:44:16 20             I think you testified when we were

15:44:17 21   looking through the bank records that there were

15:44:19 22   some expenses that you had included, some checks

15:44:25 23   paid to you for expense reimbursements that you had

15:44:29 24   included in your recent tax filings.

15:44:32 25             Do you remember that?

177

| | | |
|---|---|---|
| 15:44:36 | 1 | A.    No. |
| 15:44:42 | 2 | Q.    Okay.  So let me ask it this way then. |
| 15:44:45 | 3 | Did you include any of the -- all of the |
| 15:44:46 | 4 | checks that you received from Pristec America or |
| 15:44:48 | 5 | Innovative Crude Technologies, were they all |
| 15:44:51 | 6 | included in your tax filings? |
| 15:44:53 | 7 | A.    In my new tax filings?  Like you mean |
| 15:44:59 | 8 | all the stuff I told you I just did? |
| 15:45:02 | 9 | Q.    Yes.  Either the ones you did |
| 15:45:04 | 10 | contemporaneously or for the later years -- |
| 15:45:04 | 11 | A.    Yes. |
| 15:45:06 | 12 | Q.    -- the ones you did recently. |
| 15:45:07 | 13 | A.    Yes.  Yes.  I had to go through -- |
| 15:45:07 | 14 | Q.    Okay. |
| 15:45:10 | 15 | A.    I mean, it took me forever, but... |
| 15:45:14 | 16 | Q.    Okay.  And so did that include the |
| 15:45:16 | 17 | advances and the expense reimbursements that we saw |
| 15:45:20 | 18 | from your move to New Jersey it? |
| 15:45:28 | 19 | A.    I don't think so.  I mean, that would |
| 15:45:29 | 20 | have been before.  I don't know.  That was 2011, |
| 15:45:32 | 21 | 2012.  I only filed back taxes not that far back. |
| 15:45:37 | 22 | Q.    Okay.  And any of the payments that |
| 15:45:42 | 23 | Mr. Laura made on -- I should say that Mr. Laura |
| 15:45:49 | 24 | directed from business accounts to either the car |
| 15:45:52 | 25 | loan or the car insurance.  Were any of those |

178

| | | |
|---|---|---|
| 16:17:36 | 1 | A.    Okay. |
| 16:17:37 | 2 | Q.    Is this a message from you to Mr. Laura? |
| 16:17:40 | 3 | A.    Yes. |
| 16:17:41 | 4 | Q.    Okay.  And it says, "Hey, Joe hope you |
| 16:17:45 | 5 | are having fun." |
| 16:17:47 | 6 | Do you recall what Mr. Laura -- or what |
| 16:17:50 | 7 | you understood Mr. Laura was doing as of July 24th, |
| 16:17:53 | 8 | 2007? |
| 16:17:54 | 9 | A.    No.  He could have been on vacation.  I |
| 16:18:02 | 10 | don't know. |
| 16:18:02 | 11 | Q.    Okay.  You didn't have the perception |
| 16:18:04 | 12 | that he was working at the time, is that right? |
| 16:18:05 | 13 | A.    No.  Not when I sent that text, I guess. |
| 16:18:11 | 14 | I said unless -- |
| 16:18:11 | 15 | Q.    Okay. |
| 16:18:12 | 16 | A.    Yes.  No. |
| 16:18:14 | 17 | Q.    Okay.  I'm just asking because it's a |
| 16:18:16 | 18 | Monday.  And you said he's having fun, so maybe you |
| 16:18:19 | 19 | had a recollection of what Mr. Laura was doing at |
| 16:18:25 | 20 | the time. |
| 16:18:25 | 21 | You ask him, "Will you let me know if we |
| 16:18:29 | 22 | have money to make this truck payment." |
| 16:18:31 | 23 | Do you have a recollection of what the |
| 16:18:33 | 24 | message was concerning? |
| 16:18:35 | 25 | A.    Of what the message I wrote to him was |

190

| | | |
|---|---|---|
| 16:18:38 | 1 | concerning? |
| 16:18:38 | 2 | Q.    Yes. |
| 16:18:42 | 3 | A.    I needed money to make his truck |
| 16:18:45 | 4 | payment. |
| 16:18:45 | 5 | Q.    The truck was as of July 2017 still -- |
| 16:18:51 | 6 | the loan for the truck was still under your wife's |
| 16:18:53 | 7 | name as of July 2017? |
| 16:18:55 | 8 | A.    Yes.  Yes.  It must have been like the |
| 16:18:58 | 9 | very end of it or something. |
| 16:19:02 | 10 | Q.    Okay.  And then the next -- there seems |
| 16:19:07 | 11 | to be a repeat of the same -- |
| 16:19:09 | 12 | A.    Yes.  I sent it twice by accident. |
| 16:19:12 | 13 | Sorry. |
| 16:19:12 | 14 | Q.    -- message. |
| 16:19:14 | 15 | Oh, that's okay.  And then on PDF page |
| 16:19:17 | 16 | 4, it seems to be a reply on August 8, 2017. |
| 16:19:28 | 17 | Do you see that? |
| 16:19:28 | 18 | A.    Yes. |
| 16:19:29 | 19 | Q.    Okay.  And is that Mr. Laura with the |
| 16:19:34 | 20 | sort of grayed out -- the light gray text bubble? |
| 16:19:39 | 21 | A.    Yes.  He's in the gray. |
| 16:19:41 | 22 | Q.    Okay.  "Thanks, Joe." |
| 16:19:43 | 23 | A.    Yes. |
| 16:19:43 | 24 | Q.    "Do you know how many payments are left |
| 16:19:45 | 25 | on the truck?" |

191

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

| | | |
|---|---|---|
| 16:19:45 | 1 | Okay. So for all of these messages, is |
| 16:19:48 | 2 | it the case that Mr. Laura's messages to you are on |
| 16:19:52 | 3 | the left, in the sort of light gray bubble with the |
| 16:19:55 | 4 | purple on this document, purple J? |
| 16:19:59 | 5 | A.    Yes. |
| 16:20:00 | 6 | Q.    And your responses -- or your |
| 16:20:01 | 7 | communications are in the greenish/bluish bubble? |
| 16:20:10 | 8 | A.    Yes. |
| 16:20:11 | 9 | Q.    Okay. All right. So then Mr. Laura was |
| 16:20:15 | 10 | asking you how many payments are left on the truck? |
| 16:20:19 | 11 | A.    Yes. |
| 16:20:19 | 12 | Q.    And you respond, "We owe 1,881. Total |
| 16:20:24 | 13 | 11,559"? |
| 16:20:27 | 14 | A.    Yes. Was it -- yes, because he was |
| 16:20:29 | 15 | behind in the payment. So that's me trying to get |
| 16:20:35 | 16 | on him, because I could see we're about to go 30 |
| 16:20:39 | 17 | days late. So I'm telling him we owe basically two |
| 16:20:41 | 18 | months' payment, or if you want to pay -- he asked |
| 16:20:43 | 19 | how much. I said, "You want to pay the whole thing |
| 16:20:46 | 20 | off? It's 11,000, I guess, left." |
| 16:20:47 | 21 | Q.    Okay. As of August 2017, there was |
| 16:20:49 | 22 | $11,600 left on the car payment for the -- was it |
| 16:20:58 | 23 | still the white Chevy Tahoe truck we're talking |
| 16:21:02 | 24 | about? |
| 16:21:03 | 25 | A.    Yes. Yes. |

192

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

```
16:21:11  1        Q.    Okay.  And then you send Mr. Laura a
16:21:16  2   handful of messages.
16:21:17  3        A.    Right.
16:21:18  4        Q.    August 15th, 2017, "Hey, Joe."  "Hey,
16:21:27  5   good morning, Joe.  How is everything going?"  On
16:21:30  6   September 2017, "Hey, Joe."  September 15th, 2017,
16:21:33  7   "Hey, Joe.  What's going on with you?  How is
16:21:35  8   everything going?"
16:21:40  9             And so were there no responses from
16:21:43 10   Mr. Laura in between any of these messages?
16:21:45 11        A.    Yes.  Exactly.  No responses.
16:21:51 12        Q.    Okay.  And do you have a recollection of
16:21:52 13   whether the car payments that were due had been
16:21:56 14   made or were you still trying to pursue them at
16:22:00 15   this point?
16:22:00 16        A.    I couldn't tell you honestly, but, you
16:22:03 17   know, most likely, if I'm texting that many times,
16:22:07 18   I'm trying to get something that I need.  So I
16:22:16 19   don't know if the truck payments were made.
16:22:16 20        Q.    Okay.  All right.  And page 6, there
16:22:20 21   doesn't seem to be a date associated with --
16:22:20 22        A.    Okay.
16:22:25 23        Q.    There isn't a date on the top of these
16:22:29 24   messages.
16:22:29 25             Do you know what the date of these
```

