UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

JOSEPH M. LAURA and ANTHONY R.
SICHENZIO,

Defendants,

**MEMORANDUM & ORDER**
18-cv-05075 (HG) (VMS)

**HECTOR GONZALEZ**, United States District Judge:

Before the Court is the Securities and Exchange Commission's ("SEC") motion for

monetary remedies against Defendants Joseph M. Laura and Anthony R. Sichenzio, *see* ECF No.

180 (Motion for Damages), and Defendants' opposition thereto, *see* ECF No. 182 (Opposition to

Motion for Damages and Exhibits).  The SEC seeks an order imposing disgorgement, civil

penalties, and prejudgment interest on Defendants.  For the reasons set forth below, the SEC's

motion is granted in part.

## BACKGROUND

The Court assumes the parties' familiarity with the factual background and procedural

history of this action, as set forth in the Court's prior Order granting in part and denying in part

the SEC's motion for summary judgment and denying Defendants' motion for summary

judgment, *see SEC v. Laura*, 680 F. Supp. 204, 216–20 (E.D.N.Y. 2023) ("*Laura II*"), and

therefore only summarizes the background below as relevant to the instant motion.

### I.    Procedural History

The SEC initiated this action on September 7, 2018, and, after the Court issued its

decision on the parties' summary judgment motions, Defendants reached an agreement with the

SEC on two partial consent judgments.  ECF No. 174 (Motion to Approve Consent Judgments).

On August 22, 2023, the Court so-ordered the parties' partial consent judgments (the "Consent

Judgments"), which permanently restrained and enjoined Laura and Sichenzio from violating:

(1) Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §

78j(b)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5); and (2) Section 17(a) of

the Securities Act of 1933 (the "Securities Act") (15 U.S.C. § 77q(a)).  ECF No. 175 at 1–3, 12–

14 (So-Ordered Consent Judgments).[1]  The Consent Judgment with respect to Laura also

permanently restrained and enjoined him from violating Section 15(a) of the Exchange Act (15

U.S.C. § 78o(a)).  *Id.* at 3.

The Consent Judgments ordered the Defendants to pay "disgorgement of ill-gotten gains,

prejudgment interest thereon, and a civil penalty" pursuant to Section 20(d) of the Securities Act

and Section 21(d)(3) of the Exchange Act, in an amount to be determined by the Court upon the

SEC's motion.  *Id.* at 4, 14.  In connection with the Consent Judgments, Defendants consented to

the entry of judgment "without admitting or denying the allegations of the Complaint" except

that each Defendant agreed that, in connection with the SEC's motion for disgorgement and/or

civil penalties, he would be "precluded from arguing that he did not violate the federal securities

laws as alleged in the Complaint and found by the Court in its June 28, 2023 Memorandum and

Order" and that "the allegations of the Complaint shall be accepted as and deemed true by the

Court."  *Id.* at 1, 4, 12, 14.  The Defendants agreed that the Court could "determine the issues

raised in [the motion for disgorgement and/or civil penalties] on the basis of affidavits,

declarations, excerpts of sworn deposition or investigative testimony, and documentary evidence,

without regard to the standards for summary judgment contained in Rule 56(c) of the Federal

---

[1]       The Court refers to the pages assigned by the Electronic Case Files system ("ECF").

Rules of Civil Procedure." *Id.* at 4, 14–15.  Finally, the Consent Judgments provide that "[p]rejudgment interest shall be calculated from June 1, 2013, based upon the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26 U.S.C. § 6621(a)(2)." *Id.* at 4, 14.

On November 17, 2023, the SEC filed its motion for damages, attaching declarations from Neil Hendelman, a Supervisory Staff Accountant at the SEC, *see* ECF No. 178 (Hendelman Declaration and Exhibits), and Victor Suthammanot, a Senior Trial Counsel at the SEC, *see* ECF No. 179 (Suthammanot Declaration and Exhibits).  On January 5, 2024, Defendants filed their joint opposition, which included declarations from each Defendant.  ECF No. 182.  The SEC filed its reply in support of its motion on January 26, 2024, *see* ECF No. 183 (Reply in Support of Motion for Damages) attaching new declarations from Hendelman, *see* ECF No. 184 (the "Second Hendelman Declaration") and Margaret Spillane, a Senior Counsel at the SEC, *see* ECF No. 185 (the "Spillane Declaration").

## II.    Relevant Factual Background

Pursuant to the Consent Judgments, the parties have agreed that the Court shall accept as true the allegations in the Complaint in deciding the SEC's motion for damages.  Accordingly, unless otherwise indicated, the facts set forth herein are taken from the Complaint.  Defendants misappropriated and misused investor funds through the "fraudulent offer and sale of securities" of Pristec America, Inc. ("PAI"), a U.S. company that was incorporated in New Jersey and Nevada, and Pristec AG ("PAG"), an Austrian company that held the rights to a crude oil processing technology.  ECF No. 1 ¶¶ 1, 16, 18 (Complaint).  Laura introduced Sichenzio to PAI in April 2010, and at some point thereafter, he and Sichenzio came to hold equal ownership shares in PAI through another company called Innovative Crude Technologies, Inc. ("ICT" and,

together with PAI, "ICT/PAI"). *Id.* ¶¶ 17–19, 22.  Through ICT, Laura and Sichenzio also held

an equity interest in PAG that, at one point, constituted 33% of the company. *Id.* at 17.  Laura

and Sichenzio's relationship pre-dated their involvement with ICT/PAI, and Laura allegedly

owed Sichenzio a significant sum of money prior to introducing Sichenzio to PAI. *Id.* ¶ 19.