193

| | | |
|---|---|---|
| 16:22:31 | 1 | messages concerning -- it seems to be about a |
| 16:22:34 | 2 | communication from Katie to Mr. Laura. |
| 16:22:37 | 3 | Is that a reference to your wife, or |
| 16:22:39 | 4 | your ex-wife? |
| 16:22:39 | 5 | A.   Yes.   Yes. |
| 16:22:41 | 6 | Q.   Okay.   Do you know what dates are these |
| 16:22:43 | 7 | messages from? |
| 16:22:45 | 8 | A.   I can look real quick on my phone.   I |
| 16:22:47 | 9 | just have to turn it on. |
| 16:22:50 | 10 | Q.   Sure.   And do you recall what she was |
| 16:23:00 | 11 | e-mailing to Mr. Laura? |
| 16:23:03 | 12 | A.   It had to be something that had to do |
| 16:23:05 | 13 | with the truck, because otherwise she had no real |
| 16:23:10 | 14 | communication with him. |
| 16:23:10 | 15 | Q.   Okay. |
| 16:23:14 | 16 | A.   Or it could have been the truck or the |
| 16:23:15 | 17 | insurance.   I don't know, but it had to do with one |
| 16:23:19 | 18 | of those two things, I'm sure. |
| 16:23:24 | 19 | Q.   Okay.   And do you have a date for that? |
| 16:23:25 | 20 | A.   Sorry.   My phone is barely turning on. |
| 16:23:31 | 21 | Q.   All right.   Well, maybe your counsel can |
| 16:23:33 | 22 | look into that while we're discussing. |
| 16:23:39 | 23 | A.   Okay. |
| 16:23:39 | 24 | Q.   It seems to be around messages after a |
| 16:23:43 | 25 | September 15th message on PDF 5 here. |

194

| | | |
|---|---|---|
| 16:23:50 | 1 | A.    Right.   I'm gone. |
| 16:23:53 | 2 | Q.    And then before September 29th messages. |
| 16:24:07 | 3 | MR. O'CONNOR:   I think you can search by |
| 16:24:11 | 4 | a word.   Search Katie. |
| 16:24:16 | 5 | THE WITNESS:   It would just be with an |
| 16:24:21 | 6 | I.   Okay. |
| 16:24:23 | 7 | BY MS. SPILLANE: |
| 16:24:23 | 8 | Q.    Okay.   On PDF page 7, there's a message |
| 16:24:28 | 9 | from you on September 29, 2017. |
| 16:24:33 | 10 | A.    Yes. |
| 16:24:33 | 11 | Q.    "I just wanted to let you know, I called |
| 16:24:36 | 12 | the collection agency, and they gave me until |
| 16:24:38 | 13 | Wednesday to pay the $560 before they file a |
| 16:24:42 | 14 | judgment on me." |
| 16:24:43 | 15 | What's that a reference to? |
| 16:24:44 | 16 | A.    That was probably a reference to one of |
| 16:24:48 | 17 | my own personal medical collections that I had. |
| 16:24:51 | 18 | And that's basically me just trying to get money, |
| 16:24:55 | 19 | get paid from Joe.   Like, hey, do you have money to |
| 16:24:57 | 20 | pay me right now, because I have a deadline for |
| 16:25:00 | 21 | something I need to put in before it causes me |
| 16:25:03 | 22 | problems.   That's what that is. |
| 16:25:05 | 23 | Q.    Okay.   And then you say, "I hope |
| 16:25:06 | 24 | everything went okay with the truck." |
| 16:25:08 | 25 | What's that a reference to? |

195

| | | |
|---|---|---|
| 16:25:10 | 1 | A.    Honestly, I have no clue.  I hope |
| 16:25:13 | 2 | everything -- maybe he had to fix the truck.  I |
| 16:25:15 | 3 | don't know.  Maybe -- maybe -- I don't know what |
| 16:25:19 | 4 | that is. |
| 16:25:21 | 5 | Q.    Okay.  And then on PDF 8, there's a |
| 16:25:24 | 6 | message, October 9th, 2017.  That refers to some |
| 16:25:33 | 7 | pull violations -- |
| 16:25:33 | 8 | A.    Okay. |
| 16:25:34 | 9 | Q.    -- you got on the PA Turnpike. |
| 16:25:34 | 10 | A.    Yes. |
| 16:25:37 | 11 | Q.    Do you see that? |
| 16:25:38 | 12 | A.    Yes.  That's -- |
| 16:25:38 | 13 | Q.    Okay. |
| 16:25:40 | 14 | A.    Go ahead.  Sorry. |
| 16:25:41 | 15 | Q.    What's that a reference to? |
| 16:25:42 | 16 | A.    Let's see.  That's me trying to pay a |
| 16:25:51 | 17 | toll violation for whatever reason that was sent to |
| 16:25:58 | 18 | me from one of our trips or something. |
| 16:26:00 | 19 | Q.    And why would the toll violation be sent |
| 16:26:03 | 20 | to you? |
| 16:26:04 | 21 | A.    Because my wife -- the EZ Pass was in |
| 16:26:09 | 22 | her name as well. |
| 16:26:13 | 23 | Q.    Okay.  And you indicate in the message |
| 16:26:15 | 24 | that, "Hey, some of these toll violations you got |
| 16:26:18 | 25 | on the PA Turnpike." |

196

16:26:20  1          Do you have a recollection that it was

16:26:22  2   Mr. Laura who was driving for those violations?

16:26:26  3          A.    You know, I mean, that's what it looks

16:26:28  4   like I wrote, but I don't -- I wouldn't have a

16:26:30  5   recollection of a 2017 toll violation.

16:26:30  6          Q.    Okay.

16:26:36  7          A.    I found the date on those texts from

16:26:38  8   before.  I don't know if you want to now.

16:26:39  9          Q.    Sure.  These are the texts on PDF 6 of

16:26:44  10  Exhibit JM-1.

16:26:45  11         A.    Yes.  Where it says, "Yes, she's in

16:26:49  12  bed."  Yes.  That's Wednesday, September 27th.

16:26:57  13         Q.    Seeing that date, does that refresh your

16:26:59  14  recollection as to what the messages might have

16:27:00  15  been concerning?

16:27:06  16         A.    As far as?  Let's see.

16:27:10  17         Q.    I think your testimony was it must have

16:27:11  18  had something to do with the truck.

16:27:11  19         A.    Yes.

16:27:13  20         Q.    But I just wanted to know whether -- now

16:27:16  21  that you understand the exact date, whether it

16:27:19  22  refreshes your recollection as to what the messages

16:27:22  23  concern?

16:27:22  24         A.    Oh, no.  The date doesn't help me on

16:27:27  25  this.

197

16:27:27  1      Q.    What specifically --

16:27:27  2      A.    No.  But I'm pretty sure it has to do

16:27:29  3  with the truck, because anything that has to do

16:27:31  4  with my wife or him would have to do with his

16:27:34  5  truck.

16:27:35  6      Q.    Okay.  I meant to ask you a question

16:27:36  7  before the reference to the PA Turnpike reminded

16:27:41  8  me.

16:27:41  9           Mr. Laura has a daughter who went to

16:27:45  10  college in Pennsylvania, is that right?

16:27:46  11     A.    Yes.

16:27:47  12     Q.    Okay.  And did you do any driving

16:27:51  13  related to visits to Mr. Laura's daughter while she

16:27:59  14  was there in college?

16:28:01  15     A.    You know what?  I don't think so.  I

16:28:05  16  mean, you mean going up there to visit or

16:28:07  17  something?  No.

16:28:11  18     Q.    Okay.  Well, no.  Whether you drove

16:28:12  19  Mr. Laura when Mr. Laura was going to visit her or

16:28:16  20  family members were going to visit her?

16:28:17  21     A.    No.  Not that I can remember, I mean.

16:28:22  22     Q.    All right.  And then further on page PDF

16:28:25  23  8, on October 10th, 2017, there's a message from

16:28:29  24  you.  "Also the truck insurance is due by Friday."

16:28:34  25     A.    Yes.