Laura and Sichenzio offered and sold securities in the form of revenue sharing, stock

purchase, and convertible loan agreements, "which Laura both drafted and signed, and Sichenzio

signed." *Id.* ¶ 2.  These contracts and Defendants' "oral solicitation of investors contained a

variety of fraudulent misrepresentations and omissions of material facts concerning the purported

oil processing technology, how Defendants would use investors' funds, the financial condition of

PAI and Defendants' purported investments in it." *Id.* ¶¶ 2, 45–46.  According to the Complaint,

only a small portion of the money that Defendants raised went to legitimate business uses—

instead, Defendants misappropriated millions of dollars for their own personal use through

transfers, cash withdrawals, checks, and direct spending, including to pay back personal loans.

*Id.* ¶¶ 3, 30–41, 49–54.  PAG was dissolved in 2021, and its assets were sold by the bankruptcy

administrator, "wip[ing] out" PAG's shareholders and creditors. *Laura II*, 680 F. Supp. 3d at

220.

## **LEGAL STANDARD**

### I.    **Disgorgement**

"Where a party violates the federal securities laws, th[e] [c]ourt has broad discretion not

only to order the disgorgement of any ill-gotten gains, but also to determine the amount to be

disgorged." *SEC v. Universal Exp., Inc.*, 646 F. Supp. 2d 552, 562–63 (S.D.N.Y. 2009),[2] *aff'd*,

438 F. App'x 23 (2d Cir. 2011); *see also SEC v. Contorinis*, 743 F.3d 296, 301 (2d Cir. 2014)

---

[2]    Unless otherwise noted, when quoting judicial decisions, this Order accepts all alterations
and omits internal quotation marks, citations, and footnotes.

(same). However, disgorgement is to be "remedial rather than punitive," *see SEC v. Cavanagh*, 445 F.3d 105, 117 n.25 (2d Cir. 2006), and courts may not enter "disgorgement awards that exceed the gains made upon any business or investment" and should "deduct legitimate expenses before ordering disgorgement." *Liu v. SEC*, 591 U.S. 71, 91–92 (2020). However, "specific tracing [is] unnecessary in ordering disgorgement for securities fraud." *Contorinis*, 743 F.3d at 303 n.3. Indeed, courts have recognized that "separating legal from illegal profits exactly may at times be a near-impossible task." *SEC v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013). Thus, "the amount of disgorgement ordered need only be a reasonable approximation of profits causally connected to the violation, and any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." *SEC v. de Maison*, No. 18-2564, 2021 WL 5936385, at *2 (2d Cir. Dec. 16, 2021) (citing *Razmilovic*, 738 F.3d at 31). In determining disgorgement, "[o]nce the SEC has met the burden of establishing a reasonable approximation of the profits causally related to the fraud, the burden shifts to the defendant, who is obliged clearly to demonstrate that the disgorgement figure was not a reasonable approximation." *Id.* at 32.

### III.  Civil Penalties

The Securities Act and the Exchange Act authorize the SEC to seek the imposition of civil money penalties. *See* 15 U.S.C. §§ 77t(d), 78u(d)(3). Civil penalties serve "the dual goals of punishment of the individual violator and deterrence of future violations." *SEC v. Moran*, 944 F. Supp. 286, 296 (2d Cir. 1996). Under the "identical schemes" for civil penalties provided in the Securities Act and the Exchange Act, there is a three-tiered penalty system under which the highest tier requires a showing of "fraud, deceit, manipulation, or deliberate or reckless disregard of the law," and that the conduct "result[ed] in substantial losses or create[d] a significant risk of substantial losses to the other persons." *SEC v. Tamarind Invs., Inc.*, No. 20-cv-0007, 2021 WL

12096112, at *9 (S.D.N.Y. Feb. 1, 2021); *see also* 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii). The statutes provide that, for all three tiers "the amount of the penalty that the Court can impose, per violation, shall not exceed the greater of the current statutory amount in effect at the time of the violation, *or* the gross amount of pecuniary gain to such defendant." *SEC v. Shkreli*, No. 15-cv-7175, 2022 WL 5441792, at *3 (E.D.N.Y. Feb. 23, 2022).[3]  Courts have found that "[a] defendant's disgorgement amount is a helpful starting point for calculating that defendant's gross pecuniary gain." *SEC v. Arias*, No. 12-cv-2937, 2021 WL 7908041, at *8 (E.D.N.Y. Nov. 11, 2021).  However, beyond setting maximum penalties, "the statutes leave the actual amount of the penalty up to the discretion of the district court." *Razmilovic*, 738 F.3d at 38.  In exercising this discretion and determining whether civil penalties should be imposed and the amount of any such penalties, courts in the Second Circuit look to a number of factors, including:  "(1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition." *Fowler*, 6 F.4th at 266 (the "*Fowler* Factors").