                                                              198

| | | |
|---|---|---|
| 16:28:35 | 1 | Q. Do you see that? |
| 16:28:35 | 2 | A. Yes. |
| 16:28:39 | 3 | Q. Okay. So then is it fair to say that at |
| 16:28:42 | 4 | least as of October 10th, 2017, that it appears the |
| 16:28:46 | 5 | truck insurance was still in your and your wife's |
| 16:28:51 | 6 | name -- your ex-wife's name? |
| 16:28:53 | 7 | A. Yes. It would have been until he paid |
| 16:28:56 | 8 | the truck off. |
| 16:29:00 | 9 | Q. Understood. |
| 16:29:01 | 10 | And then I just want to ask. So between |
| 16:29:03 | 11 | September 29th, you sent the message about your |
| 16:29:06 | 12 | medical payments and the truck and October 9th |
| 16:29:10 | 13 | about E-ZPass toll violations Mr. Laura had |
| 16:29:15 | 14 | gotten -- |
| 16:29:15 | 15 | A. Yes. |
| 16:29:16 | 16 | Q. -- and then the truck insurance sent on |
| 16:29:17 | 17 | October 10th, 2017. |
| 16:29:19 | 18 | A. Right. |
| 16:29:20 | 19 | Q. And so -- and then we go on to October |
| 16:29:26 | 20 | 12th, on PDF 9, and there's a response from |
| 16:29:29 | 21 | Mr. Laura. |
| 16:29:33 | 22 | Should I understand then that there were |
| 16:29:34 | 23 | no responses to your texts about the various |
| 16:29:40 | 24 | payments that were owed from September 29th -- |
| 16:29:40 | 25 | A. Yes. No. |

199

| | | |
|---|---|---|
| 16:29:44 | 1 | Q.    -- through October 11th? |
| 16:29:45 | 2 | A.    No.  He may have called me back.  Sorry. |
| 16:29:51 | 3 | He may have called me back, but any texts that he |
| 16:29:53 | 4 | would have texted would have been right there.  I |
| 16:29:57 | 5 | mean, you know, if it's -- he's not the fastest |
| 16:30:01 | 6 | person to call back, you know, or to respond.  But |
| 16:30:05 | 7 | I'm sure he called me at some point, because |
| 16:30:07 | 8 | everything wound up getting paid, so... |
| 16:30:10 | 9 | Q.    Okay.  And so on these -- I'm just |
| 16:30:19 | 10 | wondering, were you working for Mr. Laura on these |
| 16:30:22 | 11 | days when you sent him text messages? |
| 16:30:26 | 12 | A.    No.  If I'm telling him, you know, |
| 16:30:32 | 13 | whatever it is, I'm asking about a payment or |
| 16:30:34 | 14 | saying I need money, then most likely I'm not |
| 16:30:37 | 15 | working with him on that day, because I'd be asking |
| 16:30:39 | 16 | him in person. |
| 16:30:40 | 17 | Q.    Okay.  And then on PDF 9, which is where |
| 16:30:47 | 18 | Mr. Laura responds to you on October 12th -- |
| 16:30:49 | 19 | A.    Yes. |
| 16:30:50 | 20 | Q.    -- and he indicates that he's in |
| 16:30:56 | 21 | Houston -- |
| 16:30:57 | 22 | A.    Yes. |
| 16:30:57 | 23 | Q.    And it doesn't seem to have a |
| 16:31:02 | 24 | substantive response to what you wrote, unless |
| 16:31:08 | 25 | there's any missing messages there. |

200

| | | |
|---|---|---|
| 16:31:10 | 1 | A.    No.  That's just him telling me that he |
| 16:31:13 | 2 | won't be back until the next day.  So basically, |
| 16:31:17 | 3 | I'm not going to get a response until then, because |
| 16:31:20 | 4 | he was in Houston. |
| 16:31:20 | 5 | Q.    Did Mr. Laura generally let you know |
| 16:31:23 | 6 | when he was traveling so that you would have been |
| 16:31:28 | 7 | aware of his travel schedule generally or -- |
| 16:31:31 | 8 | A.    Yes.  I mean, most of the time.  Not |
| 16:31:34 | 9 | always.  Obviously, I didn't know at this point. |
| 16:31:38 | 10 | But earlier on, he did more often than this.  As |
| 16:31:42 | 11 | time went by, maybe not as much.  But, yes, most of |
| 16:31:44 | 12 | the time, I knew if he's going somewhere. |
| 16:31:47 | 13 | Q.    Okay.  And then let's see, PDF 10, |
| 16:31:52 | 14 | October 20th, 2017, "I'm texting you to let you |
| 16:31:59 | 15 | know the truck is due by Monday." |
| 16:32:01 | 16 | Is that a reference to a payment on the |
| 16:32:03 | 17 | truck due on Monday? |
| 16:32:04 | 18 | A.    Yes.  Yes. |
| 16:32:08 | 19 | Q.    Okay.  And you say, "And I really need |
| 16:32:10 | 20 | to pay my landlord something"? |
| 16:32:12 | 21 | A.    Yes.  Again, that's me trying to get |
| 16:32:18 | 22 | paid some kind of which way.  It was basically to |
| 16:32:21 | 23 | the point where I was like, listen, if you don't |
| 16:32:23 | 24 | pay me soon or give me some sort of money for what |
| 16:32:27 | 25 | I've done, then I'm in trouble here.  That's me |

201

| | | |
|---|---|---|
| 16:32:30 | 1 | begging over here. |
| 16:32:33 | 2 | Q.    Okay.  Yes.  And then your next message |
| 16:32:35 | 3 | is October 22nd, "Joe, are you still alive?  My |
| 16:32:40 | 4 | life is in shambles." |
| 16:32:43 | 5 | What's that a reference to? |
| 16:32:44 | 6 | A.    That's just a reference to me not |
| 16:32:48 | 7 | getting paid -- not getting paid properly or not |
| 16:32:55 | 8 | getting paid enough and just me and my wife having |
| 16:33:00 | 9 | problems, on the verge of getting divorced, all |
| 16:33:02 | 10 | because I'm working for this company hanging in |
| 16:33:04 | 11 | there.  And I got to a breaking point where I was |
| 16:33:08 | 12 | like, listen, man, you either have a place for me |
| 16:33:12 | 13 | or you don't.  I just basically got fed up, because |
| 16:33:17 | 14 | I couldn't even pay my rent, basically. |
| 16:33:22 | 15 | Q.    Right.  And so is that message an |
| 16:33:23 | 16 | indication that you hadn't heard from Mr. Laura in |
| 16:33:27 | 17 | response to a substantive response about the |
| 16:33:32 | 18 | various monies that were due and your personal debt |
| 16:33:39 | 19 | situation -- or personal collections and landlord |
| 16:33:41 | 20 | payment situation? |
| 16:33:43 | 21 | A.    Probably.  Probably.  If I was that |
| 16:33:46 | 22 | dramatic in it, then it was probably, because I |
| 16:33:49 | 23 | didn't have a response in a timely fashion for me. |
| 16:33:53 | 24 | Q.    Okay.  And then Mr. Laura responds that |
| 16:33:57 | 25 | he's in Canada. |

202

16:33:58  1          Do you see that?

16:33:59  2      A.    Yes.

16:34:02  3      Q.    Okay.  And so just from the messages

16:34:06  4  from October, it looks like you weren't aware that

16:34:09  5  Mr. Laura was in Houston and then in Canada.  It

16:34:12  6  appears like you weren't -- in October, it appears

16:34:15  7  that you weren't aware that he was in Canada.

16:34:19  8          Is that right?

16:34:20  9      A.    I mean, "In Canada, I'll be back,"

16:34:22 10  that's what it appears from the text messages.

16:34:25 11      Q.    Okay.  And had you known that he was

16:34:28 12  away for either of those visits?

16:34:32 13      A.    To be honest with you, he traveled so

16:34:38 14  much for business or whatever else.  And like I

16:34:41 15  said, I wouldn't go with him on any of those trips.

16:34:44 16  So it was a pretty common occurrence, him

16:34:48 17  travelling out and then -- most of the time, he

16:34:50 18  would tell me.  But at this point, he didn't

16:34:53 19  apparently.

16:34:54 20      Q.    Okay.  All right.  And then on PDF 11,

16:34:57 21  there's another message from you, November 4th,

16:35:02 22  2017, about Katie, your ex-wife, having received a

16:35:08 23  failure to appear in the mail.  Some ticket from

16:35:11 24  Newark.  It says to pay $55 by the 7th or there

16:35:15 25  will be a warrant and a lose of license.