## DISCUSSION

### I.    Disgorgement

The SEC explains that investors suffered a pecuniary loss of almost $12 million due to Defendants' fraud and asks the Court to order Laura to pay $3,431,860 in disgorgement and

---

[3]    "[V]iolation is not defined by the statutory scheme," *SEC v. Fowler*, 6 F.4th 255, 264 (2d Cir. 2021), and courts have interpreted the phrase in different ways.  *Compare Fowler*, 6 F.4th at 264 (finding that the district court did not err in "treating each defrauded customer as a separate unit of violation in imposing civil penalties") *with SEC v. Shehyn*, No. 04-cv-2003, 2010 WL 3290977, at *2 (S.D.N.Y. Aug. 9, 2010) (counting each violation of a statutory provision as a unit of violation in imposing civil penalties).

Sichenzio to pay $1,679,369 in disgorgement.  ECF No. 180 at 13–16; ECF No. 183 at 5–11.

After reviewing the parties' submissions regarding disgorgement, the Court is satisfied that the

requested disgorgement awards (aside from one adjustment to Sichenzio's disgorgement

calculation), are a "reasonable approximation of profits causally connected" to the Defendants'

misconduct, *see de Maison*, 2021 WL 5936385, at *2, that "deduct legitimate expenses," *Liu*,

591 U.S. at 91–92.

### A. Disgorgement as to Laura

To establish Laura's ill-gotten gains, the SEC first determined that Laura's gross

pecuniary gain from Defendants' fraud was $5,462,050 by adding together:  (1) investor funds

that Laura deposited directly into his personal bank account and then used for personal expenses,

*see* ECF No. 178-1; (2) investor funds sent to Laura's law firm accounts that were not transferred

onward to PAI bank accounts, *see* ECF No. 178-3 at 2, ECF No. 178-4; (3) net transfers from

PAI bank accounts to Laura (subtracting out any transfers from Laura to the PAI bank accounts),

*see* ECF No. 178-6, ECF No. 178-9; (4) net transfers from ICT accounts to Laura (subtracting

out any transfers from Laura to the ICT bank accounts), *see* ECF No. 178-5, ECF No. 178-10;

(5) cash and equivalent withdrawals by Laura from PAI bank accounts, *see* ECF No. 178-6, ECF

No. 178-11; (6) cash and equivalent withdrawals by Laura from ICT bank accounts, *see* ECF No.

178-5, ECF No. 178-11; (7) money Laura spent on personal expenses directly from PAI accounts

(net of refunds or repayments), *see* ECF No. 178-12; and (8) money Laura spent on personal

expenses directly from ICT accounts (net of refunds or repayments), *see* ECF No. 178-12.  ECF

No. 180 at 9–14.  In calculating these figures, the SEC netted out any expenses that it determined

to be legitimate business expenses based on information provided by Defendants.  ECF No. 180

at 13–14.

After determining Laura's gross pecuniary gain, the SEC then looked at substantiated loan amounts guaranteed by Laura and determined that, based on a December 2018 option agreement evidencing a total of $2,030,200 in loans related to ICT/PAI that Laura had guaranteed over time, *see* ECF No. 182-29, $2,030,200 should be subtracted from Laura's gross pecuniary gain to determine his net pecuniary gain of $3,431,860.  ECF No. 183 at 5–9.  Based on a close review of the materials the SEC provided to support its calculations and the significant efforts made to deduct legitimate expenses from those calculations, the Court is confident that $3,431,860 is a reasonable approximation of Laura's profits causally related to his fraud.  *See, e.g.*, *Liu*, 591 U.S. at 91–92; *Razmilovic*, 738 F.3d at 31; *de Maison*, 2021 WL 5936385, at *2. Accordingly, Laura bears the burden of demonstrating that the SEC's figure is not a reasonable approximation.  *de Maison*, 2021 WL 5936385, at *2.

Laura raises the following disputes with respect to the SEC's calculation.  First, he seeks credit for an additional $515,000 in loans that he alleges were used to "offset/repay advances" previously made to him.  He submits five promissory notes relating to these loans.  ECF Nos. 182-23–182-27.  However, as the SEC correctly points out, the notes themselves do not address the purpose of each loan, and Laura offers no proof that the proceeds from each loan were used to further ICT/PAI business interests rather than his own personal interests.  ECF No. 183 at 10.

Next, he argues that certain monetary transfers and expenses for travel, housing, furniture, transportation, insurance, and certain cash withdrawals and transfers are legitimate business expenses without pointing to any specific proof of validity for each expense identified by the SEC such as contracts or consulting agreements, reimbursement reports, emails, or contemporaneous documentation reflecting a business purpose.  ECF No. 182-1 ¶¶ 24, 27, 3–33, 38, 47–48, 50–52, 59–65, 81–82.  The Court cannot rely on Laura's say-so, which is not always

accurate,[4] to contradict the SEC's reasonable approximation.  And, Laura offers no testimony to support his theory that reasonable business expenses included using investor funds in a company that was not yet profitable to cover gym memberships and private drivers for executives.[5]  *Id.* ¶¶ 50, 55–58.