203

```
16:35:19   1          Do you have a recollection of what this
16:35:22   2   message was about?
16:35:24   3       A.    It must have been some sort of ticket
16:35:27   4   that somebody got on the truck for $55 and then
16:35:31   5   apparently -- I don't really know what it was.  I
16:35:35   6   would always try and get him to pay these things,
16:35:39   7   get it done ahead of time so we wouldn't have any
16:35:42   8   problems, but I'm not sure exactly which ticket
16:35:45   9   that refers to.
16:35:48  10       Q.    Okay.  Were there multiple tickets that
16:35:52  11   you remember?  I know we saw in one of the earlier
16:35:55  12   pages about some toll violations.  So it sounds
16:35:58  13   like all the tickets and toll violations associated
16:36:02  14   with the truck that Mr. Laura was driving would go
16:36:06  15   to you or your wife, is that right?
16:36:08  16       A.    Yes.  Honestly, I think like at that
16:36:12  17   time there was like -- Joe had such little money --
16:36:15  18   I mean, I don't know this for sure, but I think the
16:36:18  19   company or Joe just had no money.  And basically,
16:36:21  20   what would happen is he wouldn't have any money in
16:36:24  21   his account.  So when it would go to renew on the
16:36:29  22   E-ZPass, it would just not renew.  And then I'd be
16:36:33  23   driving through or we'd be driving somewhere and
16:36:36  24   wouldn't know and then it would send us like
16:36:40  25   20 violations at one time.
```

204

| | | |
|---|---|---|
| 16:36:43 | 1 | Q.    Okay.  And his response is, "Okay.  Pay |
| 16:36:47 | 2 | it on my card." |
| 16:36:49 | 3 | Do you see that? |
| 16:36:50 | 4 | A.    Yes.  Yes, I see it. |
| 16:36:51 | 5 | Q.    What does that mean? |
| 16:36:55 | 6 | A.    It probably meant that he -- at the time |
| 16:36:58 | 7 | that maybe I had a credit card of his or something |
| 16:37:00 | 8 | that I had written down on paper and that he was |
| 16:37:03 | 9 | probably like pay it on a card or a pay it on that |
| 16:37:06 | 10 | card. |
| 16:37:07 | 11 | Q.    Okay.  Was that a frequent occurrence |
| 16:37:12 | 12 | where he would instruct you to make payments from |
| 16:37:15 | 13 | his credit card? |
| 16:37:15 | 14 | A.    No, not frequent.  Just if it was |
| 16:37:19 | 15 | something like this where I would tell him like, |
| 16:37:21 | 16 | hey, listen, this has got to be paid.  We can't |
| 16:37:24 | 17 | mail it in.  Basically, I'm putting there, there |
| 16:37:27 | 18 | could be a warrant or a loss of license.  But then |
| 16:37:30 | 19 | he might say use a card.  Normally, no. |
| 16:37:33 | 20 | Q.    Okay.  Do you have a recollection of |
| 16:37:39 | 21 | having had either a card of his or a number that |
| 16:37:43 | 22 | connected to his -- Mr. Laura's personal credit |
| 16:37:46 | 23 | card or was it a business credit card? |
| 16:37:48 | 24 | A.    Honestly, I couldn't tell you.  It was |
| 16:37:53 | 25 | three years ago.  I probably had it written down on |

205

| | | |
|---|---|---|
| 16:37:55 | 1 | a piece of paper that he gave me to maybe use it |
| 16:37:58 | 2 | for something else before, and then I just kept it |
| 16:38:01 | 3 | just in case there was an emergency or I had to use |
| 16:38:03 | 4 | it.  But any card that I ever had written down of |
| 16:38:08 | 5 | his was either canceled or done with. |
| 16:38:10 | 6 | Q.   Okay.  And did you ever -- let me ask it |
| 16:38:17 | 7 | this way. |
| 16:38:18 | 8 | You never used any number or card of his |
| 16:38:21 | 9 | without his permission, correct? |
| 16:38:23 | 10 | A.   No, of course not.  Correct. |
| 16:38:27 | 11 | Q.   Okay.  All right.  And then on PDF 12, |
| 16:38:34 | 12 | it looks like -- well, if you scroll back to PDF |
| 16:38:37 | 13 | 11, there's an indication of Monday, November 13th. |
| 16:38:42 | 14 | So we have a Tuesday, November 7th, with a "Good |
| 16:38:44 | 15 | morning, Joe."  No response.  And then a Monday, |
| 16:38:49 | 16 | November 13, 2017 text from you, "I'm trying to |
| 16:38:54 | 17 | reach you multiple times.  Your truck payment is |
| 16:38:57 | 18 | due.  The insurance was due.  My landlord is going |
| 16:39:00 | 19 | to evict us because he thinks I am full of shit." |
| 16:39:03 | 20 | Do you see that? |
| 16:39:04 | 21 | A.   I see it, yes.  It's bringing back great |
| 16:39:07 | 22 | memories. |
| 16:39:08 | 23 | Q.   Okay.  Is that sarcastic? |
| 16:39:12 | 24 | A.   Yes.  Yes. |
| 16:39:13 | 25 | Q.   Those were not great memories, is that |

206

```
16:39:16  1    correct?
16:39:16  2         A.    No, not great.  Not good memories at
16:39:18  3    all, yes.
16:39:24  4         Q.    Okay.  And so can you explain what you
16:39:26  5    meant by this message to Mr. Laura?
16:39:30  6         A.    I was just basically getting to the
16:39:32  7    point where I was just saying like, hey, man,
16:39:33  8    either you come up with some of the money that
16:39:35  9    you're supposed to have paid me for what I've been
16:39:38 10    doing or basically we're in trouble here.  I'm
16:39:44 11    about to lose my -- I'm about to get evicted.  We
16:39:48 12    were behind on our rent.  I mean, it was a bad
16:39:50 13    situation for us.  So I was just trying to get it
16:39:52 14    across that, hey, I need some money now or else I
16:39:56 15    have to go somewhere else.  We have to move.  We
16:39:58 16    have to do something.
16:40:00 17         Q.    What do you mean, "we have to move"?
16:40:02 18         A.    Well, like if I wasn't getting paid, I
16:40:05 19    couldn't afford my house.  I mean, my wife had a
16:40:09 20    job as a waitress, but she couldn't afford all on
16:40:12 21    her own.  So I would have had to get out.
16:40:20 22         Q.    Okay.  On PDF page -- it looks like 14,
16:40:24 23    I think.  It's not showing up which page it is.  I
16:40:27 24    guess it's also PDF page 13.  There's messages that
16:40:31 25    start with, "Hey, Joe.  Just wanted to let you know
```

207

16:40:34  1    the truck is due by 4:00 today."  But I don't see a

16:40:37  2    date associated with those messages on that

16:40:39  3    document.

16:40:40  4         A.    What did they say or what --

16:40:43  5         Q.    "Hey, Joe.  Just wanted to let you know

16:40:45  6    the truck is due by 4:00 today and the insurance

16:40:49  7    any time."

16:40:51  8         A.    I'm sorry, I'm going through.  There are

16:41:00  9    so many of them like that.  Hey, Joe, blah, blah,

16:41:02  10   blah.  Okay.  There's the failure to appear.

16:41:15  11            THE WITNESS:  Can you show it to me

16:41:17  12       there, Kevin?

16:41:23  13        A.    Okay.  I see it.  That's November 24th.

16:41:27  14   Friday, November 24th.

16:41:29  15   BY MS. SPILLANE:

16:41:29  16        Q.    Friday, November 24th, 2017?

16:41:31  17        A.    Yes.

16:41:35  18        Q.    Okay.  All right.  And so for these

16:41:40  19   messages, it seems like there was a truck payment

16:41:42  20   due and insurance payment due.  So still, as of the

16:41:46  21   end of November 2017, the truck had not been paid

16:41:50  22   off and the insurance was still owed, and both of

16:41:56  23   those were still in your wife's and your name,

16:41:59  24   correct?

16:41:59  25        A.    Yes.