Laura also argues that certain funds paid to him by ICT/PAI, which the SEC characterizes as misappropriations, "were embodied within a formal loan from ICT" to him in the total sum of $1.2 million and were "booked" as loans, asserting that "there are documents to that effect."  *Id.*  ¶¶ 83–84, 119.  Although he attaches declarations and excerpts from deposition testimony establishing that certain investors and board members were aware that he had lent money to himself, *see, e.g.*, ECF No. 182-16; ECF No. 182-19; ECF No. 182-20; ECF No. 182-34, Laura does not attach any documents memorializing that loan or anything resembling a repayment schedule.  Instead, he asks the Court to reduce his disgorgement amount by $1.2

---

[4]     For example, Laura asserts that his payments to Thomas Black were for critical consulting work that Black did for ICT/PAI and that Black reported and paid taxes on the income he received, citing to Mr. Black's deposition testimony for support.  ECF No. 182-1 ¶ 26.  However, Mr. Black's deposition testimony reflects a far more informal relationship with an individual who had no prior experience in the oil and gas industry but had certain connections, in which Mr. Black would ask Laura to "help [him] out" and Laura would do so by sending money to Mr. Black "if the company had any money."  ECF No. 182-3 at 14–30.  And the excerpts of Mr. Black's testimony that Laura attached to his declaration do not include any mention of Mr. Black paying taxes on the money he received from ICT/PAI.  *See generally* ECF No. 182-3.

[5]     Although Laura avers that Atlas is "a legitimate New York limousine company run by Viktor Ivanov," and that therefore "it would not be equitable to impose disgorgement for payments made to Atlas Limo," ECF No 182-1 ¶¶ 56–57, he fails to acknowledge Mr. Sichenzio's 2014 deposition testimony that Atlas was a corporation established by his personal drivers, that he owned the vehicles used by Atlas Limo, used its vehicles for himself on a daily basis, used Atlas to pick up his son from school, and used Atlas to get to his office at Wunderlich Securities.  ECF No. 179-3.  In this context, and in the absence of documentary evidence such as receipts, communications, or reimbursement reports, that identify specific trips and their business purpose, the Court cannot conclude that the specific payments to Atlas identified by the SEC served legitimate business purposes and were not just another method of funneling money to Sichenzio.

million based on his assertion that, over time, he paid ICT/PAI more than $1.2 million, effectively repaying the loan.[6]  ECF No. 182-1 ¶ 119.  Alternatively, he asks the Court to omit the $1.2 million from its disgorgement calculation and instead give him "a reasonable period of time in which to repay" it, again without providing the Court with anything resembling a loan agreement or schedule for repayments.

Finally, despite agreeing in the Consent Judgment that, for the purposes of this motion, the allegations in the Complaint shall be taken as true, which include allegations that Laura and Sichenzio misappropriated investor funds, Laura appears to argue that the Court should credit an arbitrator's 2019 finding in a separate action that he and Sichenzio had not "misappropriated even a penny."  ECF No. 182-1 ¶ 46.

Mindful that "any risk of uncertainty should fall on" Laura, "whose illegal conduct created [the] uncertainty," the Court cannot find that Laura has met his burden of demonstrating that the issues he raises make the SEC's disgorgement figure unreasonable or that the Court should further offset the amount put forward by the SEC.  Laura has not produced contemporaneous documentation to demonstrate that the expenses the SEC characterizes as improper actually served a legitimate business purpose or that investors were aware that their funds would be spent, for example, on gym memberships and home furniture.  With respect to the alleged $1.2 million loan, the SEC has provided a reasonable approximation of investor money that Laura misappropriated that nets out any money he may have paid or transferred to ICT/PAI over the relevant period, and thus would necessarily take into account any loan repayments Laura allegedly made.  Accordingly, the Court will not decrease Laura's

---

[6]     Laura also argues that the SEC failed to credit him with certain funds he contributed to ICT/PAI—as the SEC explains in its reply in support of its motion and the attached Hendelman Declaration, this does not appear to be the case.  ECF No. 183; ECF No.184.

disgorgement amount any further to account for this loan.[7]  The Court is satisfied that the SEC's proposed disgorgement amount as to Laura is a reasonable approximation of profits causally connected to his violation, and Laura has not demonstrated otherwise.  Accordingly, the Court orders Laura to pay $3,431,860 in disgorgement.

### B.  Disgorgement as to Sichenzio

To establish Sichenzio's ill-gotten gains, the SEC first determined that Sichenzio's gross pecuniary gain from Defendants' fraud was $1,869,976 by adding together:  (1) investor funds that Sichenzio deposited directly into his personal bank account and then used for personal expenses, *see* ECF No. 178-2; (2) net transfers from PAI bank accounts to Sichenzio (subtracting out any transfers from Sichenzio to the PAI bank accounts), *see* ECF No. 178-6, ECF No. 178-7; and (3) net transfers from ICT accounts to Sichenzio (subtracting out any transfers from Sichenzio to the ICT bank accounts), *see* ECF No. 178-5, ECF No. 178-8.