                                                              208

```
16:42:00  1         Q.    Okay.  And I don't have any response to

16:42:06  2    that text message.  Was that something that

16:42:09  3    happened after December 2017?

16:42:11  4         A.    Yes.  I don't see a response.

16:42:16  5         Q.    Okay.

16:42:17  6         A.    Actually, I don't see responses going

16:42:19  7    all the way.  No.

16:42:24  8         Q.    Okay.  Your testimony earlier today was

16:42:25  9    that you understood that the truck had been paid

16:42:28 10    off, though, so that happened -- that must have

16:42:32 11    happened sometime after November --

16:42:32 12         A.    Yes.

16:42:34 13         Q.    I'm sorry.  What did you say, November

16:42:36 14    24th, 2017?

16:42:37 15         A.    Yes.  I didn't realize how long we had

16:42:39 16    the truck for, but, yes, he definitely paid it off.

16:42:43 17    It's just a matter of I don't know the exact time.

16:42:48 18         Q.    Okay.  And do you know whether he paid

16:42:54 19    it off through Pristec funds or Innovative Crude

16:42:58 20    Technology funds?

16:43:00 21         A.    I wouldn't know.  I don't think he paid

16:43:02 22    off like a huge lump sum.  I think he just made the

16:43:06 23    payments until he owed no more, because he never

16:43:09 24    had money like that where he could make -- even

16:43:11 25    though he asked -- where you saw in the text where
```

                                                          209

| | | |
|---|---|---|
| 16:43:14 | 1 | he asked, he never made it.  Unless I'm like, hey, |
| 16:43:18 | 2 | listen, we have to pay 1800 because it's overdue, |
| 16:43:22 | 3 | then that would happen. |
| 16:43:26 | 4 | Q.    Okay.  But you're no longer receiving |
| 16:43:28 | 5 | any bills from Ally for the car loan, is that |
| 16:43:33 | 6 | right? |
| 16:43:33 | 7 | A.    No. |
| 16:43:33 | 8 | Q.    Okay.  And you haven't been for |
| 16:43:35 | 9 | sometime? |
| 16:43:37 | 10 | A.    Yes.  Correct.  No, I haven't. |
| 16:43:40 | 11 | Q.    Okay.  And that's also the case with the |
| 16:43:42 | 12 | insurance, you're not receiving bills for the |
| 16:43:44 | 13 | insurance.  And as far as you know, there's no |
| 16:43:46 | 14 | insurance in your name for Mr. Laura's truck |
| 16:43:49 | 15 | anymore? |
| 16:43:49 | 16 | A.    No.  There's no insurance in mine or my |
| 16:43:51 | 17 | wife's name. |
| 16:43:55 | 18 | Q.    Earlier, you had testified about your |
| 16:44:01 | 19 | recent tax filings for earlier years, and I just |
| 16:44:08 | 20 | wanted to get a little bit more details on that. |
| 16:44:12 | 21 | Do you recall which years those tax |
| 16:44:15 | 22 | filings covered? |
| 16:44:20 | 23 | A.    '13 through '17. |
| 16:44:23 | 24 | Q.    '13 through '17.  Okay. |
| 16:44:26 | 25 | And did you have an accountant that |

210

16:44:28  1    assisted you with that process?

16:44:32  2        A.    No.

16:44:34  3        Q.    Okay.  And you said you filed that in

16:44:37  4    2021, is that right?

16:44:38  5        A.    Yes.  I actually did through 2018.

16:44:44  6        Q.    Okay.  And did you file those before you

16:44:50  7    received -- before you were served with our

16:44:53  8    subpoena or after?

16:44:54  9        A.    After.

16:45:00 10        Q.    Okay.  And can you recall how long

16:45:01 11    after?  Was it --

16:45:04 12        A.    Like last week after.

16:45:13 13        Q.    Okay.  Were you working on this project

16:45:18 14    while you were ill with your medical issue that

16:45:26 15    caused you to delay this deposition?

16:45:30 16        A.    I've been working on this thing forever

16:45:33 17    trying to get all these numbers together.

16:45:41 18            MS. SPILLANE:  Okay.  All right.  Let me

16:45:42 19        just check my notes real quick.

16:45:45 20            (Pause in the proceedings)

16:45:50 21            MS. SPILLANE:  I don't have any more

16:45:52 22        questions for you right now, although we do

16:45:56 23        reserve the ability to ask some additional

16:45:59 24        questions depending on what your counsel

16:46:01 25        plans to ask you.

                                                        211

```
16:46:04  1              MR. O'CONNOR:  Ms. Spillane, can I get a
16:46:10  2         clarification?  Do you believe that those tax
16:46:13  3         returns fall within the scope of the
16:46:15  4         subpoena?
16:46:17  5              MS. SPILLANE:  To the extent they
16:46:18  6         concern -- to the extent that they concern
16:46:23  7         payments that were made between 2010 and 2017
16:46:28  8         related to Pristec America or Innovative
16:46:32  9         Crude Technologies before -- or to him or for
16:46:35 10         his benefit or any of the individuals that
16:46:37 11         are referenced in the subpoena, then, yes,
16:46:39 12         they would.
16:46:39 13              MR. O'CONNOR:  Okay.
16:46:40 14              MS. SPILLANE:  I can't make that
16:46:41 15         judgment not knowing what they are.  But
16:46:43 16         based on your client's testimony today, it
16:46:45 17         does seem like they would be relevant and
16:46:47 18         responsive.
16:46:48 19              MR. O'CONNOR:  Okay.  Thank you.  Now, I
16:46:50 20         just have a few questions.
16:46:51 21
16:46:51 22                   EXAMINATION
16:46:51 23    BY MR. O'CONNOR:
16:46:52 24
16:46:52 25         Q.    You testified to two groups of tax
```

212

| | | |
|---|---|---|
| 16:46:55 | 1 | returns, right?  You have some tax returns that |
| 16:46:59 | 2 | have been filed in the past? |
| 16:47:01 | 3 | A.   Right. |
| 16:47:01 | 4 | Q.   And then you have this group of tax |
| 16:47:05 | 5 | returns that you've just recently filed, right? |
| 16:47:06 | 6 | A.   Yes. |
| 16:47:06 | 7 | Q.   And did I hear you say that you're not |
| 16:47:09 | 8 | able to access the prior returns?  Is that true? |
| 16:47:12 | 9 | A.   No.  Yes.  The accountant that did those |
| 16:47:15 | 10 | couldn't. |
| 16:47:15 | 11 | Q.   He said he doesn't retain them that |
| 16:47:18 | 12 | long? |
| 16:47:18 | 13 | A.   Yes. |
| 16:47:18 | 14 | Q.   Okay.  So you'll get me the returns that |
| 16:47:21 | 15 | she's requested?  Yes? |
| 16:47:23 | 16 | A.   Yes. |
| 16:47:24 | 17 | Q.   Okay.  Before we move off of these |
| 16:47:29 | 18 | texts, counsel skipped over this text where it says |
| 16:47:34 | 19 | -- and this is Joe Laura.  When you raised the fact |
| 16:47:39 | 20 | that you hadn't been paid, he wrote to you, "Sorry. |
| 16:47:42 | 21 | I'm at the lawyers in NYC.  Walter and TJ have put |
| 16:47:49 | 22 | us in a very bad position.  I'm leaving here in |
| 16:47:53 | 23 | about 20 minutes.  I'll call you from," and then |
| 16:47:56 | 24 | it's cut off. |
| 16:47:57 | 25 | A.   Right. |

213

| | | |
|---|---|---|
| 16:47:57 | 1 | Q.   Do you see that? |
| 16:47:58 | 2 | A.   Yes. |
| 16:47:59 | 3 | Q.   What understanding did you have about |
| 16:48:00 | 4 | what he's talking about there? |
| 16:48:04 | 5 | A.   Just that these two guys are trying to |
| 16:48:07 | 6 | screw Pristec and screw him over.  That basically |
| 16:48:11 | 7 | -- to me, rereading that now, it makes me feel like |
| 16:48:19 | 8 | it's kind of over with or it's like we're screwed |
| 16:48:21 | 9 | here. |
| 16:48:22 | 10 | Q.   Yes.  When do you think was the first |
| 16:48:25 | 11 | time you heard about problems with TJ?  And I'm |
| 16:48:27 | 12 | referring there -- who did you believe TJ to be? |
| 16:48:30 | 13 | A.   TJ Earle. |
| 16:48:35 | 14 | Q.   Okay.  When do you remember the first |
| 16:48:36 | 15 | time hearing that TJ Earle was a problem for |
| 16:48:39 | 16 | Pristec? |
| 16:48:40 | 17 | A.   I couldn't say an exact date, but I just |
| 16:48:45 | 18 | remember overhearing just about lies and this and |
| 16:48:48 | 19 | that about Walter, about TJ, about Rudy. |
| 16:48:53 | 20 | Q.   Okay.  So when Mr. Laura is being asked |
| 16:48:58 | 21 | about money, he's telling you, we've got big |
| 16:49:01 | 22 | problems because of TJ.  Correct? |
| 16:49:03 | 23 | A.   Yes. |
| 16:49:08 | 24 | Q.   Okay.  So you were asked about back |
| 16:49:09 | 25 | statements.  I think your testimony was that you |

214

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

16:49:12  1    looked into it.  And it would cost you money to

16:49:15  2    actually go and get them, is that true?