After determining Sichenzio's gross pecuniary gain, the SEC first accounted for a $150,000 loan that Laura and Sichenzio jointly and severally guaranteed, and allocated 50% of the value of that loan ($75,000) to Sichenzio to avoid double-counting.  ECF No. 180 at 11; ECF No. 182-28.[8]  Next, the SEC offset Sichenzio's disgorgement by the $115,607 paid by his wife

---

[7]     Laura argues that the Court should decrease his disgorgement amount by $1.2 million to account for the loan he allegedly took from ICT/PAI while also asserting that he has repaid the loan in full.  In support of this argument, he cites to a case in which the court agreed to offset the defendant's disgorgement amount by the amount the defendant had agreed to pay to settle a related private litigation by his former company "to convey the fact that the award is not punitive" provided that the defendant filed proof of full payment within 20 days.  ECF No. 182 at 10 (citing *SEC v. Razmilovic*, 822 F. Supp. 2d 234, 277 (E.D.N.Y. 2011)).  This case is distinct from *Razmilovic*—Laura himself asserts that he has repaid the amount that he received as a loan and he has not pointed to a loan agreement, repayment schedule or any other evidence to suggest that the loan is outstanding and he intends to return the money to ICT/PAI independently.

[8]     Laura's portion of the same loan was accounted for in the total amount of $2,030,200 in loans that the SEC found Laura had guaranteed over time and subtracted from Laura's gross pecuniary gain.

for travel related to individuals associated with ICT/PAI for which the SEC could discern sufficient evidence of business purpose.  ECF No. 183 at 11; ECF No. 185.  After offsetting these amounts, the SEC determined that Sichenzio's net pecuniary gain from Defendants' fraud was $1,679,369.  As with Laura, after reviewing the materials provided by the SEC in support of its calculations, the Court agrees that the SEC has offered a reasonable approximation of Laura's profits causally related to Sichenzio's fraud.  Accordingly, the burden of demonstrating that the SEC's figure is not a reasonable approximation shifts to Sichenzio.  *de Maison*, 2021 WL 5936385, at *2.

Like Laura, Sichenzio disputes the SEC's conclusion that certain payments for transportation expenses, in particular payments to Atlas Limo, are not legitimate business expenses.  ECF No. 182-37 ¶¶ 43–48 (Sichenzio Declaration).  As addressed in note 5, *supra*, Sichenzio and Laura cannot meet their burden with respect to these payments in the absence of supporting evidence.  Sichenzio also argues that the SEC should deduct from his disgorgement amount travel charges paid by his brother, Richard Sichenzio, that were allegedly for ICT/PAI business.  ECF No. 182-38 at 141–58.  Again, he cannot meet his burden both because he does not offer any evidence that he was somehow liable for these charges and because it appears that Richard Sichenzio was in fact already reimbursed for these charges himself.  ECF No. 184-1; ECF No. 185 ¶¶ 9–10.

Sichenzio's final dispute is more complicated.  The SEC and Sichenzio agree that between 2010 and 2012, Sichenzio transferred a net amount of roughly $1,145,500 to a bank account associated with Laura's law firm.[9]  However, the parties disagree as to the purpose of

---

[9]     This $1,145,500 net amount is comprised of:  2010 transfers from Sichenzio that total $1,140,500; a 2011 transfer from Sichenzio in the amount of $50,000; and a 2012 transfer to Sichenzio of $45,000.  ECF No. 178-3.

these transfers.  The SEC argues that the money Sichenzio deposited into Laura's law firm account between 2010 and 2012 should not be used to offset his disgorgement obligation because either:  (1) the funds were investments that were used to purchase shares of PAG, or (2) the funds were loans that were improperly repaid because investors were not told Sichenzio's loans would be repaid with their funds.  ECF No. 180 at 16.  The SEC's uncertainty as to the purpose of this money appears to be a product of Defendants' own making.  According to the Complaint: "Sichenzio claimed in separate FINRA and SEC investigations that the funds he took from PAI were repayments for funds he earlier contributed," but "Laura and Sichenzio claimed to investors and other individuals associated with PAI that Sichenzio's initial payments were, in fact, investments but that Sichenzio's lawyer advised to describe these payments as loans or advances in order to minimize liability."  ECF No. 1 ¶ 96.

Defendants, on the other hand, argue that to gain equity in ICT/PAI, Sichenzio forgave the approximately $1 million he had previously loaned to Laura in connection with other projects.  ECF No. 182-37 ¶¶ 8–11; ECF No. 182-1 ¶ 8; ECF No. 182 at 12.  Defendants then argue that between 2010 and 2012, Sichenzio agreed to loan "substantial funds to Pristec early on in this relationship with the expectation that [he] would be paid back."  ECF No. 182-37 ¶ 12. Sichenzio seeks to offset his disgorgement obligations by "the $1 million that [he] forgave in prior loans to gain participation in the U.S. Pristec Companies" because the equity that he received in exchange for that forgiveness is now "worthless."  ECF No. 182-37 ¶¶ 40–42; ECF No. 182 at 12.  He further seeks to offset his disgorgement by the roughly $1,145,500 net amount that he alleges he was repaid in connection with the money he loaned to ICT/PAI between 2010 and 2012.  *Id.*

As an initial matter, Sichenzio does not point to any evidence, aside from his and Laura's say-so, to support the existence of a prior $1 million loan that was forgiven to gain equity in ICT/PAI.[10]  Based on this record, the Court cannot find that Defendants have met their burden on this point, especially since there are clear records demonstrating that Sichenzio transferred a similar amount to a bank account associated with Laura's law firm in 2010.  ECF No. 178-3 at 3. And, even if the Court were to accept that the loan was forgiven in exchange for equity, at the time Sichenzio forgave the loan he did in fact gain something of value—equity in ICT/PAI, which he apparently valued at roughly $1 million.  ECF No. 183 at 10.  That the equity he received is now, more than ten years later, "worthless," in part due to his own misconduct, is not a reason to unwind the prior transaction.[11]