16:49:16  3         A.   Yes.  $20 an hour.  But the time they're

16:49:20  4    done going through all those years, I didn't have

16:49:22  5    the money at the time to do it.

16:49:24  6         Q.   Well, the point I'm trying to make here

16:49:27  7    is these are not records in your possession, right?

16:49:28  8         A.   No.  I don't have them.

16:49:37  9         Q.   Okay.  And the computer that you have,

16:49:43 10    knowing now, looking at that subpoena cutoff date,

16:49:43 11    right --

16:49:43 12         A.   Yes.

16:49:45 13         Q.   -- is it possible that that computer

16:49:47 14    could have e-mails on it that relate to the period?

16:49:49 15         A.   No, not at all.

16:49:55 16         Q.   You said that 70,000 miles had been put

16:49:58 17    on the truck.  Is that the first or the second

16:50:00 18    truck?

16:50:00 19         A.   The first truck, we drove it to the

16:50:04 20    ground --

16:50:04 21         Q.   Okay.

16:50:04 22         A.   -- going to different business meetings

16:50:05 23    and everything.

16:50:07 24         Q.   Now, counsel suggested to you that

16:50:10 25    perhaps there was this period of time where

215

| | | |
|---|---|---|
| 16:50:12 | 1 | Mr. Laura was out riding around with that truck on |
| 16:50:15 | 2 | his own personal time. |
| 16:50:16 | 3 | Do you remember? |
| 16:50:17 | 4 | A.    Yes. |
| 16:50:17 | 5 | Q.    Did you gain a sense of how hard Joe |
| 16:50:22 | 6 | Laura was working for Pristec when you were working |
| 16:50:24 | 7 | with him? |
| 16:50:24 | 8 | A.    Yes.  It was like a nightmare, because I |
| 16:50:28 | 9 | was with him, and it was just like all day every |
| 16:50:31 | 10 | day, nonstop phone calls, nonstop going here, |
| 16:50:35 | 11 | nonstop everything.  In the beginning, I was just |
| 16:50:37 | 12 | like, man, I don't know if I can do this, because |
| 16:50:39 | 13 | it was crazy. |
| 16:50:43 | 14 | Q.    Did you perceive him to have all this |
| 16:50:45 | 15 | extra time to spend on personal things? |
| 16:50:50 | 16 | A.    To be honest with you, even if Joe is |
| 16:50:53 | 17 | doing something personal with his family or |
| 16:50:55 | 18 | whatever, nobody ever gets a word in with him.  His |
| 16:50:59 | 19 | kids will tell you this, his mom, his dad.  He's |
| 16:51:01 | 20 | always on the phone working.  He's always doing |
| 16:51:04 | 21 | something with Pristec.  I mean, he's like a |
| 16:51:06 | 22 | machine.  He does it all the time.  So... |
| 16:51:10 | 23 | Q.    And you were asked I think whether his |
| 16:51:12 | 24 | other -- anyone else in his family had a car. |
| 16:51:15 | 25 | Do you remember that? |

216

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

```
16:51:16   1        A.    Yes.

16:51:17   2        Q.    Are you sure that his wife didn't have a

16:51:19   3    car as well?

16:51:19   4        A.    No, I'm not sure.  I mean, I kind of --

16:51:23   5    I think earlier I said that that was the only car,

16:51:26   6    but I wasn't necessarily referring to that's the

16:51:28   7    only car in his whole family.  I just meant the car

16:51:30   8    that he uses.  But his wife may have had it car,

16:51:34   9    definitely.

16:51:34  10        Q.    Is Joe the kind of guy that you think

16:51:37  11    would ever take advantage of Pristec?

16:51:40  12        A.    You know what?  I've got to be honest

16:51:43  13    with you.  I've been through a lot of stuff, as you

16:51:45  14    can see by looking at these texts.  There's been

16:51:48  15    times where I needed none.  I've gone through a

16:51:51  16    divorce.  I've gone through just about everything I

16:51:54  17    have gone through here, and I still am here.  And

16:51:57  18    as far as I'm concerned -- and this is the truth to

16:51:59  19    I don't know whoever is listening.  I have known

16:52:02  20    this guy for a long time, and he is honestly a

16:52:05  21    loving, caring -- he's a family man.  He's not the

16:52:09  22    type of person that would take family, friends --

16:52:14  23    he would never take these people for their money.

16:52:17  24    I mean, Joe has worked so -- I can only tell you

16:52:18  25    because I've been with him so long.  He worked so
```

217

| | | |
|---|---|---|
| 16:52:21 | 1 | hard and so long just to get this going. |
| 16:52:25 | 2 | Otherwise, I never would have stayed with this guy. |
| 16:52:27 | 3 | With the money that I was making, I would have |
| 16:52:29 | 4 | never stayed here.  I would have left with my wife, |
| 16:52:30 | 5 | my kids, everything else.  But I had faith in what |
| 16:52:34 | 6 | he was doing, because I know what kind of person he |
| 16:52:36 | 7 | is. |
| 16:52:36 | 8 | So no matter what somebody else says |
| 16:52:39 | 9 | about him, oh, he's this, he's that or whatever, I |
| 16:52:41 | 10 | know because I spent so much time with him that |
| 16:52:43 | 11 | I've never heard the guy -- I mean, I've never |
| 16:52:46 | 12 | heard the guy say anything about ripping anybody |
| 16:52:49 | 13 | off or taking anybody's money.  All I've ever heard |
| 16:52:52 | 14 | him say is, oh, we've got to protect the people in |
| 16:52:54 | 15 | Pristec.  Oh, we've got to make sure that the |
| 16:52:56 | 16 | Pristec people get their money back, which I |
| 16:52:59 | 17 | appreciate because it's my mother-in-law.  But |
| 16:53:01 | 18 | basically, I mean, he's a great guy, man.  He would |
| 16:53:04 | 19 | never steal money from these people.  This is not |
| 16:53:09 | 20 | happening. |
| 16:53:10 | 21 | Q.    So counsel asked you about whether Joe |
| 16:53:13 | 22 | Laura would take off and spend time working on |
| 16:53:15 | 23 | other business ventures. |
| 16:53:17 | 24 | Do you remember that?  She asked you |
| 16:53:19 | 25 | about a couple of other different companies? |

218

| | | |
|---|---|---|
| 16:53:21 | 1 | A.    Yes. |
| 16:53:21 | 2 | Q.    And whether he was practicing law? |
| 16:53:22 | 3 | A.    Yes.  Yes. |
| 16:53:23 | 4 | Q.    Now, when you were involved with his |
| 16:53:25 | 5 | company, did you see him working on any other |
| 16:53:27 | 6 | companies? |
| 16:53:27 | 7 | A.    No, I never did.  It was only just |
| 16:53:29 | 8 | Pristec all day every day. |
| 16:53:31 | 9 | Q.    And you've been involved with this |
| 16:53:34 | 10 | company since 2011, correct? |
| 16:53:36 | 11 | A.    Yes.  Yes, 2011. |
| 16:53:39 | 12 | Q.    Do you recall it being said by Mr. Laura |
| 16:53:42 | 13 | to others, that there were some monies he was using |
| 16:53:48 | 14 | on personal items but he was taking it as a loan? |
| 16:53:52 | 15 | A.    Yes, all the time.  At first, I didn't |
| 16:53:57 | 16 | understand what he even meant by it.  He was saying |
| 16:53:59 | 17 | it so much.  But, yes, I've heard him say it -- I |
| 16:54:03 | 18 | heard him say it to Rudy.  I heard him say it to |
| 16:54:05 | 19 | Miguel in a meeting when we were out there in |
| 16:54:09 | 20 | Austria.  I've heard him say it to a number of |
| 16:54:11 | 21 | people on the phone.  I couldn't tell exactly who |
| 16:54:13 | 22 | all those people were, but I just remember him |
| 16:54:15 | 23 | always saying, "Everything I take from the company |
| 16:54:17 | 24 | is a basically a loan."  And I used to just think |
| 16:54:20 | 25 | like why is this guy repeating that to everybody? |