With respect to the $1,145,500 net amount that Sichenzio provided to ICT/PAI between 2010 and 2012 through Laura's law firm bank accounts, Sichenzio argues that a corresponding amount should be offset from his disgorgement because those contributions were a loan and any funds he received from ICT/PAI in that amount were to repay those loans.  ECF No. 182-37 ¶¶ 12–27.  Again, aside from his and Laura's say-so, Sichenzio does not point to any proof, such as a loan agreement, that this money was in fact provided as a short-term loan with the expectation that it would be repaid with investor funds.  Given the lack of documentary evidence, it is equally plausible that, as alleged in the Complaint and by the SEC, the money Sichenzio provided was used to purchase shares of PAG and/or ICT/PAI, making it a capital contribution

---

[10]    While the Complaint acknowledges that Laura owed money to Sichenzio from prior business dealings, it does not assert that this loan was forgiven in 2010 in exchange for equity in ICT/PAI.  ECF No. 1 ¶ 19.

[11]    The Court also notes that, as the SEC points out, crediting Sichenzio's disgorgement by $1 million for this alleged prior loan would provide him with a $1 million benefit that other investors, who are still holding on to their "worthless" equity, would not receive.

for which Sichenzio received equity in return (either in ICT/PAI or in PAG, through his 50% stake in ICT/PAI).  ECF No. 180 at 16; ECF No. 1 ¶ 19.[12]   As explained above, money provided for such a purpose would not be appropriately offset against Sichenzio's disgorgement.

Given the lack of testimonial or documentary evidence provided by the parties to support their respective positions, it is difficult for the Court to determine the purpose of the Sichenzio contributions at issue, with one exception.  The SEC's argument that Sichenzio's contributions in 2010 and 2011 were investments in exchange for which he received equity is premised on an assumption that the contributions were used to secure either his stake in ICT/PAI or ICT/PAI's stake in PAG.  *See generally* ECF No. 1; ECF No. 180.  However, the Complaint alleges that ICT acquired its equity interest in PAG in "early 2011," ECF No. 1 ¶ 17, and, in connection with its Order on the parties' motions for summary judgment, the Court found as an undisputed fact that ICT acquired an equity interest in PAG in 2010, *see Laura II*, 680 F. Supp. 3d at 216.  And, the Complaint alleges that Sichenzio's involvement with ICT/PAI began in 2010.  ECF No. 1 ¶ 19.  However, the 2011 contribution of $50,000 to Laura's law firm bank account for which the SEC alleges Sichenzio should not be credited was made on May 6, 2011, and thus appears to post-date both the date on which ICT acquired its interest in PAG and the date on which Sichenzio's involvement with ICT/PAI began.  *See* ECF No. 182-38 at 21; ECF No. 178-3 at 3. Accordingly, the Court cannot find that this specific transfer constitutes an investment in exchange for equity and it must be subtracted from Sichenzio's disgorgement like his other contributions to ICT/PAI to ensure that the amount of his disgorgement does not exceed his "net profits."  *Liu*, 591 U.S. at 87.  However, with respect to the remaining contributions at issue,

---

[12]    The SEC alleges that Sichenzio became involved with ICT/PAI in order to recover the money that Laura already owed him (presumably through profits earned on his investment in ICT/PAI) but does not speculate as to when or whether the prior loan was actually repaid.

which were made in 2010, because "any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty," the Court cannot find for Sichenzio.

Accordingly, the Court is satisfied that the SEC's proposed disgorgement amount as to Sichenzio is a reasonable approximation of profits causally connected to his violation, and Sichenzio has not demonstrated otherwise except with respect to the $50,000 that he contributed to ICT/PAI via Laura's law firm bank accounts on May 6, 2011, for which the SEC did not offset his disgorgement amount.  Accordingly, the Court subtracts $50,000 from the SEC's proposed disgorgement amount and orders Sichenzio to pay $1,629,369 in disgorgement.

## II.  Prejudgment Interest

In securities cases, "[p]rejudgment interest may be awarded on sums ordered disgorged in order to fully compensate the wronged party for actual damages suffered."  *SEC v. Frohling*, 851 F.3d 132, 139 (2d Cir. 2016).  The parties agreed in the Consent Judgments that the SEC was entitled to prejudgment interest on any disgorgement ordered "calculated from June 1, 2013, based on the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax."  ECF No. 175 at 4, 14.  The SEC has provided the Court with prejudgment interest calculations consistent with the parties' agreement in the Consent Judgments, and Defendants do not raise any issues with the SEC's calculations.  ECF No. 185-2; ECF No.185-3.[13]  Accordingly, the SEC shall be awarded prejudgment interest in accordance with the Consent Judgments.

---

[13]     The Court notes that the SEC's prejudgment interest calculation for Sichenzio is based on its own calculation of his disgorgement obligation, which the Court has decreased as set forth below in this Order.  The Court will direct the SEC to submit a revised prejudgment interest calculation for Sichenzio based on the revised disgorgement amount before awarding prejudgment interest.