219

| | | |
|---|---|---|
| 16:54:23 | 1 | I just understood. |
| 16:54:25 | 2 | Q. You understood what? |
| 16:54:26 | 3 | A. I just understood that he wasn't going |
| 16:54:27 | 4 | to take a salary from the company until the company |
| 16:54:30 | 5 | started doing well and that whatever monies that he |
| 16:54:32 | 6 | took out, because he obviously needed money to live |
| 16:54:34 | 7 | and stuff, that it would be a loan that he would |
| 16:54:37 | 8 | have to pay back into the company. |
| 16:54:38 | 9 | Q. And you said you saw him say that in the |
| 16:54:40 | 10 | presence of Mr. Miguel Castillo? |
| 16:54:44 | 11 | A. Yes. Miguel and Rudy. |
| 16:54:44 | 12 | Q. Okay. |
| 16:54:46 | 13 | A. And there were several people there, |
| 16:54:48 | 14 | too. |
| 16:54:48 | 15 | Q. We've got to be very careful about what |
| 16:54:50 | 16 | the record says. |
| 16:54:51 | 17 | A. Okay. |
| 16:54:51 | 18 | Q. You can't just say Rudy. Ruediger |
| 16:54:53 | 19 | Nuerk? |
| 16:54:53 | 20 | A. Ruediger Nuerk, yes. |
| 16:54:55 | 21 | Q. From Pristec AG? |
| 16:54:58 | 22 | A. From Pristec AG. |
| 16:54:58 | 23 | Q. And when he said it to these people, did |
| 16:55:01 | 24 | they act surprised? |
| 16:55:02 | 25 | A. Not really. I mean, they weren't |

220

| | | |
|---|---|---|
| 16:55:06 | 1 | completely surprised.  I mean, at first, they |
| 16:55:09 | 2 | didn't really understand what exactly he was |
| 16:55:11 | 3 | saying, but then he made it specific.  Like, this |
| 16:55:13 | 4 | is the way I want to do it, because I don't want to |
| 16:55:15 | 5 | represent that I'm taking money out of this company |
| 16:55:17 | 6 | when people that I know and love have put money in, |
| 16:55:20 | 7 | that I'm not going to pay back until we're |
| 16:55:23 | 8 | successful. |
| 16:55:26 | 9 |         Q.    Okay.  And the conversations you've |
| 16:55:27 | 10 | described where he told this to other people, were |
| 16:55:29 | 11 | they in 2011? |
| 16:55:33 | 12 |         A.    To be honest with you, he's been saying |
| 16:55:36 | 13 | it all along.  But when I went to -- in Austria |
| 16:55:39 | 14 | with Miguel Castillo and Ruediger Nuerk, I think |
| 16:55:45 | 15 | that was 2011 or end of 2010, right around there. |
| 16:56:04 | 16 |         MR. O'CONNOR:  Okay.  That's all I have. |
| 16:56:11 | 17 |         MS. SPILLANE:  Yes.  I just want a quick |
| 16:56:14 | 18 |     question. |
| 16:56:14 | 19 | |
| 16:56:14 | 20 |             FURTHER EXAMINATION |
| 16:56:14 | 21 | BY MS. SPILLANE: |
| 16:56:14 | 22 | |
| 16:56:16 | 23 |         Q.    Mr. Martelli, did you have access to the |
| 16:56:18 | 24 | Pristec America bank account? |
| 16:56:22 | 25 |         A.    No.  Never. |

                                                                221

```
16:56:23   1        Q.    Did you have access to the Innovative
16:56:27   2   Crude Technologies bank account?
16:56:28   3        A.    No.  Never.
16:56:32   4        Q.    Okay.  Did Mr. Laura show you bank
16:56:34   5   statements or anything like that from those bank
16:56:38   6   accounts --
16:56:39   7        A.    No.
16:56:40   8        Q.    -- for assisting him?  Okay.
16:56:45   9             MS. SPILLANE:  And I just need to go off
16:56:48  10        the record real quick to see if there are any
16:56:50  11        other questions.  So we'll come back at 5:00.
16:56:57  12             THE WITNESS:  Okay.
16:56:58  13             THE VIDEOGRAPHER:  And we're going off
16:56:59  14        the record at 4:56 p.m.
16:57:01  15             (Recess)
17:00:52  16             THE VIDEOGRAPHER:  And we're back on the
17:01:15  17        record at 5:01 p.m.
17:01:17  18   BY MS. SPILLANE:
17:01:18  19        Q.    Okay.  Mr. Martelli, before we broke, I
17:01:22  20   was asking you about Pristec or Innovative Crude
17:01:26  21   Technology bank accounts.  I think you indicated
17:01:29  22   that you didn't have access to them and you never
17:01:32  23   saw them, bank statements, is that right?
17:01:35  24        A.    Right.  Yes.  That wasn't part of my
17:01:38  25   job.
```

222

```
17:01:39  1        Q.    Okay.  And did you have any

17:01:40  2   conversations with the accountant about the state

17:01:44  3   of the Pristec and Innovative Crude Technologies

17:01:48  4   bank accounts?

17:01:49  5        A.    No.

17:01:50  6        Q.    Okay.  And so your testimony before when

17:01:56  7   Mr. O'Connor was asking you some questions about

17:01:58  8   Mr. Laura, I think you indicated that you overheard

17:02:02  9   Mr. Laura telling Mr. Nuerk and Mr. Castillo that

17:02:08 10   he was taking loans from the company, is that

17:02:12 11   right?

17:02:12 12        A.    Yes.

17:02:14 13        Q.    Okay.  And that you thought this was at

17:02:18 14   the end of 2010 or the beginning of 2011?

17:02:21 15        A.    Yes, I think so.

17:02:23 16        Q.    Okay.  And was there anyone else besides

17:02:27 17   you and Mr. Laura and Mr. Nuerk and Mr. Castillo at

17:02:31 18   that discussion?

17:02:34 19        A.    There were some other people that I know

17:02:36 20   that -- I think they were on the board of Pristec

17:02:39 21   AG or whatever, but I don't know.  I never really

17:02:44 22   met those people.  The only people I knew were

17:02:48 23   Ruediger and Miguel.  Those other people, they were

17:02:51 24   there momentarily in and out, whatever, so I don't

17:02:53 25   know who any of those people are.
```

223

```
17:02:54  1        Q.    Okay.  And can you tell me what

17:02:56  2   Mr. Laura said specifically about the loan he was

17:02:59  3   taking?

17:03:00  4        A.    He just said that he was going to -- any

17:03:05  5   monies that he took from the company, he was going

17:03:07  6   to take as a loan and that he would repay it.

17:03:09  7        Q.    Okay.  And how did that subject come up,

17:03:13  8   if you recall?

17:03:13  9        A.    You know what?  I'm not sure, to be

17:03:19 10   honest with you.

17:03:20 11        Q.    Okay.  And I think you testified earlier

17:03:22 12   that Mr. Laura said he was -- any money that he

17:03:29 13   took from the company, he was going to repay, but

17:03:32 14   not until something happened with the company.  Do

17:03:37 15   I have that right?

17:03:38 16        A.    Basically -- I'm trying to think of what

17:03:42 17   I said before.  I mean, the bottom line is he said

17:03:45 18   once that he wouldn't take a salary until the

17:03:47 19   company did well.  That's what he was saying.

17:03:51 20        Q.    Okay.  All right.  And what about the

17:03:53 21   loan repayment?  Did he say when he intended to

17:03:57 22   repay the monies that he was taking from the

17:03:59 23   company?

17:03:59 24        A.    No.  Not that I can remember.  Not a

17:04:06 25   specific date.
```

224

```
17:04:08  1       Q.    Okay.  Was there a general date, like in
17:04:11  2   a year from now or two years or anything like that,
17:04:14  3   that you can remember?
17:04:16  4       A.    No.
17:04:19  5       Q.    Okay.  And did Mr. Laura, when he was
17:04:22  6   talking about this, have bank statements or any
17:04:25  7   other -- did he say like, here's how much I've
17:04:28  8   taken so far, and here's how much I'm intending to
17:04:31  9   take on an ongoing basis?
17:04:33 10       A.    No.
17:04:35 11       Q.    All right.  And I think you had also
17:04:40 12   said in your conversation with Mr. O'Connor that
17:04:42 13   you heard Mr. Laura say similar things about taking
17:04:47 14   money from the company outside of this meeting with
17:04:52 15   Mr. Nuerk and Mr. Castillo, is that right?
17:04:55 16       A.    Yes.
17:04:56 17       Q.    Okay.  And were these meetings with
17:05:05 18   other people where you heard Mr. Laura say this?
17:05:08 19       A.    Oh, no.  Basically, I'd hear him on the
17:05:11 20   phone.  When we're driving around, I'd hear him say
17:05:14 21   it.  I heard him say it numerous times on different
17:05:19 22   locations.  Like I said, I don't know exactly who
17:05:20 23   he was saying it to, because I don't know who's on
17:05:24 24   the other end of the phone all the time, but I
17:05:25 25   heard it several times over the course of years.
```