III.     **Civil Monetary Penalties**

If the Court chooses to impose a civil penalty, the statutory maximum penalty that the

Court can impose per violation is "the greater of the current statutory amount in effect at the time

of the violation, *or* the gross amount of pecuniary gain to such defendant."  *Shkreli*, 2022 WL

5441792, at *3.  The SEC argues that a civil penalty in the amount of each Defendant's net

pecuniary gain is warranted, and asks the Court to impose civil penalties equal to the amount of

disgorgement it seeks for each Defendant.  ECF No. 183 at 13.  Defendants do not contest that a

Tier III civil penalty may be warranted[14] but ask the Court to impose a "one-time Tier III penalty

of $140,000 as against each of Sichenzio and Laura," based on the $160,000 civil penalty

imposed upon their co-defendant Walter Gil de Rubio, who accepted responsibility and settled

with the SEC before summary judgment.  ECF No. 182 at 18.  The Court agrees that a civil

penalty is warranted and that any such penalty should be tied to the Defendants' net pecuniary

gain, with adjustments based on the *Fowler* Factors.  However, the Court cannot impose the

specific penalties that the SEC seeks.

As the Court explained in *Laura II*, although the National Defense Authorization Act for

Fiscal Year 2021 (the "NDAA") amended the Securities Exchange Act of 1934 to establish a

ten-year statute of limitation period for certain disgorgement claims and equitable relief, and

applied that amendment to any currently pending proceeding, the Second Circuit has clarified

that even in a post-NDAA world, "civil penalties [claims] remain[] subject to § 2462's five-year

---

14      Defendants argue generally that they did not profit from their misconduct and that
therefore no monetary relief is warranted.  *See generally* ECF No. 182.  However, they appear to
concede that if the Court determines that they did profit from their misconduct such that
disgorgement is warranted, and the Court has so-determined, then a Tier III civil penalty may be
appropriate.

statute of limitations."[15]  *Fowler*, 6 F. 4th at 260 n.5.  Therefore, while in connection with the instant motion the SEC was correct to apply a ten-year statute of limitation period to its disgorgement calculations, it must use a five-year statute of limitations period in calculating the appropriate civil penalty amount.  *SEC v. Xia*, No. 21-cv-5350, 2022 WL 17539124, at *13 (E.D.N.Y. Dec. 8, 2022) (civil penalties subject to original five-year statute of limitations even after the NDAA).  The SEC ignores this distinction in its papers, asking the Court to order civil penalties in the amount of disgorgement because those amounts represent the "net pecuniary gain" that each defendant obtained and therefore are less than the potential statutory maximum of "gross pecuniary gain to each defendant."  ECF No. 183 at 12–13.  However, the net and gross pecuniary gain calculations that the SEC puts forward in its briefing are based on the ten-year statute of limitations period applicable to disgorgement and do not account for any adjustments that must be made to bring the calculations in line with the five-year statute of limitations period applicable to civil penalties.[16]

Keeping this in mind, the Court moves on to consider the *Fowler* Factors.  The first four *Fowler* Factors suggest that a significant civil penalty in line with the Defendants' net pecuniary gain within the five-year statute of limitations period is appropriate.  Defendants' conduct was intentional, repeated, and egregious.  As alleged in the Complaint, over more than five years, Defendants repeatedly, intentionally, and egregiously lied to investors and misappropriated investor funds for their own personal use.  ECF No. 1 ¶¶ 1, 22–42, 45-46, 53–54.  As a result,

---

[15]   The Court specifically explained in its summary judgment decision that "civil penalties for all of the SEC's claims are still subject to the original five-year statute of limitations." *Laura*, 680 F. Supp. 3d at 236.  The parties apparently did not take notice.

[16]   In their insistence that a one-time Tier III penalty of $140,000 is appropriate, Defendants ignore the statute of limitations issue in their papers.  ECF No. 182 at 17–18.

investors suffered substantial losses of almost $12 million.  *Id.* ¶¶ 3, 5; *see also* ECF No. 178 ¶¶ 9–13.[17]

With respect to the fifth *Fowler* Factor, Defendants do not argue that their current and future financial position suggest that the Court should reduce any penalty it intends to impose (this is not surprising since Defendants do not address the *Fowler* Factors at all).  However, certain events have transpired since the parties completed their briefing on the motion for damages that are relevant to the Court's analysis of this factor.  On March 26, 2024, Defendants' counsel filed a motion to withdraw, explaining that "[o]ver the last few months" the firm had made "many attempts to be paid, to no avail" despite warning Defendants that if the firm was not paid it would need to withdraw.  ECF No. 188-1 at 2 (Motion to Withdraw).  The Court granted the motion on April 2, 2024.  On May 1, 2024, Defendants filed a *pro se* letter with the Court in which they explained that they were "vigorously trying to borrow money from friends and family" to allow them to either re-engage their prior counsel or find new counsel.  ECF No. 190 (*Pro Se* Letter from Defendants).  In their letter, Defendants explained that "Mr. Sichenzio has been unemployed since October 2018," that Mr. Laura was "currently engaged with a startup facing real financial challenges" and that both Defendants were "struggl[ing] to pay [their] legal bills and to also support [their] families during this time."  *Id.*  The Court credits Defendants' assertions regarding their respective financial positions and finds that the civil penalty should be reduced to account for their limited financial condition currently and going forward.