225

| | | |
|---|---|---|
| 17:05:28 | 1 | Q.    Okay.  So which -- around when did you |
| 17:05:30 | 2 | hear him have -- say the first time you heard him |
| 17:05:34 | 3 | talking to somebody on the phone and making a |
| 17:05:37 | 4 | statement about the loan? |
| 17:05:38 | 5 | A.    I couldn't tell you, to be honest.  I |
| 17:05:42 | 6 | mean, I would be lying if I gave you two dates.  I |
| 17:05:45 | 7 | don't know exactly when.  I just know because when |
| 17:05:48 | 8 | I first heard it the first couple of times, I was |
| 17:05:52 | 9 | thinking to myself, like, hmm.  But then I just got |
| 17:05:57 | 10 | used to hear hearing it.  That's why this is one of |
| 17:06:00 | 11 | those things that sticks out.  But as far as time |
| 17:06:02 | 12 | goes, I couldn't tell you. |
| 17:06:03 | 13 | Q.    Okay.  And I think you testified earlier |
| 17:06:05 | 14 | that you were -- you as a general habit and |
| 17:06:11 | 15 | practice were not -- you did not attend any |
| 17:06:14 | 16 | meetings with investors and you did not -- you |
| 17:06:16 | 17 | weren't a part of any communications that Mr. Laura |
| 17:06:19 | 18 | had with investors, is that right? |
| 17:06:20 | 19 | A.    Yes. |
| 17:06:21 | 20 | Q.    Okay.  And the same goes for business |
| 17:06:26 | 21 | meetings, other than the two you were at in |
| 17:06:31 | 22 | Austria, is that right? |
| 17:06:32 | 23 | A.    Yes, pretty much.  I mean, I'm not |
| 17:06:36 | 24 | saying I've never sat at a dinner at some point in |
| 17:06:40 | 25 | time over the years where there's associates or |

226

```
17:06:41   1   people around talking about stuff, but I wouldn't
17:06:44   2   know what the heck or when that was.  But I made it
17:06:47   3   a practice to -- I wasn't needed or necessarily
17:06:52   4   wanted in those meetings.
17:06:58   5        Q.   Okay.  And so I just want to make sure
17:07:01   6   then.
17:07:02   7             So this conversation -- this statement
17:07:05   8   that you heard Mr. Laura say about taking loans
17:07:08   9   from the company, that was in the meeting with
17:07:13  10   Mr. Nuerk and Mr. Castillo.  And then, after that,
17:07:16  11   you only ever heard him say that on the phone, is
17:07:21  12   that right?
17:07:21  13        A.   Yes.
17:07:24  14        Q.   Okay.  And you can't remember when those
17:07:26  15   phone conversations might have taken place?
17:07:29  16        A.   You know, I heard it so many times that
17:07:31  17   there's no way I could remember.  It was ongoing.
17:07:35  18   It was like going on for years at a time.
17:07:39  19        Q.   Okay.  And did you hear Mr. Laura when
17:07:42  20   he would tell these people or whoever it was on the
17:07:48  21   other end of the phone how much money he had
17:07:51  22   already taken?
17:07:52  23        A.   No.
17:07:56  24        Q.   Any reference to, I provided you bank
17:08:00  25   statements or anything like that, that you heard
```

227

| | | |
|---|---|---|
| 17:08:05 | 1 | him say anything specific about the amount that he |
| 17:08:07 | 2 | had taken or that he would -- he was planning to |
| 17:08:10 | 3 | take? |
| 17:08:10 | 4 | A.    No.  No.  Never.  Not really. |
| 17:08:15 | 5 | Q.    Okay.  And the conversation that you |
| 17:08:18 | 6 | recall in Austria with Mr. Nuerk and Mr. Castillo, |
| 17:08:22 | 7 | do you remember anything else that they were |
| 17:08:24 | 8 | discussing other than the money that Laura was |
| 17:08:29 | 9 | taking? |
| 17:08:34 | 10 | A.    You know, it was an ongoing |
| 17:08:37 | 11 | conversation.  I mean, in the office, over dinner. |
| 17:08:39 | 12 | I mean, they were talking about everything from the |
| 17:08:41 | 13 | technology to what they thought it could do, what |
| 17:08:45 | 14 | certifications they had.  Just -- it was just |
| 17:08:50 | 15 | business talk.  But to be honest with you, you |
| 17:08:53 | 16 | know, I just wanted to get out of there.  I mean, |
| 17:08:56 | 17 | they were just talking about all types of stuff.  I |
| 17:08:59 | 18 | mean, it wasn't just that.  I don't remember.  I |
| 17:09:03 | 19 | mean, mostly I guess technology.  I remember Rudy |
| 17:09:06 | 20 | talking about his poker, his bad gambling poker |
| 17:09:12 | 21 | habit that he has.  I mean, just little stuff like |
| 17:09:16 | 22 | that.  Nothing really that specific, though, except |
| 17:09:18 | 23 | for that. |
| 17:09:20 | 24 | Q.    Okay.  And then so I just want to |
| 17:09:21 | 25 | confirm, you never heard Mr. Laura explain to any |

228

17:09:25  1    investor that -- well, I'll ask it a different way.

17:09:30  2            Did you ever hear Mr. Laura explain to

17:09:32  3    any investor that he was taking money from the

17:09:35  4    company?

17:09:37  5        A.    That he was taking money what, other

17:09:39  6    than a loan?

17:09:41  7        Q.    Taking money as a loan or -- I think you

17:09:44  8    also said something about he wasn't going to take a

17:09:47  9    salary until Pristec -- something happened with

17:09:52 10    Pristec?

17:09:54 11        A.    Yes.  You know, I never -- no, I never

17:09:56 12    heard him -- can you repeat the question, actually,

17:10:01 13    the first question?

17:10:02 14        Q.    Did you ever hear Mr. Laura make that

17:10:05 15    same statement to an investor, to somebody you knew

17:10:07 16    was an investor or potential investor?

17:10:09 17        A.    No, because I wouldn't know who he was

17:10:12 18    talking to was an investor necessarily or -- so,

17:10:16 19    yes, no.

17:10:22 20            MS. SPILLANE:  Okay.  I don't think we

17:10:24 21        have any more questions.  We'll go off the

17:10:25 22        record.  Thank you for your time.

17:10:27 23            THE WITNESS:  Thank you.

17:10:30 24            MR. O'CONNOR:  Have a good night,

17:10:31 25        everybody.

                                                              229

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

| | | |
|---|---|---|
| 17:10:32 | 1 | MS. SPILLANE:  Good night. |
| 17:10:34 | 2 | THE VIDEOGRAPHER:  And this concludes |
| | 3 | today's videotaped deposition of Joseph |
| | 4 | Martelli.  We're going off the record at 5:10 |
| | 5 | p.m. |
| | 6 | (Proceedings concluded at |
| | 7 | 5:10 P.M. E.S.T.) |
| | 8 | |
| | 9 | |
| | 10 | |
| | 11 | |
| | 12 | |
| | 13 | |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

230

```
 1                    C E R T I F I C A T E

 2      STATE OF NEW YORK )

 3                       ) ss.:

 4      COUNTY OF NEW YORK)

 5             I, Christina Diaz, a Certified Realtime

 6      Captioner, Registered Merit Reporter and Certified

 7      Realtime Reporter and Notary Public within and for

 8      the State of New York, do hereby certify:

 9             That JOSEPH MARTELLI, the witness whose

10      deposition is hereinbefore set forth, was duly

11      sworn by me and that such deposition is a true

12      record of the testimony given by such witness on

13      April 14, 2021.

14             I further certify that I am not related

15      to any of the parties to this action by blood or

16      marriage and that I am in no way interested in the

17      outcome of this matter.

18      Dated:  April 18, 2021

19

20             _____
               CHRISTINA DIAZ
21             NCRA Certified Realtime Captioner
               NCRA Certified Realtime Reporter
22             NCRA Registered Merit Reporter
               NYS Certified Shorthand Reporter
23

24

25
                                                        232
```