Having found that a civil penalty tied to Defendants' net pecuniary gain across the applicable five-year statute of limitations period and reduced to account for Defendants'

---

[17]  As the Court has already recognized in its disgorgement discussion, the Defendants also invested funds in ICT/PAI—these investments are why the Court believes a civil penalty tied to Defendants' *net* pecuniary gain rather than their *gross* pecuniary gain is appropriate.

financial wherewithal is appropriate, the Court must now determine Defendants' gross and net pecuniary gain for the period within the five-year statute of limitations.  As discussed above, the Court cannot rely on the calculations provided by the SEC for this exercise because of the SEC"s failure to adjust its calculations to adjust for the relevant statute of limitations.

In determining the starting date for the five-year statute of limitations applicable to the Court's civil penalty calculation, the Court can look to Judge Garaufis's decision on Defendants' motion to dismiss, which was issued on March 24, 2020, *before* the NDAA amended the statute of limitations period for certain disgorgement claims and equitable relief.  *See generally SEC v. Laura*, No. 18-cv-5075, 2020 WL 1434114 (E.D.N.Y. Mar. 24, 2020) ("*Laura I*").  Accordingly, at the time the motion to dismiss was filed and Judge Garaufis issued his decision, a five-year statute of limitations applied to all remedies that the SEC sought (injunctive relief, disgorgement, and civil monetary penalties).  In their motion to dismiss, Defendants had argued that all claims based on factual allegations prior to September 8, 2013, were time-barred because the Complaint was filed on September 7, 2018.  ECF No. 37-1 at 23 (Motion to Dismiss).  In his decision, Judge Garaufis held that, "accounting for the parties' tolling agreements, . . . the SEC cannot obtain relief for any conduct occurring prior to June 2, 2013."  *Laura I*, 2020 WL 1434114, at *5.  Accordingly, and consistent with Judge Garaufis's decision, the Court will use June 2, 2013, as the starting point in calculating the appropriate civil penalty to impose.

Unfortunately, the Court's analysis cannot proceed beyond this point.  Because the Court found that the SEC's calculation of Defendants' net and gross pecuniary gain over the ten-year period relevant to disgorgement was largely a reasonable approximation of profits causally connected to Defendants' violations (with one exception as to Sichenzio), the Court attempted to use the methodology and exhibits put forward by the SEC to determine Defendants' gross and

net pecuniary gain over the five-year period relevant to civil penalties. However, the Court was unable to do so because certain of the exhibits provided by the SEC in support of its calculations do not list any dates on which the relevant debits and credits occurred, *see, e.g.*, ECF No. 178-12, and others list only the year during which the relevant debits and credits occurred without providing a specific date, *see, e.g.*, ECF No. 178-11. This makes it impossible for the Court to determine which funds were spent and received prior to June 2, 2013, and which were spent and received thereafter.

Accordingly, to enable the Court to accurately determine an appropriate civil penalty for each Defendant, the Court hereby directs the SEC to file, on or before August 9, 2024, a revised civil penalty calculation of each Defendant's gross and net pecuniary gain using June 2, 2013, as the starting date. These amounts must be calculated consistently with the methods the SEC used in its disgorgement analyses, *see* ECF Nos. 178–179, 184–185, and with this Order. Defendants may file their own civil penalty calculation in response to the SEC's calculation on or before August 23, 2024. Defendants must account for the issues already determined in this Order in their submission and may not use their civil penalty calculation as an opportunity to relitigate the Court's findings. Any letters submitted in connection with the parties' civil penalty calculation may not exceed five pages, and parties' submissions must comply with the requirements set forth in Section IV.B. of the Court's Individual Practices with respect to the length and number of affidavits and exhibits.

## **CONCLUSION**

For the foregoing reasons, the Court GRANTS in part the SEC's Motion for Damages and orders Laura to pay $3,431,860 in disgorgement and $1,732,128 in prejudgment interest,[18]

---

[18]     The SEC submitted a prejudgment interest calculation for Laura based on the parties' agreement in the Consent Judgments, which the Court has reviewed.  ECF No. 185-2.

and Sichenzio to pay $1,629,369 in disgorgement.   On or before August 9, 2024, the SEC shall

file:  (1) a revised calculation of Sichenzio's prejudgment interest that reflects the adjustments to

his disgorgement amount made in this Order; and (2) a revised civil penalty calculation as

discussed in Section III, *supra*.  If Defendants wish to file their own civil penalty calculation in

response to the SEC's submission, they must do so on or before August 23, 2024, as set forth in

Section III, *supra*.  Once the Court has reviewed the parties' submissions, it will impose

prejudgment interest on Sichenzio and civil penalties on each Defendant consistent with the

analysis already conducted in this Order.  At that time, the Court will direct the Clerk of Court to

enter judgment.  The Clerk of Court is respectfully directed to mail a copy of this Order to

Defendants, and to note the mailing on the docket.

      SO ORDERED.

*/s/ Hector Gonzalez*
HECTOR GONZALEZ
United States District Judge

Dated: Brooklyn, New York
       July 9, 2024

---

Defendants do not contest that this calculation is consistent with the Consent Judgments.
Accordingly, the Court orders Laura to pay prejudgment interest based on this calculation.